# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| BUILDING TRADES UNITED PENSION TRUST FUND, On Behalf of Itself and All Others Similarly Situated,<br><br>     Plaintiff,<br><br> vs.<br><br>ST. JUDE MEDICAL, INC., DANIEL J. STARKS, JOHN C. HEINMILLER, ERIC S. FAIN, MICHAEL T. ROUSSEAU,<br><br>     Defendants.<br><br>_____<br><br>In re ST. JUDE MEDICAL, INC. SECURITIES LITIGATION<br><br>_____<br><br>This Document Relates To:<br><br> ALL ACTIONS.<br><br>_____ | Civ. No. 0:10-cv-00851-JNE-JJK<br><br><u>CLASS ACTION</u><br><br>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND OVERVIEW ................................................................. 1

II.     JURISDICTION AND VENUE .......................................................................... 5

III.     PARTIES ........................................................................................................... 6

IV.     SOURCES OF ALLEGATIONS ....................................................................... 9

V.     BACKGROUND TO DEFENDANTS' SCHEME ............................................ 12

     A.     Nature of STJ's Business and Competition ................................................ 12

     B.     STJ Relies on Heavily Discounted Bulk Sales to Inflate Revenues Beyond Legitimate Demand for Its Products ............................................... 15

     C.     By 2009, a Deepening Economic Recession Was Wreaking Havoc on STJ's Business ....................................................................................... 22

     D.     Defendants Manipulate STJ's Financial Statements and Guidance to Conceal the Economic Impact on Its Business ........................................... 24

VI.     MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS AND FRAUDULENT SCHEME AND COURSE OF BUSINESS BY DEFENDANTS DURING THE CLASS PERIOD .................... 29

     A.     1Q09 Press Release, Conference Call and Report on Form 10-Q (April 22 and May 12, 2009) ....................................................................... 29

     B.     1Q09 Guidance ............................................................................................ 35

     C.     May 12, 2009 Banc of America Securities Merrill Lynch Conference ...... 36

     D.     2Q09 Press Release, Conference Call and Report on Form 10-Q (July 22 and August 12, 2009) ................................................................... 38

     E.     2Q09 Guidance and Statements About Current Market Conditions ........... 42

     F.     September 10, 2009 Thomas Weisel Partners Healthcare Conference and September 15, 2009 Morgan Stanley Healthcare Conference ............. 45

VII.     DAMAGES, LOSS CAUSATION AND RELIANCE ......................................... 52

VIII.     STJ'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP AND SEC RULES ........................... 61

**Page**

A.      STJ's Accounting Treatment for Bulk Sales Was Improper and STJ
        Omitted to Make Required Disclosures of Those Transactions in Its
        SEC Filings ................................................................................................ 62

B.      Applicable Accounting Rules for Bulk Sales ............................................. 67

C.      STJ Improperly Accounted for Rebates in Violation of GAAP and
        Its Own Publicly Disclosed Policy ............................................................ 72

D.      STJ Improperly Accounted for Consignment Inventory as Sales in
        Violation of GAAP and Its Own Publicly Disclosed Policy ...................... 74

E.      Other GAAP Violations ............................................................................. 77

F.      STJ's Misstatements Were Material .......................................................... 80

IX.     ADDITIONAL SCIENTER AND CONTROL PERSON ALLEGATIONS ........ 82

A.      Insider Trading .......................................................................................... 83

B.      Bonuses and Other Incentive Compensation ............................................. 84

C.      SOX Certifications ..................................................................................... 86

X.      ADDITIONAL CONTROL PERSON ALLEGATIONS ..................................... 89

XII.    CLASS ACTION AND FRAUD ON THE MARKET ALLEGATIONS ............. 91

# I.    INTRODUCTION AND OVERVIEW

1.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the securities of St. Jude Medical, Inc. ("STJ" or the "Company") between April 22, 2009 and October 6, 2009, inclusive ("the Class Period"), against STJ and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     STJ is a medical device manufacturer based in St. Paul, Minnesota.  Plaintiffs allege that during, and even prior to the Class Period, STJ ran its business in a manner which operated as a fraud or deceit upon investors by using a variety of improper artifices and devices to inflate revenues and conceal declining demand for its products and the impact of a recessionary economic environment on its business and operations.   In particular, defendants: (i) failed to disclose the extent to which STJ's business was reliant upon heavily discounted, end-of-quarter bulk sales to meet forecast expectations for its performance; (ii) issued materially false and misleading financial statements that failed to properly account for revenues from bulk sales and associated rebates and other inducements; (iii) issued financial guidance to investors that was contradicted by STJ's internal forecasts; and (iv) concealed the extent to which an ongoing economic recession was affecting or could potentially affect sales of and demand for the Company's products.

3.     Through extraordinary discounts, rebates and other inducements, STJ had been able to coerce its customers into purchasing more medical devices than they could reasonably anticipate using before the products' limited shelf lives expired.  STJ's end-of-quarter sales were therefore cannibalizing sales from future periods, and its business

- 1 -

practices were unsustainable.   While the practice assisted the Company in meeting the quarterly earnings expectations defendants had set for the market, the sales purportedly generated by the bulk sales created a false picture of demand, and generated artificially inflated earnings.   Defendants, recognizing the true state of demand for STJ's products, dumped more than $15 million of their personal holdings in STJ stock during the Class Period.

4.     Defendants used a variety of improper business practices and fraudulent accounting techniques to conceal these circumstances from investors, including by failing to disclose the extent of its bulk sales, as required by Generally Accepted Accounting Principles ("GAAP"), improperly booking revenues on bulk sale products which STJ had agreed to replace if they expired before they could be used, and failing to account for rebates consistent with the Company's stated accounting policies.

5.     To further conceal their actions and the extent to which an ongoing economic recession was affecting the business, defendants issued guidance that was deliberately inflated from STJ's internal financial forecasts.   Although STJ had developed a highly-accurate statistical forecast model that had dramatically improved its ability to forecast future sales, it regularly ignored the data generated by that model in providing forecasts to investors.   Instead, defendants continued relying upon STJ's historic and unreliable method of generating forecasts based on "top-down" financial goals set by senior management which low-level sales staff had been coerced to agree to meet.

6.     Heading into the Class Period, prior sales of STJ's products had resulted in a large buildup of excess and unnecessary inventory on its customers shelves.   This inventory

- 2 -

buildup, together with recessionary economic pressures, had caused many hospitals to scale back on their willingness to engage in large, end-of-quarter bulk purchases of STJ's products. Business executives and sales personnel throughout STJ's operations recognized that 2009 was going to be an extraordinarily difficult year. Nevertheless, at the outset of the year, STJ – alone among its competitors – raised its financial guidance and told investors its business was well insulated from the economic conditions then roiling the markets. In fact, due to its extensive reliance on bulk sales of products in amounts that exceeded customers' demand, STJ's business was at great risk of declining during an extended recession.

7. The Class Period begins when STJ issued its financial results for 1Q09, reporting that the Company experienced stable growth and market share gains throughout the period despite the global economic recession. Defendants further assured investors that the Company was well poised for continued growth, and that there were no signs of any slowdown, striking a defiant tone they would maintain throughout the Class Period. Defendants touted the introduction of new products that would support STJ's continued growth, and claimed their business was better managed and more resistant to a recession than their competitors. Unlike its competitors, STJ claimed, the Company's workers did not have to worry about losing their jobs. To reinforce those assertions, STJ reaffirmed its earnings per share ("EPS") guidance in the first and second quarters of 2009.

8. Despite their repeated representations to the market that the Company would enjoy continued double digit growth into the foreseeable future, defendants knew or recklessly disregarded that the Company's reliance on end-of-quarter bulk sales was ultimately unsustainable. In response to the weakening economy and increased shelf

- 3 -

inventory at the outset of 1Q09, hospitals were even more disinclined to absorb excess inventory of expensive and unnecessary products, even at STJ's steeply discounted prices. Further, by 1Q09, defendants had begun to recognize that the market was not as receptive to STJ's new products as the Company had anticipated.  Recognizing internally that sales would be insufficient to meet their misleading guidance, defendants caused STJ to issue and sell $1.2 billion in debt securities at the end of 2Q09, then used most of the proceeds to buy back Company stock in a desperate attempt to make STJ's EPS guidance easier to meet by expediently reducing the number of shares outstanding in the market.  To counter weakening demand, the Company imposed more unrealistic sales goals on its sales force in the second and third quarters, then was forced to layoff an increasing number of workers when those goals could not be achieved.  Before the end of the third quarter, STJ had laid off more than 10% of its domestic sales force due to the impact of negative economic conditions on its business.

9.     On October 6, 2009, just weeks after defendants had reaffirmed that STJ was purportedly on track to meet its forecast guidance, the Company shocked investors by revealing a stunning miss in its 3Q09 forecast results.  Revenue in every product line was down, STJ admitted in a press release issued that day, and overall revenues for the quarter would be 20% below the forecast defendants had just reaffirmed.  Defendants would later claim that the earnings miss had resulted from 50 hospitals (out of 1,600 customers) refusing to make bulk purchases of its products.  Finally acknowledging that the economy was affecting, and would continue to affect, STJ's business, defendants reduced the Company's earnings guidance for the remainder of the year.

- 4 -

10.     On this news, STJ's common stock fell immediately, declining by $4.84, or 12.7%, on exceptionally high trading volume on October 6, 2009, causing millions of dollars in damages to plaintiffs and other members of the class:



## II.     JURISDICTION AND VENUE

11.     Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arose under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") (17 C.F.R. §240.10b-5).

- 5 -

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  STJ's corporate headquarters are located in St. Paul, Minnesota, where the day-to-day operations of the Company are directed and managed.  Many of the false and misleading statements were made in or issued from this District and many of the acts and practices complained of herein occurred or were directed in substantial part in this District.

14.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, the Internet, interstate telephone communications and the facilities of the national securities markets.

## III.   PARTIES

15.     Lead plaintiff Building Trades United Pension Trust Fund ("Pension Trust Fund") is a Taft-Hartley defined pension trust fund with over $1 billion in assets located in Wisconsin.  The Pension Trust Fund provides pension services and benefits to approximately 23,000 participants.  The Pension Trust Fund purchased 21,900 shares of STJ common stock during the Class Period, as described in the attached certification, and was damaged thereby.

16.     Plaintiff City of Taylor Police and Fire Retirement System purchased 6,260 shares of STJ common stock during the Class Period, as described in the certification attached to the Class Action Complaint for Violations of Federal Securities Laws it filed in this action on March 18, 2010, and was damaged thereby.

- 6 -

17.     Defendant STJ develops, manufactures and distributes cardiovascular and implantable neurostimulation medical devices worldwide.  The Company employs 14,000 people, and operates in four segments.  The Cardiac Rhythm Management ("CRM") segment focuses on implantable cardioverter defibrillator systems ("ICDs") to address irregular heartbeats.  The Cardiovascular ("CV") segment develops products for cardiology and cardiac surgery, such as replacement heart valves.  The Atrial Fibrillation ("AF") segment provides products for assisting physicians in diagnosing and treating irregular heart rhythms.  The Neuromodulation ("NMD") segment offers a range of devices generally used for pain management related to nerve damage or nervous system disorders.

18.     Defendant Daniel J. Starks ("Starks") served as STJ's Chairman, President and Chief Executive Officer ("CEO") during the Class Period.  As CEO, Starks is charged with overseeing and directing the day-to-day business of STJ.  As both Chairman and CEO of STJ, Starks has extensive control over all of STJ's operations, including all of the transactions and conduct giving rise to this action.  Prior to assuming his role as Chairman, President and CEO of STJ in 2004, Starks was President and Chief Operating Officer ("COO") of STJ from 2001, and President and CEO of its CRM business from 1998.  He was previously the CEO and President of Daig Corporation, another medical devices company, after it became a wholly-owned subsidiary of STJ.  During the Class Period, Starks prepared or authorized and signed STJ's SEC filings and Sarbanes-Oxley Act of 2002 ("SOX") certifications, prepared or authorized the press releases containing the false and misleading statements alleged herein, and participated in or directed STJ's conference calls

- 7 -

with and presentations to analysts throughout the Class Period in which he and the other individual defendants made false statements, as alleged herein.

19.     Defendant John C. Heinmiller ("Heinmiller") served as STJ's Chief Financial Officer ("CFO") and Executive Vice President during the Class Period.  In addition to his role as CFO, to which he was appointed in 1998, Heinmiller has served in several other capacities at STJ, including Vice President of Finance and Vice President of Corporate Business Development.  Heinmiller was a member of the Board of Directors of Daig Corporation from 1993 until its acquisition by STJ in 1996.  He also served as CFO of Lifecore Biomedical, Inc., a medical and surgical products company, from 1991 to 1995, and as an audit partner at Grant Thornton, LLP from 1986 to 1991.  During the Class Period, Heinmiller prepared or authorized and signed STJ's SEC filings and SOX certifications, prepared or authorized the press releases containing the false and misleading statements alleged herein, and participated in or directed STJ's conference calls with and presentations to analysts throughout the Class Period in which he and the other individual defendants made false statements, as alleged herein.  Heinmiller is a licensed Certified Public Accountant.

20.     Defendant Eric S. Fain ("Fain") served as President of the Cardiac Rhythm Management Division ("CRMD") at STJ throughout the Class Period.  Prior to his promotion to that position in 2007, Fain held several other positions within the CRMD, including as Senior Vice President, and then Executive Vice President of Development and Clinical/Regulatory Affairs from 1998 onwards.  Fain helped prepare for and participated in each of the quarterly conference calls with analysts held by STJ during the Class Period in which false statements were made, as alleged herein.

- 8 -

21.     Defendant Michael T. Rousseau ("Rousseau") served as Group President of STJ, responsible for STJ's four product divisions, throughout the Class Period.  Rousseau held several positions at STJ after he joined the Company in 1999 until being named Group President, including as President of STJ's U.S. Division, and as Senior Vice President of Sales and Marketing.  Rousseau helped prepare for and participated in each of the quarterly conference calls with analysts held by STJ during the Class Period in which false statements were made, as alleged herein.

22.     The individuals named as defendants in ¶¶18-21 are collectively referred to herein as the "Individual Defendants."

## IV.     SOURCES OF ALLEGATIONS

23.     Plaintiffs' allegations are based upon the investigation of plaintiffs' counsel, including information contained in SEC filings by STJ, regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases, conference call transcripts and other public statements issued by the Company, as well as media reports and other sources of information about the Company, including information obtained from more than 20 former employees of STJ.  Information provided by the former employees is reliable and credible because: (a) each of the witnesses worked at STJ during or immediately prior to the Class Period; (b) each witness stated that she/he had personal knowledge of the information provided; (c) the witnesses' job titles and responsibilities show that they had personal knowledge of the information provided; (d) the witness accounts corroborate one another; and (e) the witness accounts are corroborated by other information alleged herein.

- 9 -

24.     Confidential Witness No. 1 ("CW1") was a Senior Field Finance Manager in the Cardiovascular Sales Division of STJ from 2007 until 2010.  In connection with this position, CW1 participated in monthly and quarterly conference calls with other divisions within STJ to assess how the different divisions were performing relative to their goals.

25.     Confidential Witness No. 2 ("CW2") worked as a Project Lead for STJ's Customer Relationship Management system within STJ's CRMD, from March 2007 to August 2009.  CW2's job was terminated as part of the wide-scale reduction in workforce in the third quarter of 2009.

26.     Confidential Witness No. 3 ("CW3") worked at STJ as a Corporate Accounts Manager from approximately 2005 to August 2009, when CW3's position was eliminated as part of the reduction in workforce in 3Q09.  In this position, CW3 was responsible for negotiating and transacting bulk purchases of products from all of STJ's divisions.

27.     Confidential Witness No. 4 ("CW4") worked at STJ as a CRM Sales Representative in Las Vegas, Nevada between December 1998 until August 2009.

28.     Confidential Witness No. 5 ("CW5") worked as a Direct Sales Representative at STJ from 2006 to July 2009.  CW5's principal responsibility was CRM sales in a major metropolitan area in Texas.

29.     Confidential Witness No. 6 ("CW6") worked as a Regional Sales Manager for the CRM Product Group at STJ from approximately 2005 to early 2010.

30.     Confidential Witness No. 7 ("CW7") worked at STJ as a Technical Services Specialist within the STJ U.S. sales division, principally responsible for the sale and support

- 10 -

of CRM products.  CW7 worked at STJ from approximately 2001 to August 2009, when CW7 was terminated as part of the Company-wide reduction in force.

31.     Confidential Witness No. 8 ("CW8") worked at STJ between 2006 and 2009 as a Senior Marketing Manager and then as a Regional Sales Manager.  While at STJ, CW8 was tasked with improving STJ's CRM sales forecasting methodologies for its internal forecasts reflecting the sales goals the Company hoped to achieve within a given period.

32.     Confidential Witness No. 9 ("CW9") worked at STJ as a Senior Financial Analyst from 2006 to August 2008, and was involved in developing revenue forecasting methodologies.

33.     Confidential Witness No. 10 ("CW10") worked at STJ as a Reporting Analyst from approximately 2004 to August 2009, when CW10 was terminated as part of a wide-ranging reduction in force of the U.S. sales division.  As a Reporting Analyst, CW10 was responsible for preparing daily reports that detailed sales for all of STJ's products on a daily, weekly, monthly and quarterly basis, and also provided information about the sales achieved by individual sales representatives in different regions.

34.     Confidential Witness No. 11 ("CW11") worked at STJ from 2006 to July 2009. For two years CW11 worked as a CRM Sales Representative in Northern California, and then as a Senior Technical Service Specialist, tasked with providing support to customers of STJ within the same region.

35.     Confidential Witness No. 12 ("CW12") was a Vice President of Corporate Brand and Marketing at STJ until December 2009.

36.     Confidential Witness No. 13 ("CW13") worked at STJ beginning in 2006 until CW13 was laid off in mid-2009 as part of the Company's wide-ranging workforce reduction. During that time CW13 worked within Customer Relationship Management, and was responsible for the deployment of a system used by the Company's sales force to track and monitor sales activity and product serial numbers.

37.     Confidential Witness No. 14 ("CW14") worked as a Project Manager for STJ's Corporate Accounts Group until the end of 2008.   CW14's responsibilities included determining pricing for discounts on end of quarter bulk sales.

38.     Confidential Witness No. 15 ("CW15") worked at STJ intermittently from 2006 to 2009 as a Financial Analyst involved in strategic planning and forecasting for several divisions, including CRM.

## V.     BACKGROUND TO DEFENDANTS' SCHEME

### A.     Nature of STJ's Business and Competition

39.     STJ develops, manufactures and distributes cardiovascular and other medical devices worldwide.   STJ sells four basic types of products: (1) CRM products, including pacemakers and ICDs designed to regulate and control heartbeats in patients with advanced stage heart disease; (2) AF products, designed to assist physicians in diagnosing and treating various irregular heart rhythms used in the electrophysiology laboratories and cardiac surgery, including catheters and ablation systems; (3) NMD products such as rechargeable implantable pulse generators and radio frequency powered neurostimulation systems; and (4) CV products, including heart valves and other products used in open heart surgery.

- 12 -

573787_1

40.     CRM devices, which typically sell for $10,000-$20,000 or more apiece, make up the largest segment of STJ's business, accounting for approximately 60% of the Company's sales immediately prior to and during the Class Period.  AF and neurostimulation products represented the fastest growing market segments for the Company, although they represented just 13% and 7% of its annual sales respectively.  The CV business is STJ's oldest, and accounts for approximately 20% of its annual sales.

41.     The following charts reflect STJ's net sales and operating profits by reportable segment, which combine the CRM and NMD divisions and the CV and AF divisions.





42.     The worldwide market for CRM products is worth approximately $11 billion in annual sales and is dominated by three companies: STJ, Medtronic, Inc. ("MDT") and Boston Scientific Corporation ("BSX").  As a result of product recalls that had eroded physician and patient confidence in CRM devices, there has been little growth in the overall market for CRM products.  The total CRM market grew from approximately $9.29 billion in 2005 to approximately $10.22 billion by the beginning of 2009, reflecting a compound annual growth rate of only 3.23%.  As a result, market share and revenue gains by one company are typically matched by market share and revenue declines by its competitors.

43.     Prior to the Class Period, MDT accounted for approximately half of worldwide CRM sales, while STJ and BSX had each captured approximately one-quarter of the market.  STJ was the fastest-growing of the three, having increased its market share from 20% in

- 14 -

2005 to 26% by the beginning of 2009.  STJ's stated goal was to capture a third of the market by 2012.



**2008 Net Sales from CRM**
**(In Billions of Dollars, Except Percentages)**

$2.4  24%    $2.7  26%

□ St. Jude
■ Medtronic Inc (Adjusted)
▩ Boston Scientific Corp

$5.1  50%

44.    Most of STJ's market share gains had come at the expense of MDT whose CRM revenues and market share declined while STJ's was rising.  Product recalls by BSX (and its predecessor in the CRM business, Guidant Corporation ("Guidant")) in 2006 and MDT in 2007 had eroded each of those companies' sales, providing an opening for STJ to gain a stronger foothold in the CRM market.  STJ did so principally by competing on price, and became well known in the market as the low priced CRM alternative.  While STJ, like its competitors, attempted to differentiate its products based on technology, the differences between competing products were viewed as clinically insignificant to many physicians and patients.  By the beginning of the Class Period, CRM devices were widely viewed as rapidly becoming interchangeable commodities.

**B.     STJ Relies on Heavily Discounted Bulk Sales to Inflate Revenues Beyond Legitimate Demand for Its Products**

45.    STJ relies on heavily discounted, end-of-quarter bulk sales to meet its sales and earnings estimates.  The extent to which it did so was concealed from investors during and

- 15 -

prior to the Class Period, as were the risks to its business arising from those sales.  In particular, a deepening recession affecting the health care industry in 2009 coupled with numerous hospitals having bloated inventories of STJ CRM products at the outset of the year due to previously completed bulk sales, made STJ particularly vulnerable to missing its earnings forecasts during the Class Period.  Despite this, defendants raised STJ's guidance and told investors that, due to the nature of the products it sold, the Company was well insulated from the negative effects of the economic downturn that existed during the Class Period.

46.     STJ's bulk sales – referred to internally as QPs – were critical to its ability to meet quarterly CRM sales and revenue projections and earnings estimates provided to the market.  CW1, CW3.  The Company's practice of making its numbers by way of QPs was at the heart of STJ's business.  According to CW13, it was "a well oiled machine."  STJ's bulk sales were accomplished outside of normal sales channels by 16 corporate account managers working with regional sales managers and sales vice presidents.  CW1, CW2.  The QPs were not driven by individual sales personnel, but by a highly specialized Corporate Accounts Group within the U.S. sales division which determined the appropriate pricing to extend to meet sales revenue goals.  CW1, CW14.

47.     The QPs were negotiated at significant discounts, which varied from account to account and region to region.  CW3.  To make up for the heavy discounts offered in the QPs, the Company had to move a higher number of products to achieve its monetary sales revenue goal, frequently inducing customers to purchase more devices then they could reasonably expect to use in the near term, and eroding future sales opportunities.  To meet QP goals, the

- 16 -

Company sold "a ton of volume but with poor margins" and a very low average selling price. CW14. STJ engaged in so many bulk sales in some regions that the practice changed from an incentive to an expectation. For example, by 2009 it had gotten to the point that Catholic Healthcare West, which operated 41 hospitals that purchased products from STJ, "wouldn't even negotiate until the end of the quarter." CW4. Catholic Healthcare West was not alone; many other hospitals engaged in the same practice. Because STJ was selling so many CRM devices through QPs, the reported sales did not reflect actual demand for its products – *i.e.*, the use of its products by doctors and patients. CW5.

48.     If a hospital purchased more CRM devices than it could use in the next three months, there was a substantial risk that it would reduce or eliminate bulk purchases of CRM devices in subsequent quarters or that it would be in a position to demand still greater discounts. CW1, CW3, CW4, CW6. As a result, STJ was at greater risk of lost sales during times of economic uncertainty such as in 2009, when cash-strapped hospitals faced with declining procedure volumes and tightening healthcare reimbursement policies were more likely to discontinue bulk purchases of CRM devices – which, even at discounted prices, were still among the most expensive consumable devices purchased by hospitals. As economic conditions worsened in 2009, many hospitals began telling STJ that they could no longer participate in bulk sales. CW1.

49.     Although many sales representatives believed that the bulk sales were akin to "robbing Peter to pay Paul," STJ continued aggressively pushing customers to engage in QPs because without those sales, STJ could not report quarterly financial results that were in line with the expectations defendants had set for the Street. CW3, CW7. As a result of these

- 17 -

undisclosed aggressive sales practices, some hospitals had 20-40 CRM devices that would "sit on their shelves up until their expiration dates." CW4. It "got to the point that we were loading up so much" product on customers that "it would take the entire next quarter or longer to move the stuff off the shelf," recalled CW4. Yet, STJ would still push those hospitals to engage in further bulk sales. CW4. Although it might be difficult to get them to do so, the feeling among STJ sales staff was that "if the price was low enough, maybe you could get another order." CW4. It was readily apparent to STJ's sales force and other personnel that the practice was unsustainable. CW1, CW3, CW4, CW5, CW14. "There are only so many procedures" that are going to be performed at a given hospital, explained CW5. Nevertheless, the practice continued because, as CW3 said, the current quarter "was always the most important" one to the Company.

50.    STJ used various incentives to induce customers to purchase more CRM devices then they needed. As part of QPs, STJ would frequently exchange products sold as part of prior bulk sales that were nearing the end of their shelf life because their batteries were too old to permit the device to be implanted into patients, or promised to do so if the devices purchased in a current quarter could not be utilized.[1] CW1, CW8. Agreements to exchange products were not put in writing, but instead were based on verbal agreements between STJ sales staff and hospital purchasing agents. CW6, CW8. As a result, it was easier to conceal the exchange of older products for newer devices. There was enormous

---

[1]    CRM devices are powered by batteries, and therefore have a finite life and have to be replaced before the battery runs out. Replacement requires a subsequent invasive surgical procedure.

573787_1

pressure to live up to such agreements because failure to do so would create ill will that could lead hospitals to discontinue the use of STJ products.  CW5, CW6.  Swapping out CRM products that were close to expiration was also arranged through oral communications. CW4.  Although such exchanges were at one time arranged by e-mail, in 2007, STJ sales employees in at least one region that was a significant source of QPs during and prior to the Class Period were directed to stop using e-mail, and make all such arrangements by telephone instead so that "there was no e-mail trail" regarding the swaps.  CW4.  Although products sold by QPs were purportedly owned by the hospital, in practice STJ sales representatives were expected to manage that inventory, including by making sure that products were exchanged before they expired.  CW4.

51.    Prior to the Class Period, STJ had experienced problems with its sales reporting processes and systems.  CW13, CW14.  As CW14 reported, STJ "did not have a good handle" on sales reporting or on inventory.  Sales personnel kept stocks of inventory in their possession which they used to fulfill customer orders, and the Company relied on the sales people to fax in the details of their transactions.  CW14.  This system was susceptible to "gamesmanship" among the sales personnel, who could distort how and when they achieved their sales, even between quarters.  CW5.  To address the deficiencies in this system, which often resulted in late and inadequate sales reporting, the Company deployed the Siebel Customer Relationship Management ("Siebel") system, which facilitated the timely and accurate reporting of sales information by sales personnel, and transferred the data to the Company's headquarters.  CW2, CW7, CW10, CW13.  The Siebel system served two main functions: (i) registering the serial numbers of implanted STJ products with the

- 19 -

FDA; and (ii) internal tracking and monitoring of sales activity.  CW2, CW13.  In addition, the Siebel system tracked the shelf life of the CRM devices, so that the sales personnel were aware of when they were close to expiration and needed to be swapped out.  CW13.

52.     According to CW13, the adoption of the system by the sales force was extremely successful, so that by 2009, more than 96% of all transactions were timely input into the system.   However, for products sold in QPs, the serial numbers were *not* immediately entered in the Siebel system.  CW2, CW13.  This provided corporate account managers with an opportunity to swap or manipulate purportedly sold products that were nearing or had reached the end of their shelf life.  Despite this, the Siebel system still gave "extreme visibility" to STJ managers regarding sales, including a daily sales report, circulated among Company management as well as individual defendants Starks and Rousseau, which showed all recent sales activity as well as sales for the prior weeks and months.  CW10, CW13.  In addition to the daily reports generated by the Siebel system, the Company also generated monthly management reports which showed actual sales against the forecasted sales for the period, which were also presented to STJ executives.  CW15.

53.     STJ also used rebates to induce customers to continue purchasing CRM devices even when it had sufficient inventory to meet anticipated patient demand.  CW1, CW14.  For example, STJ would offer a customer a cash rebate if it purchased a certain number of CRM devices over a specified time period.  CW1, CW14.  The rebate was typically based on a percentage of the total amount of products the customer purchased from STJ during the designated period.  CW4.  Once the purchase requirement was met, the customer would be issued a rebate by STJ's accounts payable department.  CW1, CW14.

- 20 -

STJ accounted for the rebates as a reduction in sales in the period in which the rebate was issued, such that the payments would not be reflected in STJ's publicly filed financial statements during the Class Period. CW1, CW15.  However, because the rebates were only triggered upon a customer reaching a certain threshold, STJ's sales and finance personnel were unable to anticipate when or how the rebates would impact their sales numbers.  CW1.  If a rebate was triggered at the end of a quarter, the Company would have to compensate with additional sales to meet its numbers.  The rebates therefore could have a distorting effect on the Company's forecasts due to the manner in which STJ accounted for them.  CW1.

54.     In addition to end-of-quarter and end-of-year bulk sales, STJ employed other sales tactics to help meet its quarterly numbers.  For example, prior to the Class Period, STJ requested that a particular large distributor in Little Rock, Arkansas place orders for a certain number of devices prior to the close of a quarter.  CW13.  STJ then recognized revenue on the purported sales in direct violation of GAAP and the Company's own stated accounting policies, which allow recognition only upon the use of the product by the intended recipient.  CW13. *See infra* at §VIII.D.  This practice persisted throughout 2008, and CW13 indicated that it likely continued through the Class Period.

55.     STJ's misleading business practices were not limited to its CRM products.  Similar fraudulent sales practices in its other divisions, including undisclosed end-of-period QPs used to boost sales, manipulation of inventory purportedly already sold to a customer, and undocumented transactions involving products that were nearing the expiration of their useful life.

- 21 -

**C.   By 2009, a Deepening Economic Recession Was Wreaking Havoc on STJ's Business**

56.   At the outset of 2009, some analysts questioned whether STJ could continue to take market share away from its rivals, noting that BSX was re-entering markets it had been prohibited from selling into following the recall of its Guidant products, and that both MDT and BSX had introduced new products into the marketplace that were expected to compete favorably with STJ's products.  *See, e.g.*, Collins Stewart LLC STJ Report, Jan. 23, 2009 ("[W]hile the Company has been successful in capturing market share from its rivals, we expect this to become more difficult in 2009, as its competitors launch new products into the market."); Stanford Group Company STJ Company Update, Jan. 7, 2009 ("We have also slowed the market share growth for STJ modestly, trimming it by 0.1% in each quarter through the end of 2009, due to BSX's new product introductions, which compete with STJ's.").

57.   Analysts were also concerned over the potential slowing of the already limited growth in the overall CRM market as a result of the economic downturn, amid fears that hospitals would reduce advance purchases of CRM devices, and that procedure rates would slow as the result of greater numbers of uninsured patients and increased difficulties in obtaining reimbursement approval for those who were insured.  These concerns were fueled by negative results and lowered guidance reported by STJ's competitors at the end of 2008. MDT lowered growth expectations, warning of a flat to negative outlook for ICD implants and telling investors that "'business conditions and environmental turbulence drives a more conservative growth outlook for the foreseeable future.'"  Though BSX gained market share

- 22 -

in 4Q08 at MDT's expense, its sales were lower and expenses higher than in prior quarters, leading it to issue financial guidance for 2009 that was below Wall Street expectations.

58.     STJ, however, held fast to its forecasts, repeatedly assuring investors that its business was strongly "recession resistant," denying that it had seen any deterioration in the market for its products like that reported by its competitors, and claiming it was poised to continue growing both top line revenues and bottom line results by 15% over the prior year. On January 27, 2009, after exceeding expectations for its 4Q08 and FY08 financial results, STJ *raised* its FY09 revenue and earnings guidance, telling investors it believed it could continue to gain market share at historic rates.  Defendant Starks asserted that STJ's business, "[w]hile not recession-proof, . . . is strongly recession-resistant," and that investors could expect to see "double-digit average annual sales growth from each of our divisions . . . for the foreseeable future."  "Tough quarter to cast aspersions," wrote Morgan Stanley & Co. Inc. in a January 28, 2009 research report, "but impressive revenue guidance either reflects confidence in outlook or is not appropriately risk adjusted if CRM environment weakens or share gains become more challenging."

59.     In fact, by the beginning of 2009, if not earlier, it was clear to defendants that the economy *was* exerting a heavy toll on STJ.  Even as early as 2008, STJ's internal quantitative statistical forecasts showed that sales of STJ's CRM devices were on a downward sales trend, which was forecast to continue during 2009.  CW9.  Throughout 2009, STJ found it increasingly difficult to maintain its business as a result of the economic downturn.  CW1.  At the outset of the year, CW8 said she/he knew the combination of a deepening economic recession and overly "aspirational" sales forecasts was going to make it

- 23 -

difficult for the Company to achieve its forecast results.   CW13.   "The whole year was tough" due to the economy, said CW6, as virtually every region and salesperson was falling short of its CRM sales quota.   As few as four out of STJ's 73 regional sales managers attained their quarterly quotas for CRM sales during 2009, and 2008 had been similarly difficult.   CW6.   Indeed, many within the Company recognized that through 2007 and 2008 the CRM market had already become mature and saturated, which was reflected in an overall "flat" market for sales in 2008 and 2009.   CW6, CW13.   With little differentiation between the products from the competing companies, STJ increasingly had to rely on aggressive pricing and sales strategies such as quarter-end bulk sales to remain competitive.

60.     In particular, CW8 said, the economic downturn affected hospital purchasing decisions, making it "harder and harder" to complete the bulk sales which were critical to STJ's ability to meet its forecasts.   By the outset of 2009, hospitals were already telling STJ that they lacked the funding to continue engaging in bulk sales of CRM devices.   CW1.   In the Las Vegas region, for example, so many bulk sales had occurred in 4Q08 that virtually no such sales with major customers took place in 1Q09.   CW4.   Other regions, including Texas, were similarly "bulked up" with QPs at the outset of 2009.   CW5.

**D.     Defendants Manipulate STJ's Financial Statements and Guidance to Conceal the Economic Impact on Its Business**

61.     STJ's publicly issued financial statements and related earnings releases during the Class Period were materially misstated in violation of GAAP and SEC rules because defendants knowingly recognized revenues improperly in connection with the bulk sales (QPs) and rebates described above.   In addition, STJ had also violated GAAP in FY08 by

- 24 -

improperly recognizing revenues for certain "sales" that were actually consignments, establishing that STJ was already having difficulties meeting its own guidance prior to the Class Period.

62.    STJ's income statements and balance sheets were materially misstated in the Company's Forms 10-Q for the periods ended April 4, 2009 (1Q09) and July 4, 2009 (2Q09) because of STJ's improper accounting for those transactions.  STJ's improper accounting treatments of QP transactions and rebate transactions resulted in overstated revenues, net income and stockholders' equity in Forms 10-Q for 1Q09 and 2Q09.  STJ's improper accounting treatments of certain consignment transactions resulted in overstated revenues, net income, account receivable and stockholders' equity in Form 10-K for 2008.  In addition, the Company failed to make required disclosures regarding QP transactions in Form 10-K for 2008 and Forms 10-Q for 1Q09 and 2Q09, made false disclosures regarding transactions involving rebates in Forms 10-Q for 1Q09 and 2Q09, and made insufficient disclosures regarding transactions involving consignments in Form 10-K for 2008.

63.    In addition to misleading investors about current and historical financial results, defendants provided investors with deliberately inflated financial guidance intended to create the misleading appearance of financial success, thereby maintaining and increasing the artificial inflation in STJ's stock price.  Prior to the Class Period, STJ had sought to improve its forecasting methodology because the estimates from its sales organization had proven to be unreliable, and had directly lead to a significant earnings miss in 2007.  At a gathering of STJ employees following the earnings miss, Starks said that it was his "number one objective" to improve the accuracy of STJ's forecasting methods.  CW9.  At Starks'

- 25 -

direction, STJ's sales and marketing organization designed and implemented a new computer-based forecasting methodology, based on ForecastPro software.  CW8, CW9. ForecastPro was intended to be used to support the Company's publicly issued guidance, in contrast to the historical "top-down" forecast provided by management that was purportedly supported by "bottom-up" forecasts provided by the sales force describing plans to meet the goals set by management.  CW9, CW13, CW15.  In fact, STJ's sales force has been coerced to provide "bottoms-up" forecasts that simply reiterated the goals set by management regardless of whether there was a belief those goals could be met.  CW8, CW9, CW15.

64.     The ForecastPro system was up and running by mid-2007 and quickly proved to be much more reliable than the Company's historical qualitative approach to forecasting based on mandated predictions of sales results.  CW8, CW9.  Compared with STJ's historical forecast method, which had an accuracy rate between 65% and 80%, ForecastPro system had a 98% accuracy rate.  CW9, CW10.  The system, which relied on quantitative data including seven years of historical sales results of STJ and its competitors, was particularly accurate in predicting sales results within the U.S.  CW9.  However, STJ management did not like the ForecastPro forecasts because its results were always significantly lower than what they wanted to present to the Street.  CW8, CW9.  As a result, STJ continued to rely on its historical forecasting method to support its sales forecasts, ignoring the lower ForecastPro data.  CW8, CW9.

65.     During 2007 and 2008, STJ's financial performance projections provided to investors were consistently and substantially higher than the results predicted by ForecastPro, prompting CW9 to repeatedly ask CW9's supervisor whether the forecasts were

- 26 -

being provided to management.  CW8, CW9.  Near the end of 2007, CW9 told Rousseau that the forecasts provided to the Street were unsupported by ForecastPro's analysis.  Despite this, ForecastPro data continued to be disregarded by senior management, who continued to rely on STJ's historical forecasting method to support guidance given to the Street.  CW8, CW9.  To make up the difference between the two forecasts, as needed to meet the expectations they had set for the Company's performance, STJ continued pushing its largest customers to take additional CRM devices they didn't need through end-of-quarter bulk sales negotiated at substantial discounts under its QPs program.

66.    The conditions described by CW8 and CW9 continued during the Class Period, when separate CRM forecasts were provided to Starks by CRM division headquarters in Sylmar, California and by STJ's sales and marketing organization based in Austin, Texas.  CW1.  Unlike the quantitative statistical model used by ForecastPro, the sales forecasts that Starks relied upon had been "dictated downward" from STJ management, such that sales personnel were expected to provide forecasts that comported with what management wanted to hear.  CW1, CW5, CW6, CW9.  If the sales forecasts did not match what management wanted, intense pressure was placed on sales staff to increase their forecast – regardless of whether it was realistic to do so.  CW6, CW8, CW9.  If they refused to do so, they risked losing their jobs.  CW9.  In one representative example, a sales person was told she/he needed to increase sales of one product by 80% over the prior year, even though the forecast was clearly unreasonable.  CW5.  Another forecast provided to senior management was "overridden" for being "very conservative."  CW13.  In another case, a sales person was told that STJ's goal for 2009 was that 35% of its sales would be achieved by getting surgeons to

- 27 -

use STJ devices when replacing implanted BSX and MDT devices which had reached the end of their useful life. CW6. However, as defendants readily acknowledged, in practice such changes almost never occurred.[2] As a result of such actions, there was growing awareness within STJ that management's forecasts "ignored the economic realities" facing the Company in 2008 and 2009, and continued projecting sales goals that were unattainable. CW1, CW13.

67.   STJ's historical forecasting method consistently overestimated the sales that would be achieved by sales people recruited away from STJ's competitors, MDT and BSX. CW6, CW8. Sales forecasts from new hires were inflated because many of the new recruits simply cannibalized sales from existing members of STJ's sales force. "We were putting people on top of each other even though they were killing each other," CW8 recounted. Different STJ sales people working in the same region would end up calling on the same customer accounts, "almost like competing against each other," CW8 said.

68.   Although new recruits were typically barred from selling to their old accounts for a year after leaving their former employers, in practice most of them were doing so prior to the expiration of their non-compete agreements, according to CW8, who interviewed many such workers as part of CW8's duties in the sales and marketing department. As a result, the anticipated revenue bump when those employees came off their non-competes almost never materialized, and STJ's projections for increased sales from those employees

---

[2]   For example, during a September 15, 2009 investor presentation described at §VI.F. *infra*, Heinmiller told investors, "[T]ypically the manufacturers that sold those devices in the first place get that replacement device."

consistently proved to be inaccurate, leading to inflated revenue and earnings forecasts. CW8.  Although CW8 repeatedly brought this to the attention of CW8's supervisor, Mike Zagger, who reported directly to Rousseau, the warnings were consistently dismissed and ignored, and STJ executives continued to justify their forecasts by unreasonably claiming that they expected sales bumps when recruits came off their non-competes.

## VI.   MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS AND FRAUDULENT SCHEME AND COURSE OF BUSINESS BY DEFENDANTS DURING THE CLASS PERIOD

### A.   1Q09 Press Release, Conference Call and Report on Form 10-Q (April 22 and May 12, 2009)

69.     On April 22, 2009, STJ issued the press release attached hereto as Exhibit A, announcing its financial results for 1Q09, the period ending April 4, 2009.  The press release was initially disseminated to the market by the *Business Wire* news service, and thereafter its contents were disseminated further by other news organizations, financial analysts, investment websites and other sources of information to investors.  The press release included STJ's financial statements and results for 1Q09 in both tabular and narrative form, including the following:

| STJ 1Q09 Results (\$ in millions, except EPS) | 1Q09 |
| --- | --- |
| Net sales | \$1,134 |
| CRM sales | \$676 |
| AF sales | \$145 |
| NMD sales | \$73 |
| CV sales | \$240 |
| Net earnings | \$201 |
| Net EPS | \$0.58 |

- 29 -

70.     By virtue of the facts alleged in §V and the other facts set forth below, it may be strongly inferred that defendants knew or recklessly disregarded that the financial results provided in the April 22, 2009 press release were misleading to and operated as a fraud upon investors.  In particular, the foregoing statements were recklessly misleading in at least the following respects:

- The results were based on improper revenue recognition practices in violation of GAAP made in connection with STJ's end of quarter QP sales strategy, and as a result, were overstated.  *See* GAAP section, *infra* at §VIII.

- The financial results do not reflect actual demand for STJ's products, but rather are artificially inflated by STJ's practice of forcing more products through its sales channels with end-of-quarter bulk sales than STJ's customers could actually absorb.

71.     The 1Q09 press release included the following statement attributed to Starks, which misled investors about the extent to which the overall economy was affecting STJ's operations, and was expected to impact its operations over the remainder of the year:

Commenting on the first quarter and the Company's growth program, St. Jude Medical Chairman, President and Chief Executive Officer Daniel J. Starks said, "***Our first quarter results reflect the resilience of St. Jude Medical's growth program in an environment of global economic recession. Growth dynamics in our core markets are remarkably stable.***  St. Jude Medical's investment of over 12 percent of revenue in research and development each year the last eight years ***is paying off with market share gains*** driven by all four of our major technology platforms and by our expanded investment in people.  ***These results further strengthen our confidence that we are in the right markets with the right products and that our growth program remains on track.  We reaffirm our guidance for full year 2009 earnings***."

72.     On April 22, 2009, STJ hosted a conference call to discuss the Company's 1Q09 results with investors and analysts.  Each of the Individual Defendants participated in the call, as did other STJ officers.  None of the Individual Defendants corrected the false and

573787_1

misleading statements cited herein.  Analysts representing at least seven Wall Street firms also attended and participated in the call.  The call had been publicized by STJ in advance, and a recording of the call was made available thereafter on the "Investor Relations" section of the Company's website and on a toll-free number publicized at the end of the call. Written transcripts of the call were also published and disseminated by third parties, including the *Thomson Reuters StreetEvents* conference call transcript attached hereto as Exhibit B.  The contents of the call were widely reported by news organizations, in analyst reports and on Internet sites frequented by investors and, as a result, became widely available to investors and reflected in the market price for STJ securities.

73.     In a prepared statement delivered at the outset of the call, Starks again misled investors about the strength of demand for STJ's products, its insulation from macroeconomic conditions, and its ability to continue taking market share from MDT and BSX:

> The strength of our first quarter results reinforces the messages we delivered at our annual investor conference on February 6, 2009. ***One core message was that St. Jude Medical is well positioned to deliver sustained double-digit sales growth.***  Total St. Jude Medical sales during the first quarter increased over 17% on a constant currency basis compared with the first quarter one year ago.  If we adjust for the sales benefit we received from acquiring Radi Medical systems in December of 2008, St. Jude Medical organic sales still increased over 15% on a constant currency basis during the first quarter compared with the same quarter one year ago.

> A second key message we delivered during our February 6 conference was that ***we will continue to gain market share in our Cardiac Rhythm Management or CRM business*** consisting of our Pacemaker and ICD product line.  First quarter results confirm that we have continued to gain share in our CRM business as reflected in constant currency sales growth of 12% for our global CRM business and sequential quarter growth for our global ICD business.  ***We expect the competitive position of our CRM business to***

- 31 -

*continue to strengthen during the remainder of 2009 as we leverage the benefit of our AnalyST and AnalyST XO ICD launches in Europe, the upcoming launch of our Accent and Anthem Pacemakers with wireless RF telemetry and all of the other CRM new product launches we outlined during our February 6, conference.*  That includes our Promote Plus and Current Plus ICDs in the United States, our Promote XO and Current XO ICDs in Europe and in Japan our Zephyr and Frontier II Pacemakers together with our current RF and Promote RF ICDs.

74.    When analysts questioned whether STJ was seeing increased pricing pressure from hospitals, Starks emphatically denied that the selling environment had changed from prior years:

> [H]ospital administration has always been intensively focused on driving prices down.  So I think the world looks a little bit different from different individual perspectives. ***But from a global perspective, for St. Jude Medical, what strikes us the most about ICD market dynamics is the stability of them. So we see stable trends in average selling prices which includes ongoing significant price pressure which is really business as normal for us and has been nor a number of years.  We've seen no change in continued pressure on average selling prices.***
>
> ***We see stable dynamics on procedure volumes and we see stable dynamics on customer inventory levels***, so we are encouraged that we continue to anticipate that as data becomes clearer that we have some continued growth in de novo implants in the United States as well as continued strong growth in the replacement market and on a total global basis for ICDs, ***we clearly see growth in the de novo segment as well as strong growth in the replacement segment.  So looking forward to the remainder of this year, there is nothing in particular that leads us to expect a change in these stable dynamics.***

75.    The Company's 1Q09 press release and conference call generated favorable coverage in the news media, including articles in which the statements alleged above were quoted and re-published to the market.  *See, e.g., St. Jude Medical 1Q Net Jumps 14% On Sales Gains, Dow Jones Newswires*, April 22, 2009; *St. Jude earnings rise 16% despite market jitters, Star Tribune* (Minn.), April 23, 2009.  In addition, numerous analysts

- 32 -

published favorable reports on the Company based on their belief of defendants' misrepresentations about the strength of STJ's business and its purported ability to continue increasing sales and gaining market share at the expense of MDT and BSX. *See, e.g.*, *Morgan Stanley*, April 22, 2009 ("Given the concerns surrounding share loss post BSX report, the CRM results should allay some fears of severe market contraction and share shifting away from STJ."); *Credit Suisse*, April 23, 2009 ("we view the quarter and lack of guidance change as positives considering other companies in the universe are missing sales by fairly wide margins and lowering EPS guidance"); *Jefferies & Company, Inc.*, April 23, 2009 ("Importantly, CEO Dan Starks commented that STJ has not seen any increase from historical levels of pricing pressure or softness in procedure volumes and he reiterated his projection of ~4-7% growth for the CRM business ($2.8-2.9B) in 2009.").

76.     On April 21, 2009, the *St. Paul Pioneer Press* published a follow-up article further touting the Company's results, and noting how STJ had "served as a relatively steady source of local jobs at a time when employment for many is fleeting."  Noting that both BSX and MDT had recently been cutting jobs, Heinmiller told the newspaper that STJ had been adding jobs locally and "likely will continue to do so."  According to the article:

> The company's financial results during the first quarter of 2009, which were released Wednesday, help explain why the trend is likely to continue, said John Heinmiller, the chief financial officer at St. Jude Medical.
>
> *"**The real advantage that employees have with St. Jude Medical is that we're really built for growth," Heinmiller said in an interview. "So, we provide an environment where people don't have to worry about job layoffs or reductions in our work force**."*

77.     On May 12, 2009, STJ issued its Report on Form 10-Q reflecting its results of operations for 1Q09, the period ending April 4, 2009.  The Report included STJ's 1Q09

- 33 -

financial statements, including the Company's net sales and operating profit for its combined CRM and NMD departments, CV/AF departments, and other financial results and metrics. The Report was signed by Starks and Heinmiller, and also included SOX certifications signed by Starks and Heinmiller. *Infra* §IX.C.

78.     By virtue of the facts alleged in §V, and the other facts set forth below, it may be strongly inferred that defendants knew or recklessly disregarded that the statements in the April 22, 2009 press release and April 22, 2009 conference call, and the financial information discussed there and in the 1Q09 Report on Form 10-Q, would be, and were, misleading to and operated as a fraud upon investors.  Defendants knew or recklessly disregarded that the market for the Company's CRM products was mature and saturated in part as a result of their QP sales, and that a gain in market share, given the lack of differentiation between STJ's products and its competitors, would only come with continued use of heavily discounted end-of-quarter bulk sales.  Considered as a whole, defendants' representations about the purported continuing strength of STJ's performance and its prospects for driving further growth, continued to mislead investors by presenting an overly-optimistic picture of STJ's results, while failing to disclose, and actively concealing or recklessly ignoring, conditions which created material and significant risks to the Company. Together, these facts and the other allegations herein give rise to a strong inference that defendants knew or recklessly disregarded the actual condition of the Company at the time they delivered their statements at the end of the first quarter.  In particular, the foregoing statements were recklessly misleading in at least the following respects:

- 34 -

- Defendants concealed the extent to which the Company's revenues had been achieved through unsustainable sales practices, including by over-reliance on quarter-end bulk sales that were unconnected to actual demand.  The statements lacked a reasonable basis because the Company's dependence on QPs at the end of each quarter to meet earnings was particularly vulnerable to changing market conditions.  Rather than making the Company recession-resistant, the QP strategy increased the Company's sensitivity to market fluctuations, as hospitals with excess inventory from the bulk sales in one quarter would be less inclined to purchase new product the following quarter when their own budgets were strained by a down economy.

- STJ omitted disclosure of the existence and nature of the QP transactions in its 1Q09 Report on Form 10-Q, or the material risks those practices created to STJ's future financial results.  *See infra* at §VIII.A.

- STJ's reported financial results were the result of improper accounting treatments and GAAP violations.  *See infra* at §VIII.

- At the time the statements were made, internal forecasting data and daily sales reports that were circulated among the Company's executives and management reflected a downward sales trend across the CRM and AF product lines contradicting the positive outlook the statements were intended to create.

- The financial results created a misleading appearance of demand for STJ's products because the reported revenues had been artificially inflated by STJ's unsustainable business practice of forcing more products through its sales channels with end-of-quarter bulk sales than STJ's customers could reasonably expect to absorb, thereby cannibalizing sales from future periods.

## B.   1Q09 Guidance

79.   In the 1Q09 press release and on the 1Q09 conference call, defendants provided investors with projections in the table below for STJ's financial performance for the following quarter and the remainder of the year, generally reiterating the increased guidance STJ had issued at the close of FY08.  At the outset of the call, the operator read a statement prepared by or at the direction of STJ which claimed that the projections "are

based upon management['s] *current* expectations" as to the Company's financial

performance for the remainder of the year:

| STJ 1Q09 Guidance ($ in millions, except EPS) | 2Q09 | FY09 |
|---|---|---|
| EPS | $0.62 - $0.64 | $2.48 - $2.54 |
| CRM sales | $690 - $720 | $2,820 - $2,900 |
| AF sales | $145 - $160 | $640 - $670 |
| CV sales | $235 - $250 | $955 - $985 |
| NMD sales | $70 - $75 | $295 - $315 |
| Total sales | $1,140 - $1,205 | $4,710 - $4,870 |
| Net other expense | $7 | $20 - $25 |

80.     By virtue of the facts alleged in §V.D, and the other facts set forth below, it

may be strongly inferred that defendants knew or recklessly disregarded that the projections

in the 1Q09 press release and on the 1Q09 conference call were misleading to and operated

as a fraud upon investors.  In particular, the foregoing statements were recklessly misleading

in at least the following respects:

- The published guidance exceeded STJ's own internal forecasts of sales.

- As early as 2008, STJ's internal forecasts indicated that the sales of STJ's CRM devices through 2009 were trending downward, and hospitals were telling STJ that they were going to be unable to continue engaging in bulk sales.

- STJ's financial guidance lacked a reasonable basis because it failed to account for the practice of QPs sales that were highly sensitive to changing market conditions, and because it failed to account for STJ's improper accounting practices and GAAP violations.  *See infra* at §VIII.

## C.    May 12, 2009 Banc of America Securities Merrill Lynch Conference

81.     On May 12, 2009, just a few weeks after STJ's 1Q09 earnings release, Starks

addressed investors gathered at the Banc of America Securities Merrill Lynch 2009 Health

Care Conference at the Palace Hotel in New York City, and reiterated defendants' bullish

outlook for the Company.  One of the participants noted that STJ's full year guidance appeared to reflect growth below that reported by the Company in the first quarter, and asked Starks whether "there [is] something going on in Q2 that we should know about that would lower those growth rates."  In response, Starks denied, in no uncertain terms, that STJ's growth was slowing, and strongly reaffirmed the Company's guidance:

> [O]ur first quarter conference call, the guidance we gave for the rest of the year was intended to communicate that our growth program is entirely on track, number one.  It was intended to communicate that, in spite of unplanned negatives, namely a negative trend in the yen, which we estimate to cost us $40 million in sales for the remainder of this year versus where we were with the prior quarter guidance, in spite of all of that, we were maintaining our guidance.  We were filling in the challenge created by a $40 million reduction in foreign currency exchange.
>
> In our Q1 actual results versus guidance, we were in the upper end of all of our sales guidance for each product category except neuromodulation.  We were meaningfully above the top end of our guidance.
>
> Although there was a $40 million hit to remainder of year sales from the yen, we didn't bring down the top end of our sales guidance at all.  We brought up the bottom end of our sales guidance.  So, all of that was intended, and then we reaffirmed our full year EPS.
>
> *So, all of that was intended to say we've just had an extremely positive first quarter.  We are well positioned to continue to deliver at a superior level versus our peer group for the remainder of the year.  There was not intended to be anything in there that was between the lines, a negative or a hesitation*.
>
> *We wouldn't have been that subtle.  If we thought there was something that we wanted to communicate negatively, we had plenty of opportunity to do it*.  We could have taken advantage of the $40 million detriment to sales from the yen and said, "Now, that's going to fall through to a X number of EPS drop, and so the business is still good."  *We could have said something like that.  We didn't.  So, we really have very robust, bullish guidance with our Q1 earnings call, and no between-the-lines messages to the contrary*.

- 37 -

82.     By virtue of the facts alleged in §V and the other facts set forth below, it may be strongly inferred that Starks knew or recklessly disregarded that his statements at the investors conference on May 12, 2009, which reinforced the false statements made in the 1Q09 press release and on the 1Q09 conference call, were misleading to and operated as a fraud upon investors for the same reasons previously alleged, including the following:

- Quarter-end bulk sales obscured actual demand for STJ's products, and the Company relied on the ability of its customers to absorb excess inventory in order to sustain its growth.

- At the time of Starks' statement, weakening market conditions were already impacting STJ's sales operations, and internal forecasting numbers showed that the effects would only worsen.  As hospitals became increasingly unable to purchase products only to see them sit indefinitely on shelves, the viability of STJ's QP sales strategy deteriorated.

- At the time the statements were made, internal forecasting data and daily sales reports that were circulated among the Company's executives and management contradicted the positive outlook the statements were intended to create, and reflected a downward sales trend across the CRM and AF product lines.

**D.     2Q09 Press Release, Conference Call and Report on Form 10-Q (July 22 and August 12, 2009)**

83.     On July 22, 2009, STJ issued the press release attached hereto as Exhibit C, announcing its financial results for 2Q09, the period ending July 4, 2009.  The press release was initially disseminated to the market by the *Business Wire* news service, and thereafter its contents were disseminated further by other news organizations, financial analysts, investment websites and other sources of information to investors.  The press release included STJ's financial statements and results for 2Q09 in both tabular and narrative form, including the following:

- 38 -

| STJ 2Q09 Results (\$ in millions, except EPS) | 2Q09 |
|---|---|
| Net sales | \$1,184 |
| CRM sales | \$704 |
| AF sales | \$156 |
| NMD sales | \$81 |
| CV sales | \$243 |
| Net earnings | \$219 |
| Net EPS | \$0.63 |

84.    On July 22, 2009, STJ hosted a conference call to discuss the Company's 2Q09 results with investors and analysts.  Each of the Individual Defendants participated in the call.  None of the Individual Defendants corrected the false and misleading statements cited herein.  Analysts representing at least seven Wall Street firms also attended and participated in the call.  The call had been publicized by STJ in advance, and a recording of the call was made available thereafter on the "Investor Relations" section of the Company's website and on a toll-free number publicized at the end of the call.  Written transcripts of the call were also published and disseminated by third parties, including the *Thomson Reuters StreetEvents* conference call transcript attached hereto as Exhibit D.  The contents of the call were widely reported by news organizations, in analyst reports and on Internet sites frequented by investors and, as a result, became widely available to investors and reflected in the market price for STJ securities.

85.    During the call, Starks and Heinmiller repeatedly downplayed a year-over-year decline in CRM sales reflected in the Company's 2Q09 results, falsely reassuring investors that it was a statistical anomaly not reflective of weakening economic conditions.  Defendants repeatedly asserted that STJ's growth plans were on track and its competitive

position unchanged.  In prepared remarks at the outset of the call, for example, Heinmiller

told investors:

> The second quarter was an unusual fiscal quarter for us, since it included the
> first week of July due to our 52, 53 week fiscal year convention.

> This brought both an extra holiday and an extra week of summer
> seasonality into our second quarter.  We expect the negative impact of the
> unusual fiscal quarter timing for Q2 to reverse itself in the third quarter, which
> obviously will have one less holiday than usual and one more week of stronger
> fall seasonality than normal.  All of this is another example of why investors
> should be careful about reacting to comparative sales results for a single
> quarter, and it is usually more helpful to combine the results of results at least
> two quarters when making comparisons that will provide the best insight into
> trends affecting our business.

86.     In response to questions from analysts, Starks reiterated the point:

> I think what you'll see is the – you'll see the impact of the short quarter
> in Q2 reverse itself with the impact of a long quarter in Q3 and so I *think the*
> *best perspective would be to appreciate that normally we have a sequential*
> *quarter reduction in sales of almost all product classes, including our CRM*
> *sales in Q3, versus Q2, due to seasonality*, including the impact of holidays
> and vacations in the summer season.  And you see from the CRM guidance
> that we gave here for Q3, you can infer that *we expect a sequential quarter*
> *increase in CRM sales Q3 versus Q2, and so that would be the best way to*
> *give you some color commentary about our expectations of the impact of a*
> *short quarter in Q2 and a long quarter in Q3.*

> I think another way to get at it would be to look at our sequential
> quarter increase Q2 versus Q1, and this would really apply to all of our
> product classes.  You would see that all of our major product categories,
> revenue increased sequentially Q2 versus Q1, even though Q2 was a short
> quarter.  We actually delivered about 4.4% increase on a sequential quarter
> basis, Q2 versus Q1.  There was – and FX accounted for some of that, but less
> than half of that 4.4% sequential quarter increase, so that would give you some
> – an additional indication of the ongoing strength of our CRM sales growth.

> Maybe another way to look at the – to triangulate the strength of our
> CRM sales in Q2 in spite of the short quarter would be to look at the
> percentage increase growth for CRM sales that we've reported this morning,
> versus what Boston [Scientific] reported yesterday.  *So in Q1, it was clear to*
> *everybody I think that St. Jude Medical continued to gain share with robust*

- 40 -

*results, both on the pacing and on the ICD side in the CRM segment of our business. With that strong Q1 on a sequential quarter basis, our CRM sales grew 4.1% Q2 versus Q1, again, even though Q2 was a short quarter.* Boston's sequential quarter sales growth was lower than that, Q1 to Q2.

So both total CRM sales growth, our trend was on a comparative basis favorable, the sequential quarter on the pacing side. There's even a stronger favorable comparison on the ICD side. It was more of a wash, our ICD sales on a sequential quarter basis increased about 1.8% versus Boston's on a sequential quarter basis increased about 2.3%. *And exactly how much of that reflects short quarter versus other dynamics is something that will really become very visible with comparative Q3 results.*

I think another way to think about it is you see the additional strength of our ICD sales results on international market, that's probably a leading indicator for the – for what you will see in our US ICD sales results as the new products get into the international market, get into the European segment or the international market a little bit quicker than they do here in the US. So the impact of Current Plus and Promote Plus in Europe was earlier than in the United States. We've got the benefit of the AnalyST and now the beginning limited launch impact of AnalyST XL in European markets. Obviously we don't have that benefit yet in the US. *I appreciate that it's a challenge to figure out exactly how to value our short quarter in Q2, but there are a number of perspectives I've given you to help you triangulate.*

87.    On August 12, 2009, STJ issued its Report on Form 10-Q reflecting its results of operations for 2Q09, the period ending July 4, 2009. The Report included STJ's 2Q09 financial statements, including the Company's net sales and operating profit for its combined CRM and NMD departments, CV/AF departments, and other financial results and metrics. The Report was signed by Starks and Heinmiller, and also included SOX certifications signed by Starks and Heinmiller. *See* §IX.C.

88.    By virtue of the facts alleged in §V, and the other facts set forth below, it may be strongly inferred that defendants knew or recklessly disregarded that the financial information discussed in the July 22, 2009 conference call and the 2Q09 Report on

Form 10-Q was misleading to and operated as a fraud upon investors.  In particular, the foregoing statements were recklessly misleading in at least the following respects:

- At the time the statements were made, internal forecasting data and daily sales reports that were circulated among the Company's executives and management reflected a downward sales trend across the CRM and AF product lines contradicting the positive outlook the statements were intended to create.

- STJ's reported financial results were the result of improper accounting treatments and GAAP violations.  *See infra* at §VIII.

- The financial results created a misleading appearance of demand for STJ's products because the reported revenues had been artificially inflated by STJ's unsustainable business practice of forcing more products through its sales channels with end-of-quarter bulk sales than STJ's customers could reasonably expect to absorb, thereby cannibalizing sales from future periods.

- STJ omitted disclosure of the existence and nature of the QP transactions in its 2Q09 Report on Form 10-Q, or the material risks those practices created to STJ's future financial results.  *See infra* at §VIII.A.

## E.   2Q09 Guidance and Statements About Current Market Conditions

89.   In the 2Q09 press release and on the 2Q09 conference call, defendants provided investors with projections in the table below for STJ's financial performance for the remainder of the year.  At the outset of the call, the operator read a statement prepared by or at the direction of STJ which claimed that the projections "are based upon management's *current* expectations" as to the Company's financial performance for the remainder of the year:

| STJ 2Q09 Guidance ($ in millions, except EPS) | 3Q09 | FY09 |
|---|---|---|
| EPS | $0.61 - $0.63 | $2.48 - $2.54 |
| CRM sales | $700 - $730 | $2,820 - $2,880 |
| AF sales | $150 - $165 | $630 - $660 |
| CV sales | $230 - $245 | $960 - $990 |
| NMD sales | $77 - $82 | $305 - $320 |
| Total sales | $1,157 - $1,222 | $4,715 - $4,850 |
| Net other expense | $6 | $22 - $27 |

90.     STJ's guidance caused one analyst to ask, "[O]n the CRM side, you lowered the top end of the guidance a little bit. . . .   [R]elative to your previous guidance, what's changed?  Is it a little bit less confidence on share?  A little bit less confident on the market or both?"  In response, Heinmiller said:

> [HEINMILLER]:  [W]hat you see in our guidance is more our being cautious with respect to second half of the year market growth, and the – we get – it's hard for us to fully factor in the impact of the economy and unemployment level and kind of the general slowdown in procedures in hospitals.  We get quite a bit of comment from customers on an anecdotal basis of changes in procedure volumes but it's not consistent feedback from customers and I think to the extent there are – there's economic impact on hospital procedure volumes as it relates to our business and particularly our CRM business, we think that that would be minimal and if anything, it would just be more a question of timing than anything else.
>
> But we're just concerned about softness in the market due to just the continued impact of more people losing jobs and more focus on inventory at hospitals, more focus on management of capital at hospitals.  ***But nothing that would be – that would deserve to draw a lot of attention, but it's at a level where when we're updating our guidance, we would rather err on the side of being a little bit cautious and we again would rather underpromise and overdeliver than the reverse.  So we're just being very cautious in our outlook***.
>
> [ANALYST]:  It's a comment on market, not market share?
>
> [HEINMILLER]:  That's right.

91.     Defendants denied, however, that there had been any fundamental change in

the market for STJ's CRM products:

> [ANALYST]:  [C]oming back to the US on the kind of competitive dynamic within ICDs.  ***Was there any material change in kind of behavior patterns***, whether pricing or aggressiveness or whatever, between Q1 and Q2, Dan, that you noticed or that you anticipate in the back half?

> [STARKS]:  No.

> [ANALYST]:  Okay.

> [STARKS]:  No, continued – by that, to give it a little more flavor, we see pricing pressure as a meaningful competitive dynamic.  ***It has been and we expect it to continue to be but not in a different way, Q2 versus Q1.  And so there are a number of dynamics that are meaningful in our competitive outlook, but not different in any meaningful way from Q2 versus Q1***.

92.     By virtue of the facts alleged in §V.D, and the other facts set forth below, it

may be strongly inferred that defendants knew or recklessly disregarded that the projections

in the 2Q09 press release and on the 2Q09 conference call, and their statements about market

conditions then existing, were misleading to and operated as a fraud upon investors.  In

particular, the foregoing statements were recklessly misleading in at least the following

respects:

- Contrary to their representations about current market conditions, by the time of the 2Q09 call, defendants were aware of, or recklessly disregarded, the deepening impact the economic recession was having on STJ's business, and that of its customers.  In fact, by this time, defendants were already making plans for and commencing a significant reduction in force that would not be revealed until months later as discussed below.

- There already had been a material change in  hospital purchasing behavior which was continuing at the time these statements were made, as previously alleged.

- The published guidance exceeded STJ's own internal sales forecasts.

- 44 -

- As early as 2008, STJ's internal forecasts indicated that the sales of STJ's CRM devices through 2009 were trending downward, and hospitals were telling STJ that they were going to be unable to continue engaging in bulk sales.

- STJ's financial guidance lacked a reasonable basis because it failed to account for the practice of quarter-end QP sales that were highly sensitive to changing market conditions, and because it failed to account for STJ's improper accounting practices and GAAP violations.

- The daily sales reports that CW10 prepared and circulated among the Company's executives and management at the time these statements were made reflected downward sales trends in the Company's product lines throughout the Class Period. Declining trends during 2Q09 and 3Q09 had many CRM and AF executives worried that STJ was "not making our numbers." CW10.

- By June 2009, there were increasing efforts to reduce corporate expenses, including a complete prohibition on corporate travel, according to CW2.

## F.   September 10, 2009 Thomas Weisel Partners Healthcare Conference and September 15, 2009 Morgan Stanley Healthcare Conference

93.   By June or July 2009, STJ had already embarked on a major reduction in force among its U.S. sales force. An additional 200 people in STJ's U.S. sales division were laid off in August 2009. CW3. The layoffs impacted 10% of the U.S. sales division, and was the first of three significant rounds of layoffs during the year, totaling more than 500 members of STJ's domestic sales and manufacturing organization. CW1, CW3. In addition to the announced layoffs, other members of STJ's sales and support staff were let go just prior to the reduction in force, being expressly told that their terminations "were not part of the reduction in force," thereby suggesting that the layoffs were much more widespread than reported. CW4, CW11. In addition, when STJ reported its 3Q09 results at the end of the Class Period, it revealed that *another* 200 manufacturing employees had been laid off due to

- 45 -

declining business conditions.   The layoffs cost the Company nearly $50 million in severance payments and other expenses.

94.     The layoffs occurred in part because STJ had hired too many new sales workers away from MDT and BSX in anticipation of sales that never occurred.   Internally, the layoffs were recognized as a response to negative economic conditions affecting the Company in 1Q09 that persisted into 2Q09, and reflected an acknowledgment by senior STJ executives that the economy was significantly affecting the Company's business.   CW1, CW6.

95.     The layoffs were not immediately disclosed by STJ, but were later reported by newspapers who learned of the action from laid-off workers.   In an August 17, 2009 article in the *St. Paul Pioneer Press*, STJ spokeswoman Sara Spafford said that cuts were needed because spending in the U.S. division "'was above the level prescribed by our operating plan during the second quarter.'"   A Leerink Swann analyst quoted in the article said that he did not believe the cuts reflected "'a broad or sweeping initiative'" to cut costs in the wake of "'slightly disappointing'" 2Q results.

96.     By August 2009, it was apparent during regular monthly conference calls among finance managers in all of STJ's divisions that the Company was unlikely to meet its 3Q09 sales and revenue projections.   CW1.   "In August 2009, I knew we were not going to hit" the Company's sales goals, said CW1, who participated in those calls.   "It was looking bad in July [as well]," CW1 said.   In fact, business was so bad, it caused CW1 to become concerned as to whether CW1 would still have a job at the end of the quarter.

- 46 -

97.     Despite these conditions, defendants continued to mislead investors by telling them that the market for STJ's products remained stable, that STJ was continuing to gain market share at the expense of its competitors and that the guidance they had provided for 3Q09 and full year results continued to be reliable.

98.     On September 10, 2009, Heinmiller spoke to investors at the Thomas Weisel Partners Healthcare Conference at the Four Seasons Hotel in Boston, Massachusetts.  At the outset of his presentation, Heinmiller told investors "that we're really not here giving any additional guidance or any update to the guidance that we've given at the end of July when we did our earnings call and so we're really just here giving – without giving any comment on anything other than *sticking by the guidance that we've given in July*."  Heinmiller assured investors at the conference that STJ's CRM business was continuing to gain market share, and "getting on contracts that we haven't been on historically."  Heinmiller said later in his presentation, "[O]ur *guidance on our Cardiac Rhythm Management sales has not really materially changed* from the beginning of the year.  So *our expectations in terms of market share shift and ultimately market growth has really not changed dramatically from where we were at the beginning of the year*."

99.     When asked about the recent layoffs, Heinmiller similarly assured investors that the reduction in force merely reflected prudent financial management, deflecting concerns that it might have been a signal of deeper problems in STJ's business:

> [ANALYST]:  One of the things that hit the wires shortly after your second quarter results was I guess you guys laid off about 200 people in your sales organization, your domestic sales organization.  Curious, what was behind that, whether you plan to replace those folks, just really anything more around that.

- 47 -

[HEINMILLER]:  Yes.  I think that really we manage our business very carefully and each one of our operating divisions is required to adhere to a budget that we outline at the beginning of the year and we're – in this particular case – we were seeing that it was necessary to make a course correction really for the benefit of the entire business to make sure that our resources were being properly deployed.  We made that move and – .  But I think *it's really more of just a tweak in the way we are managing our business* and it will give us an opportunity to continue to now invest our SG&A resources in the right way and at the same time stay disciplined with the way we're managing our operations.

[ANALYST]:  How do you respond to the idea that 200 people is I guess roughly 10% of your domestic sales organization and whether letting that number of people go is going to have any impact on your near term sales results.

[HEINMILLER]:  Well, keep in mind that when we talk about our United States division, it really incorporates all the infrastructure and where you might think of some of the administrative functions that are in the SG&A aspect of it and we certainly aren't targeting eliminating people that we believe are ultimately going to impact our sales results and so nothing that we would do would have that kind of an intended consequence.

100.   By virtue of the facts alleged in §V and the other facts set forth below, it may be strongly inferred that Heinmiller knew or recklessly disregarded that his statements at the September 10, 2009 investor conference, in which he reinforced the guidance issued by the Company in July, were misleading to and operated as a fraud upon investors.  In particular, the foregoing statements were recklessly misleading in at least the following respects:

- By the time these statements were made, the Company had begun laying off workers in response to the severe impact economic conditions were having on the Company, dramatically reducing internal expectations for performance.

- The published guidance exceeded internal forecasts.

- The layoffs were much more than a "tweak" in STJ's business, and resulted from a significant restructuring and downsizing necessitated by weakening economic conditions.

- 48 -

- STJ's financial guidance lacked a reasonable basis because it failed to account for the practice of quarter-end QP sales that were highly sensitive to changing market conditions, and because it failed to account for STJ's improper accounting practices and GAAP violations with respect to those bulk sales.

- As early as 2008, STJ's internal forecasts indicated that the sales of STJ's CRM devices through 2009 were trending downward, and hospitals were telling STJ that they were going to be unable to continue engaging in bulk sales.

101.   Five days later – just two weeks before the end of the third quarter – Heinmiller made a presentation at another investor conference, where he again falsely promised investors that STJ's business was on track, its guidance remained achievable, and it was continuing to gain market share at the expense of its competitors.   On September 15, 2009, Heinmiller made the following statements to a group of investors and analysts gathered in New York City to attend the Morgan Stanley Global Healthcare Conference:

So I think we can start it out by saying *we focus on achieving 15% earnings per share growth* and we do that with a goal to grow our revenue line on a sustained basis at a double-digit level and then focus on the middle of our income statement and generate increasing margins along the way.   In addition to that, we have the good fortune of generating fairly significant cash flow with our business and that supports us with a balance sheet that is capable of buying back stock or acquiring new businesses from time to time.   I would point out that *we really are one of a few large-cap healthcare companies that has actually achieved the double-digit sales growth goal.*   If you look at the four-year period ended 2008, our revenues grew at a CAGR [(Compound Annual Growth Rate)] of 17.4%.   And then if you looked at that same period and evaluated our adjusted earnings per share, we grew at 17.6% on that measure.   And then perhaps significantly, if you looked at EBITDA [(Earnings Before Interest, Taxes, Depreciation, and Amortization)] over that period, we grew at the rate of 19.6% CAGR, so that really was a EBITDA in 2004 of about $670 million and in 2008 almost $1.4 billion.

So you see the kind of growth that we have in our balance sheet that really continues to support our business and our ability to continue to grow.   It gets lost a little bit in the outline of the debate that David mentioned that *we really have had that kind of historical strength in our business and that's what gives us confidence that we can continue to grow our business on the*

- 49 -

***top line at a double-digit rate***, continue to work and make as many smart moves as we can in the middle of the income statement and continue to deliver earnings per share growth.

102.   In the question and answer session that followed, Heinmiller continued to falsely tout STJ's ability to continue its double digit growth trajectory, including by making the following additional statements:

And so we've had a historical experience of taking market share, we have a culture that is really tied to that real-life experience and ***then we have a product flow now that has really caught up with the competition*** and in some cases is – provides features and benefits for patients and the physicians that use these devices that are only available from St. Jude Medical.

And if you – just to mention a couple of those things, we have the first and only pacemaker product line that has wireless telemetry so a physician can be implanting the device without having the wand from the programmer in the sterile field and can be performing the tailoring of the therapeutic settings with the programmer on a wireless basis. And then that also provides convenience and ease of use at the time of the follow-up clinic, not to mention the bedside monitor that the patient goes home with that allows for a wireless transmission of data over the internet to a secure website where a physician then with the password can access the patient data on a daily basis if he or she would like to. So that kind of a technology is available only from St. Jude Medical as an example of where we've caught up and actually now exceed the competition with our product line. ***So if you really came into this industry for the first time, you would look at this set of circumstances and our business and wonder why don't we have a larger share and we intend to ultimately have larger share. I think we expect that our cardiac rhythm management business, we put a stake in the ground and say we can get to a 33% market share based upon the experience that we've done that, based upon the product line that we have and based upon the people and the whole surrounding focus that we have on driving market share in cardiac rhythm management products***.

And so you've got that piece of the business that we expect the cardiac rhythm management market – and that is pacemakers and ICD's combined – to be able to generate about mid single-digit growth and we think that ***everything we're seeing in the current results, if you reviewed the second quarter, the first half of 2009, it really validates that that's a reasonable assumption for growth*** for that market. And then if we can take market share,

- 50 -

in addition to riding that market growth, that gives us a good confidence that that part of our business can grow in the double-digit range.

103.    By virtue of the facts alleged in §V, and the other facts set forth below, it may be strongly inferred that Heinmiller knew or recklessly disregarded that his statements at the September 10 and 15, 2009 investor conferences, in which he characterized the layoff of 200 people in STJ's sales organization as a managing tweak, and reaffirmed the Company's focus on 15% earnings per share growth, were misleading to and operated as a fraud upon investors.  In particular, the foregoing statements were recklessly misleading in at least the following respects:

- Defendants knew, at the time these statements were made, that end-of-quarter QPs would not permit the Company to meet its forecast guidance, as reflected in a Summer Street Research Partners analyst report which stated that "STJ management acknowledged that the weakness in ordering pattern became pronounced in the last 2-3 weeks of the quarter, but they are still working on a root-cause analysis.  We remain cautious of blaming the economy or the overhang for this surprising miss."

- As early as 2008, STJ's internal forecasts indicated that the sales of STJ's CRM devices through 2009 were trending downward, and hospitals were telling STJ that they were going to be unable to continue engaging in bulk sales.

- Quarter-end bulk sales obscured actual demand for STJ's products, and the Company relied on the ability of its customers to absorb excess inventory in order to sustain its growth.

- At the time of Heinmiller's statements, weakening market conditions were impacting STJ's sales operations, and internal forecasting numbers showed that the effects would only worsen.  As hospitals became increasingly unable to purchase products only to see them sit on shelves, the viability of STJ's QP sales strategy continued to deteriorate.

## VII.   DAMAGES, LOSS CAUSATION AND RELIANCE

104.   As a result of their purchases of STJ stock during the Class Period, plaintiffs and other members of the class suffered economic loss, *i.e.*, damages under the federal securities laws.

105.   During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of business that artificially inflated the price of STJ's publicly traded securities.  Defendants' conduct, including the false statements and material omissions described above, operated as a fraud or deceit on Class Period purchasers of STJ securities by misleading investors about the Company's business practices, the demand for its products, the impact of the economic downturn on its business, its past performance and its prospects for future success.

106.   The market for STJ securities was open, well-developed and efficient at all relevant times, as set forth below.

107.   The false and misleading statements and omissions described above caused STJ's publicly traded securities to trade at artificially inflated prices during the Class Period in that the securities traded at prices higher than they would have traded had complete, accurate and truthful information about STJ been known to the market.

108.   When defendants' prior misrepresentations and fraudulent conduct, or the economic consequences thereof, were disclosed and became apparent to the market, the price of STJ securities declined disproportionately to the market and relevant peer indices, thereby eliminating the prior artificial inflation.  This disproportionate decline in STJ's share price, including but not limited to, the disproportionate stock drop described below that occurred

on October 6, 2009, caused economic damages to be incurred by class members, including

plaintiffs, who had purchased STJ securities at artificially inflated prices prevailing in the

market during the Class Period.

109.   On October 6, 2009, the Company stunned investors by announcing that its

3Q09 results would not meet the guidance Heinmiller had reaffirmed just weeks earlier.  In a

press release issued that day, STJ announced its preliminary results for 3Q09 ending October

3, 2009.  The press release reported that the Company would reduce its earnings guidance for

the remainder of the year, and revealed that it had laid off twice as many workers as it had

previously acknowledged.  The release stated in pertinent part as follows:

### Preliminary Third Quarter Results

The Company expects to report net sales of approximately $1.159 billion in the third quarter of 2009, an increase of 7 percent compared to the third quarter of 2008.  Foreign currency translation comparisons decreased third quarter sales by approximately $29 million.  Revenue for the third quarter increased approximately 10 percent after adjusting for the impact of foreign currency.

As a result of lower than expected sales, the Company now expects adjusted earnings per share (non-GAAP) to be in the range of $0.57 to $0.58 for the third quarter of 2009, versus previous guidance of $0.61 to $0.63.  In addition, the Company will record charges in the range of $50 to $55 million in the third quarter, or $0.09 to $0.10 per share.  These charges primarily reflect severance costs associated with personnel reductions related to our continuing efforts to improve sales and sales support productivity as well as to streamline manufacturing operations.  The charge also includes a write-down of certain strategic cost investments.

The Company believes that one factor impacting third quarter sales was a slowdown in hospital stocking of certain medical devices.

"We believe that macro economic factors coupled with the continued pressures surrounding healthcare reform resulted in changes in purchasing behavior among some of our hospital customers," said Dan Starks, Chairman,

- 53 -

President, and Chief Executive Officer of St. Jude Medical. "We will have a further update during our regularly scheduled earnings call in mid-October."

Revenue for all product categories with the exception of our Neuromodulation business came in below or at the low end of our guidance range. Preliminary sales results for the third quarter for all product categories are below.

\*       \*       \*

**Fourth Quarter and Full Year 2009 Sales and Earnings Guidance**

The Company will provide further information, including information regarding our income statement, balance sheet, and outlook for the full-year 2009 when St. Jude Medical releases its third quarter results on October 21, 2009. The conference call will be broadcast live on the St. Jude Medical web site at sjm.com.

110.     The price of STJ common stock fell by $4.84 on October 6, 2009, a one-day drop of 12.7% on extraordinary volume in excess of 51 million shares that day that caused millions of dollars in damages to class members. The market for STJ stock traded on more than ten times its average daily trading volume during 2009. By comparison, the Dow Jones U.S. Medical Devices Index Fund, which includes MDT, BSX and STJ among its holdings, fell by just 0.6% the same day, demonstrating that the decline in the price of STJ securities resulted from the October 6, 2009 press release, and not from general market conditions or other macroeconomic factors.

111.     On October 21, 2009, STJ issued a press release announcing its final 3Q09 results, which confirmed the extent to which its earnings had been propped up by undisclosed discounted end-of-quarter bulk sales. The Company reported quarterly EPS of $0.59, not including a $0.09 charge for severance and other costs associated with the layoffs of its U.S. sales and manufacturing staff as it struggled to adapt to the declining sales during

- 54 -

the Class Period.  According to STJ, a refusal by just 50 of its 1,600 customers to make

discounted bulk sale purchases at the end of 3Q09 had caused the Company to miss its

quarterly earnings by $0.03 per share ($0.12 when the severance costs are included).

Admitting that it expected additional hospitals to reduce purchases due to the need to

"destock" their inventories of STJ products purchased in prior quarters, STJ reduced its

guidance for the remainder of the year.

      112.    STJ's 3Q09 press release issued on October 21, 2009 stated, in pertinent part:

**Third Quarter Sales**

      The Company reported net sales of $1.160 billion in the third quarter of 2009, an increase of 7 percent compared with the $1.084 billion in the third quarter of 2008.  Foreign currency translation comparisons decreased third quarter sales by approximately $29 million.

      Commenting on the Company's results, St. Jude Medical Chairman, President and Chief Executive Officer Daniel J. Starks said, "Despite some challenging dynamics experienced during the third quarter, St. Jude Medical's revenue grew approximately 10 percent and we delivered 15 percent growth in adjusted earnings per share on a constant currency basis.  International revenue grew 15 percent in the quarter, constant currency, but U.S. revenue was lower than expected.  Related to our U.S. growth, we have identified approximately 50 U.S. hospitals who did not participate in normal quarter end purchases of cardiac rhythm management devices due to a variety of financial considerations, which we will discuss further on our earnings call this morning.  We are lowering our expectations for our fourth quarter results to accommodate the issues we are experiencing from a limited portion of our customer base in the U.S., but we are confident that our long term growth program is on track."

      *     *     *

**Third Quarter Earnings Results**

      In the third quarter, the Company recorded pre-tax charges of $57 million, or $0.11 per diluted share, comprised primarily of employee termination costs related to continuing efforts to improve sales and sales support productivity as well as to streamline manufacturing operations.

- 55 -

Including these charges, reported net earnings for the third quarter of 2009 were $167 million, or $0.48 per diluted share.

Excluding these charges, adjusted net earnings for the third quarter of 2009 were $204 million, or $0.59 per diluted share. A reconciliation of the Company's non-GAAP adjusted net earnings per share to the Company's GAAP net earnings per share is provided in the schedule at the end of the press release.

**Fourth Quarter and Full-Year 2009 Sales and Earnings Guidance**

During a conference call today, St. Jude Medical will provide its range for revenue expectations for the fourth quarter by product category.

The Company expects its consolidated earnings for the fourth quarter of 2009 to be in the range of $0.61 to $0.63 per diluted share and for full-year 2009 to be in the range of $2.41 to $2.43 per diluted share. This full-year guidance does not include the impact on earnings per share of the charges recorded in the third quarter of 2009. A further reconciliation of the Company's annual guidance is provided in the schedule below.

113.   On STJ's 3Q09 conference call with analysts and investors on October 21, 2009 after the release of its final earnings report, Starks offered the following further explanation for the Company's decline in performance:

As we reported in our October 6th announcement, preliminary third quarter results were lower than expected. Final results for the quarter confirm that this was due primarily to sales dynamics in the United States, which grew 5%, compared with international sales for the quarter, which grew 15% on a constant currency basis.

As we indicated in our October 6th press release, our initial assessment was that sales were affected by a change in purchasing behavior at the end of the quarter among some of our hospital customers. The analysis we have completed since October 6th confirms that our initial assessment was correct, related to purchasing behavior changes. In terms of our own customer purchasing experience this quarter, we have identified approximately 50 US hospital customers who did not execute normal quarter-end quantity purchases of Cardiac Rhythm Management, or CRM, devices from us due to financial considerations.

In some cases, these hospitals simply were not willing to commit capital to inventory for CRM products in this current economic environment.

- 56 -

In other cases, these hospitals would do so only in exchange for price discounts that were steeper than what St. Jude Medical was willing to provide. On a year-over-year basis, the math indicates that we may have lost some market share in CRM devices in the United States during the third quarter, but our analysis supports the conclusion that CRM market share changes in the United States for the third quarter largely reflect dynamics related to inventory practices, rather than changes in customer preference for St. Jude Medical's brand of CRM device.

This conclusion is supported by specific account by account analysis, and is consistent with the competitive strength of our CRM product lines, the high quality of our comprehensive field sales and support, people and programs in the United States, and with our ongoing double-digit constant currency revenue growth for CRM devices in global markets outside the United States. Although we are encouraged by the sound fundamentals of our US CRM business during the third quarter, we are clearly disappointed that we did not have better visibility into predicting the dynamics that ultimately led to third quarter sales coming in below expectations.

We are committed to making all changes in process, personnel and programs that we believe are appropriate to improve our visibility and execution with respect to US CRM sales. Until these changes have been fully implemented and validated, we will lower our guidance to increase our confidence that if we err with our guidance, we will err on the side of underpromising and overdelivering.

114. On the 3Q09 conference call, Heinmiller said that the Company had recorded $49 million of special charges, "primarily reflecting severance costs associated with personnel reductions related to continuing efforts to improve our sales and sales support productivity, as well as to streamline manufacturing operations." Heinmiller then provided the following guidance for the remainder of the year, significantly reducing the financial projections that STJ had given on the 2Q09 conference call that Heinmiller had reaffirmed just weeks prior to the end of the quarter:

| STJ 3Q09 Guidance ($ in millions, except EPS) | FY09 | % Change from Prior Guidance |
|---|---|---|
| EPS | $2.41 - $2.43 | (3.6%) |
| CRM sales | $2,750 - $2,780 | (3.0%) |
| AF sales | $607 - $622 | (4.7%) |
| CV sales | $943 - $958 | (2.5%) |
| NMD sales | $320 - $325 | 3.2% |
| Total sales | $4,620 - $4,685 | (2.7%) |
| Net other expense | $46 | 87.8% |

115.    As investors dug into the results, they realized that the reduction in STJ's FY09 guidance was even greater than it seemed at first blush.  As Morgan Stanley & Co. Inc. pointed out in an October 22, 2009 research report, improved currency exchange rates which were expected to favorably impact STJ's foreign sales by $65-$75 million obscured the magnitude of the Company's reduction in its sales guidance.  Adjusting the Company's sales guidance to eliminate this effect revealed that its overall sales guidance had been reduced by 3%-6% overall, and 8%-12% in its AF business.  In addition, the FY09 guidance delivered at the end of 2Q09 had been premised on STJ having 350-352 million shares outstanding at the end of the quarter.  At the midpoint of guidance, this implied that the Company expected more than $88.1 million in earnings for the year.  As a result of the Company's share buyback however, there were only 344.3 million shares outstanding at the end of 3Q09 – implying revenues of just $83.3 million for the year – a 5.4% decline from prior guidance.

116.    Contrary to defendants' claims in the October 2009 press releases and on the 3Q09 conference call, the disappointing 3Q09 results and lowered FY09 expectations were not caused by a sudden or unexpected change in hospital purchasing behavior.  Instead, those disclosures were caused by and reflected conditions that had been impacting the Company all year, but had been concealed from investors by defendants' publication of unsupported

- 58 -

guidance and misleading sales reports that relied on undisclosed end-of-quarter QPs, rebates and product swaps that created the appearance of greater demand for STJ's products than actually existed.  In a January 27, 2010 research report describing continuing loss of market share by STJ in 4Q09, William Blair & Co., L.L.C. wrote: "***Management noted*** that one factor contributing to the domestic softness in the quarter was a ***continuation of inventory destocking*** among its hospital customers ***that began in early 2009***."

117.   The market initially reacted with skepticism to defendants' claims that the shortfall was due to a sudden or unexpected change in hospital stocking procedures, with many analysts noting that it was unlikely that such conditions would have manifested themselves without warning so late in the year.  As Morgan Stanley & Co. Inc. wrote in an October 22, 2009 research report on STJ, "we do not understand why this market-specific dynamic is emerging in 3Q09.  Clearly the device purchasing environment has been challenging all year and high-priced CRM devices would have been identified early."  When MDT and BSX said that they had not seen any change in hospital purchasing or stocking activity during this period, STJ's explanation for its shortfall became even less credible.  For example:

- "Our checks suggest that blaming macro-economic issues or healthcare reform overhang may be premature. . . . [B]oth [MDT and BSX] indicated that fundamentals have not changed dramatically from what they had observed earlier in the year."  (Report by *Summer Street Research Partners* dated October 7, 2009).

- "After speaking with various participants in the CRM market we believe the miss in ICDs is unique to STJ . . . .  While not completely discounting the macro environment, we have not been able to find much evidence of a slowdown in procedures or radical change in hospital buying patterns." (Report by *Craig-Hallum Capital Group LLC* dated October 7, 2009).

- 59 -

- "Management cited destocking among several of its hospital customers as the cause of the revenue shortfall in the quarter, but we doubt this was the major contributor to the shortfall. Our recent channel checks indicate that inventory destocking has largely abated at most hospitals around the United States. Rather, we believe the company is likely failing to take market share." (Report by *William Blair & Co.*, *L.L.C.* dated October 7, 2009).

118. Former STJ employees were also skeptical of defendants' explanation for the 3Q09 sales miss:

- CW1 said it was unlikely that the miss was caused by delayed orders at 50 hospitals, and it was more probable that the Company had simply used the explanation to provide a plausible cover story for the miss to conceal a wider decline in its business. CW3 said that the August layoffs had decimated the Company's corporate accounts group, which was primarily responsible for negotiating bulk sales. CW3 said that the layoffs had likely contributed to the 3Q09 sales miss.

- STJ's claim that it had lost sales by refusing to accede to outrageous discount demands from the hospitals also didn't ring true. STJ had always been "extremely aggressive on price," and was often willing to extend very large discounts to hospitals to induce them to complete end-of-quarter sales. CW8, CW9. Once rebates, contractual discounts negotiated by hospital purchasing organizations and other incentives were included, bulk discounts for QPs could be as much as 60% lower than a product's stated list price. CW4, CW9. CW8 said she/he could not recall a single instance during the three years CW8 worked for STJ that the Company ever rejected a deal because the discount was too steep.

- Other former employees suggested that weak sales of the new products STJ introduced in 2009 were a significant contributor to the earnings miss. Although STJ had touted the introduction of new products such as pacemakers with wireless radio-frequency telemetry and other advanced features at the outset of 2009, in practice, the response to the products was lukewarm. CW4, CW5. Physicians looked at the new features as marketing gimmicks that did not provide significant clinical benefits. The failure to realize anticipated sales of those products was one of the factors that caused STJ to layoff significant numbers of its U.S. sales staff during 2Q09. CW4.

119. As reflected in the chart below, when considered with STJ's 2Q09 results, the Company's 3Q09 results plainly revealed that, contrary to defendants' numerous positive

and optimistic statements about the strength of STJ's business and its insulation from negative economic conditions, the Company had in fact been struggling to maintain sales throughout the Class Period.  Caris & Company wrote in an October 7, 2009 research report, "We suspect STJ share loss is the primary contributor to the 2Q/3Q growth deceleration, with hospital budget pressure secondary."  Morgan Stanley & Co. Inc. added in an October 22, 2009 report: "The disconnect in 3Q09 may be tied to inventory behavior at certain customers, but the 6-month trend suggests incremental competitive pressures on pricing and share and not a dramatic change in the hospital environment."



## VIII.  STJ'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP AND SEC RULES

120.    STJ's income statements and balance sheets were materially misstated in the Company's Forms 10-Q for the periods ended April 4, 2009 (1Q09) and July 4, 2009 (2Q09) in violation of GAAP and SEC rules.  STJ overstated revenues, net income and stockholders'

equity in Forms 10-Q for 1Q09 and 2Q09 because STJ knowingly recognized revenues improperly for:

> (a)    Bulk sales of CRM products to customers involving side agreements at the end of 1Q09 and 2Q09, referred to within STJ as QPs; and

> (b)    Rebates paid for prior period sales to customers.

121.    STJ also violated GAAP and SEC guidance in fiscal year 2008 by improperly recognizing revenues for certain "sales" that were actually consignments, establishing that STJ was already having difficulties meeting its own guidance prior to the Class Period.

122.    In addition, the Company:

> (a)    Failed to make required disclosures regarding QP transactions in Form 10-K for 2008 and Forms 10-Q for 1Q09 and 2Q09;

> (b)    Made false disclosures regarding transactions involving rebates in Forms 10-Q for 1Q09 and 2Q09; and

> (c)    Made insufficient disclosures regarding transactions involving consignments in Form 10-K for 2008.

## A.    STJ's Accounting Treatment for Bulk Sales Was Improper and STJ Omitted to Make Required Disclosures of Those Transactions in Its SEC Filings

123.    STJ's income statements and balance sheets were materially misstated in the Company's Forms 10-Q for 1Q09 and 2Q09 in violation of GAAP and SEC rules because STJ knowingly recognized revenues improperly for CRM QP transactions involving side agreements with customers, whereby STJ was obligated to replace "stale" or obsolete inventories, among other services.  STJ's QP transactions for CRM products were essentially

bulk sales of those products to customers, typically hospitals, that were negotiated during the end of the quarter.  Those QP transactions entailed selling CRM products at substantial discounts to the Company's normal selling prices that were offered through customary sales channels, as alleged above.

124.    STJ's QP practices can be described as a form of improper "channel stuffing." Channel stuffing has been defined by the American Institute of Certified Public Accountants ("AICPA") as:

> [A] marketing practice that suppliers sometimes use to boost sales by inducing distributors to buy substantially more inventory than they can promptly resell. Inducements to overbuy may range from deep discounts on the inventory to threats of losing the distributorship if the inventory is not purchased.[3]

125.    The SEC describes channel stuffing as:

> [T]he pulling forward of revenue from future fiscal periods by inducing customers – through price discounts, extended payment terms or other concessions – to submit purchase orders in advance of when they would otherwise do so.[4]

126.    Material undisclosed channel stuffing may distort a company's results of operations, causing a company's financial reporting to be misleading.  STJ failed to disclose its channel stuffing as required to prevent investors from being misled.  In addition, STJ's accounting treatment for QP transactions was improper, as described in the paragraphs that follow.

---

[3]      1999 AICPA Indicators of Improper Revenue Recognition, at 4.

[4]      *In the Matter of Sunbeam Corp.*, Securities Act Release No. 7976, Exchange Act Release No. 44305, Accounting and Auditing Enforcement Act Release No. 1393, File No. 3-10481, 2001 SEC LEXIS 931, at *4 n.4 (May 15, 2001).

127.   Because CRM products that the Company sold for QP transactions did not have an unlimited life, as alleged above, the discounted bulk sales of CRM products to hospital meant that, unless other arrangements were made, hospitals would be stuck with "stale" or obsolete inventories of CRM products that could not ultimately be resold and implanted in patients.   To address this problem, STJ authorized its corporate account managers who engaged in QP transactions to "swap" or replace CRM products held by customers that were sufficiently close to expiration with fresh products.

128.   In fiscal years 2006 through 2009, STJ's sales representatives made verbal side agreements with customers in QP transactions to swap products that were close to expiration. STJ account representatives engaged in QP transactions also had the obligation of managing the CRM inventory that was sold to customers.   In fiscal year 2006, the account representatives would send e-mails to their regional managers to request that replacement inventory be made available when customers' existing inventory was close to expiration.   In fiscal year 2007, however, account representatives were told to cease referring to the Company's obligations regarding replacement of CRM products in all e-mails, demonstrating the Company's recognition that the practice was illegitimate.   Thereafter, account representatives were only permitted to make ***verbal*** communications concerning the Company's obligations to swap or otherwise manage products purposefully sold in QP transactions.   CW4.   Therefore, even though STJ was contractually obligated to swap or replace "stale" CRM inventories with fresh CRM products, STJ deliberately tried to maintain no documentation pertaining to the Company's swap obligations during the Class Period.

- 64 -

129.   As part of the swap arrangements for QP transactions, STJ sales representatives were also obligated to manage the CRM inventories at the hospitals.  To ensure that stale CRM products were replaced with fresh products, sales representatives were required to monitor the expiration dates of the CRM products sold in connection with QP transactions.  In addition, STJ technical services specialists were also obligated to assist customers in selecting the appropriate devices for various medical procedures.  For example, some customers would purchase 20 or 30 CRM devices ahead of the need for those devices.  And even though the customers already had inventory on hand, when the need arose for a CRM product to be implanted, CW7 travelled to the medical facility to assist the medical staff with selecting the appropriate device for a medical procedure.  CW7 did not generate an invoice for his services, however, because the customer had already held CRM inventory from a previous QP transaction.

130.   STJ's Siebel system tracked exactly how much CRM inventory was on the shelves of customers and was also used to help track when customers' inventories were getting close to expiration.  STJ assigned a unique serial number to each CRM device so that sales data could be tracked by division, region, territories and individual corporate account managers.  Pending expirations of CRM devices held in inventory by hospitals could also be tracked for STJ's internal use.  STJ did not record, however, the serial numbers of CRM products sold in QP transactions into the database at the time of sale that would be used to report serial numbers to the FDA, as the serial number information for bulk sales was managed separately by corporate account managers.  CW13.  This helped STJ to conceal the exchange of "stale" products for newer ones.  Because an unknown portion of the customer's

- 65 -

inventory in any given QP transaction would require replacement due to obsolescence, and would, therefore, not be implantable in any patients, the serial numbers of QP transactions were tracked separately and were monitored by STJ sales representatives.

131.    The revenues that STJ reported for the above CRM QP transactions were in violation of GAAP and SEC guidance because STJ had significant obligations to track and monitor every CRM product sold in a QP transaction, and to replace all "stale" products with fresh products prior to expiration before any "stale" device could be implanted in a patient, and to advise the customer's medical staff regarding which particular CRM device to use prior to surgery.  CW7.  Although those obligations were not included in any written agreement between the parties, STJ was still obligated to perform them in connection with CRM QP transactions based upon the parties' verbal side agreement.  STJ's verbal side agreement violates GAAP because the customer had the right to return the CRM products purchased in a QP transaction when those products became "stale" or have expired, and STJ did not satisfy specific GAAP and SEC criteria required to appropriately recognize revenues.

132.    STJ did not disclose the nature of the QP transactions in the Company's FY08 Report on Form 10-K or its 1Q09 and 2Q09 Reports on Form 10-Q.  Because QP arrangements involved channel stuffing and material transactions that occurred close to the end of each quarter and entailed significant obligations on the part of STJ with regard to replacing "stale" products and managing customers' QP inventories, STJ was required to disclose the nature of the QP transactions in the Company's SEC filings.  Consequently, STJ also violated GAAP and SEC disclosure requirements.

B.      **Applicable Accounting Rules for Bulk Sales**

133.    GAAP constitute those standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").  SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.  Regulation S-X, 17 C.F.R. §210.10-01(a), requires that interim financial statements, such as quarterly financial statements, must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements.[5]

134.    STJ's QP arrangements violated GAAP and SEC guidance because the customer had the right to return the CRM products purchased in a QP transaction when those products became "stale" or have expired, and STJ did not satisfy specific GAAP and SEC criteria required to appropriately recognize revenues.  FAS 48, *Revenue Recognition When*

---

[5]      On June 30, 2009, FASB issued Statement No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles, a replacement of FASB Statement No. 162.*  FASB Accounting Standards Codification (ASC) became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009.  The ASC did not change existing U.S. GAAP.  These allegations use the historical references to U.S. GAAP, as such references existed during the Class Period.

*Right of Return Exists*, establishes accounting and reporting standards for sales of a product when the buyer has the right to return the product. FAS 48, ¶6 provides that in such circumstances, revenue from the sales transaction should be recognized at the time of sale only if all of the following conditions are met, and STJ had not met the criteria presented in bold print below:[6]

    (a)  The seller's price to the buyer is substantially fixed or determinable at the date of sale.

    (b)  ***The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.***

    (c)  The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.

    (d)  The buyer acquiring the product for resale has economic substance apart from that provided by the seller.

    (e)  ***The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.***

    (f)  ***The amount of future returns can be reasonably estimated.***

    135.   The CRM QP transactions do not meet the criterion that "[t]he buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product." FAS 48, ¶6b. In STJ's QP transactions, the buyer's obligation to pay *is* contingent on the resale of the CRM products to the ultimate customers: the patients receiving the implants of the devices. "Stale" CRM products cannot be resold by the hospitals and implanted in patients, and, consequently, STJ has not met the criterion. *Id.*

---

[6]    Footnotes and paragraph cross-references omitted here and elsewhere in this section.

136.   The CRM QP transactions do not meet the criterion that "[t]he seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer."  *Id.*, ¶6e.  Account representatives were obligated to manage customers' inventories and to assist customers in selecting the appropriate devices for various medical procedures, which involved travelling to customers' sites and advising customers on the appropriate product for a given medical procedure.  CW7.

137.   The CRM QP transactions also do not meet the criterion that "[t]he amount of future returns can be reasonably estimated."  *Id.*, ¶6f.  Because an unknown portion of the customer's inventory in any given QP transaction would require replacement due to obsolescence, and would, therefore, not be implantable in any patients, STJ would not be able to reasonably estimate the volume and sales dollar amount of the "stale" or obsolete devices that the hospitals would return to STJ for replacement with fresh products.

138.   FAS 48, ¶¶8a and 8b provide further guidance that confirms that STJ could not reasonably estimate the returns:

8.   The ability to make a reasonable estimate of the amount of future returns depends on many factors and circumstances that will vary from one case to the next.  However, the following factors may impair the ability to make a reasonable estimate:

a.   The susceptibility of the product to significant external factors, such as technological obsolescence or changes in demand; and

b.   Relatively long periods in which a particular product may be returned.

When a customer's inventory of CRM products purchased in a QP arrangement becomes "stale" or  approaches expiration, the condition of those CRM products is analogous to "technological obsolescence," in that those "stale" CRM products are rendered useless to the

- 69 -

buyer, and certainly to the ultimate customers, the patients.  FAS 48, ¶8a.  Additionally, the

time period in which the CRM devices in a QP transaction could remain on the shelves of the

hospitals could be "[r]elatively long," but it is still ultimately required that those products be

returned for replacement when they become stale, which impaired STJ's ability to make a

reasonable estimate of the amount of future returns.  *Id.*, ¶8b.

139.   SEC Staff Accounting Bulletin ("SAB") 104 provides additional guidance that

states that if a sales transaction fails to meet all of the conditions of FAS 48, as outlined

above, "***no revenue may be recognized until those conditions are subsequently met or the***

***return privilege has substantially expired***."  SAB 104 also provides other factors in addition

to those listed in FAS 48, ¶8 that may preclude a registrant from making a reasonable and

reliable estimate of product returns.[7]  The criteria in SAB 104 below, presented in bold print,

precluded STJ from being able to make a reasonable and reliable estimate of product returns:

> The staff believes that the following additional factors, among others, may
> affect or preclude the ability to make reasonable and reliable estimates of
> product returns: (1) ***significant increases in or excess levels of inventory in a***
> ***distribution channel (sometimes referred to as "channel stuffing")***, (2) lack
> of "visibility" into or the inability to determine or observe the levels of
> inventory in a distribution channel and the current level of sales to end users,
> (3) ***expected introductions of new products that may result in the***
> ***technological obsolescence of and larger than expected returns of current***
> ***products***, (4) the significance of a particular distributor to the registrant's (or a

---

[7]     The complete list of factors in FAS 48, ¶8 are: "a.  The susceptibility of the product to significant external factors, such as technological obsolescence or changes in demand[,] b.  Relatively long periods in which a particular product may be returned[,] c.  Absence of historical experience with similar types of sales of similar products, or inability to apply such experience because of changing circumstances, for example, changes in the selling enterprise's marketing policies and relationships with its customers [, and] d.  Absence of a large volume of relatively homogeneous transactions."

- 70 -

reporting segment's) business, sales and marketing, (5) the newness of a product, (6) the introduction of competitors' products with superior technology or greater expected market acceptance, and (7) other factors that affect market demand and changing trends in that demand for the registrant's products.

SAB 104 at 66-67.

140.   STJ's QP transactions comport closely with the condition of "significant increases in or excess levels of inventory in a distribution channel (sometimes referred to as 'channel stuffing')."  Many of STJ's QP transactions would also comport with the condition of "expected introductions of new products that may result in the technological obsolescence of and larger than expected returns of current products," in that shelf-life limitations of CRM products means that unused inventory on customers' shelves is subject to expiration, which is analogous to technological obsolescence, and the amount of CRM product that ultimately may need to be returned is unknown and could be larger than expected.

141.   In the QP transactions, delivery of the CRM products may have occurred, but the services that STJ was obligated to perform were **not** fully rendered.  STJ had significant obligations to track and monitor every CRM product sold in a QP transaction; to replace all "stale" products with fresh products prior to expiration, before any "stale" device could be implanted in a patient; to manage inventories; and to assist the medical staff with selecting the appropriate device when it was time for a device to be implanted in a patient.  CW1, CW4, CW7.

142.   STJ also failed to disclose the nature of the QP transactions in the Company's Form 10-K for 2008 and Forms 10-Q for 1Q09 and 2Q09.  In SAB 104, the SEC referred to the requirements under Financial Reporting Release ("FRR") No. 36, which noted that the

- 71 -

following practice – which is analogous to channel stuffing as applied by STJ – **must** be disclosed in the Management Discussion and Analysis ("MD&A") section in Forms 10-K/10-Q:

> Shipments of product at the end of a reporting period that significantly reduce customer backlog and that reasonably might be expected to result in lower shipments and revenue in the next period.[8]

SAB 104 at 77.

## C.   STJ Improperly Accounted for Rebates in Violation of GAAP and Its Own Publicly Disclosed Policy

143.   STJ used sales rebates as incentives for certain customers to continue purchasing products even when the customer had sufficient inventory to meet anticipated patient demand. CW1, CW14, CW15. Typically, STJ would offer the customer a cash rebate if it purchased a certain amount of products over a specified time period. CW1, CW14, CW15. The rebate was usually based on a percentage of the total amount of products the customer purchased from STJ during the designated period. CW14. Once the purchase requirement was met, the customer would be issued a rebate by STJ's corporate accounting department. CW1. STJ accounted for the rebates as a reduction in sales in the period in which the rebate was *paid*, rather than when the sale was originally recognized, in violation of GAAP and its own publicly disclosed accounting policy. CW1, CW15. Delaying the recording of the rebates enabled defendants to overstate sales in any period in which a lower amount of rebates were paid than were offered.

---

[8]      SAB 104, referring to FRR No. 36 (§501), *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*.

144.    This practice was inconsistent with accrual accounting and violated the fundamental matching principle of accounting, which states that revenues and expenses that are directly related to each other require recognition at the same time.  *See* FASB Statement of Concepts No. 6, *Elements of Financial Statements*, ¶¶145-146.

145.    GAAP, specifically EITF Issue No. 01-9, *Accounting for Consideration Given by a Vendor to a Customer (Including a Reseller of the Vendor's Products)*, provides the following guidance with regard to rebates:

> [C]ash consideration (including a sales incentive) given by a vendor to a customer is presumed to be a reduction of the selling prices of the vendor's products or services and, therefore, should be characterized as a reduction of revenue **when recognized in the vendor's income statement**.

EITF Issue No. 01-0, ¶9.

146.    It is clear that defendants were aware of the GAAP governing rebates as STJ essentially reiterated the above in the following statement included in its Forms 10-K issued both prior to and subsequent to the Class Period:

> The Company offers sales rebates and discounts to certain customers.  The Company records such rebates and discounts as a reduction of net sales ***in the same period revenue is recognized***.  The Company estimates rebates based on sales terms and historical experience.

147.    Despite this public disclosure regarding the proper accounting for rebates, STJ failed to adhere to this stated policy during the Class Period.  Several CWs stated that STJ did ***not*** establish a sales reserve for the rebates at the time of the sales and that it was ***not*** until the cash incentives were paid to the customer that rebates were actually recorded as a reduction of sales.  CW1, CW15.

- 73 -

148.    Additionally, anticipated rebates were not included in the sales forecast.  Yet, because paying the rebates reduced sales in a given period, the rebates would impact STJ's forecast and ability to meet the sales goals for that period.  CW1, CW15.

**D.     STJ Improperly Accounted for Consignment Inventory as Sales in Violation of GAAP and Its Own Publicly Disclosed Policy**

149.    By the beginning of 1Q09, the CRM market was mature and had become saturated.  There was no substantial technological differentiation between competitors' CRM products, and those products were considered to be essential commodities.  In the face of these challenges to achieving growth in STJ's CRM sales, the Company resorted to various tactics to artificially inflate revenues that involved improper accounting practices, in an effort to meet its own guidance to investors.  One of those tactics was improperly accounting consignment inventory as sales.  STJ's senior management knew that even with those improper accounting practices, the Company's forecast and guidance to investors for fiscal year 2009 were not achievable.

150.    Prior to the Class Period, STJ improperly recognized revenue on multiple occasions for consigned products shipped – at STJ's request – to a large distributor in Little Rock, Arkansas that represented approximately 10%-15% of STJ's total CRM business.  CW13.  Consigning goods is a specialized method of marketing products.  Under such an arrangement, the consignor (STJ) ships products to a consignee (distributor) who acts as the consignor's agent in selling the goods.  The consignee agrees to accept the goods without any liability, except to exercise due care and reasonable protection from loss or damage, until the goods are sold to a third party.  When the consignee sells the goods, the revenue less a

- 74 -

selling commission and expenses incurred in accomplishing the sale is remitted to the consignor.  Goods out on consignment remain the property of the consignor.

151.   On multiple occasions, STJ management (Mike Zagger) instructed the STJ sales representative assigned to the Little Rock distributor to call the distributor and tell them that STJ needed an order for a certain number of CRM devices before a quarter was going to end.  CW13.  The orders would be placed, the products shipped to the distributor and then STJ would recognize revenue on these shipments in violation of GAAP and the Company's own publicly stated policy.  CW13.  CW13 personally saw the paper documentation reflecting the product sales in the quarter when the products were shipped to the distributor, but that the devices were not actually implanted into patients until the following quarter.  CW13.  CW13 explained that STJ would only get paid on the distributor deals when a hospital actually implanted the devices, and the distributor would receive a commission – *i.e.*, STJ's sale was contingent upon resale of the product to the hospital/patient.  CW13.

152.   Contrary to STJ's practice as described above, GAAP, specifically FAS 48, prohibits the recognition of revenue unless "[t]he buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product."  *See* FAS 48, ¶6b.  CW13 brought STJ's improper practices regarding these consignment transactions to the attention of a STJ vice president several times, but STJ took no action, to his/her knowledge, to address the practices at the time CW13 left the Company.

153.   It is clear that defendants were aware of the GAAP governing consignment sales and revenue, as STJ disclosed the following in its Forms 10-K issued both prior to and subsequent to the Class Period:

- 75 -

The Company recognizes revenue when persuasive evidence of a sales arrangement exists, delivery of goods occurs through the transfer of title and risks and rewards of ownership, the selling price is fixed or determinable and collectability is reasonably assured.  A portion of the Company's inventory is held by field sales representatives or consigned at hospitals.  ***Revenue is recognized at the time the Company is notified that the inventory has been implanted or used by the customer.  For products that are not consigned, revenue recognition occurs upon shipment to the hospital or, in the case of distributors, when title transfers under the contract***.

154.   Despite this public disclosure regarding proper revenue accounting policies, STJ failed to adhere to this stated policy before the Class Period.  Specifically, STJ recorded revenue on the consigned products shipped to the Little Rock distributor despite the fact that persuasive evidence of a sales arrangement did not exist: there was no transfer of title and risk and rewards of ownership; the final sales price was not yet fixed or determinable; collectability was not reasonably assured; and the products had not yet been implanted or used by the customer.  These criteria conform to GAAP and the SEC's guidance on proper accounting for revenue recognition as illustrated in SAB 104 which states that revenue generally is realized or realizable and earned when all of the following criteria are met: persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price to the buyer is fixed or determinable and collectability is reasonably assured.

155.   Ultimately, by improperly recognizing revenue on such consignment "sales," defendants were able to fraudulently inflate their revenue and earnings to meet guidance in periods prior to the Class Period.  STJ's improper accounting for revenue on certain consignment "sales" in fiscal year 2008 also establishes that STJ was already having difficulties meeting its own guidance prior to the Class Period.

- 76 -

156. Because the market conditions that led the Company to engage in improper consignment sales prior to the Class Period had not changed, and because STJ's consignment sales practices were ongoing – and the resulting GAAP violations – and deliberate, it is appropriate to infer that these illegitimate practices continued during the Class Period. In addition, given the nature of and reasons for the practices, it may be inferred that such sales were not limited to the transactions with the Little Rock distributor, but involved other distributors as well.

### E. Other GAAP Violations

157. STJ was also required to prepare its financial statements in accordance with the following fundamental accounting principles under GAAP, but failed to do so:

(a) The principle that "[f]inancial reporting should provide information that is useful to present and potential investors and creditors and other users [of the financial reports] in making rational investment, credit, and similar decisions." FASB Statement of Concepts No. 1, ¶34. STJ relied upon QP transactions and improper consignment sales as vehicles to meet revenue and earnings expectations. STJ failed to disclose the existence and nature of the QP transactions in Form 10-K for 2008 and Forms 10-Q for 1Q09 and 2Q09;

(b) The principle that "[f]inancial reporting should provide information [about the economic resources of] an enterprise, the claims to those resources . . . and the effects of transactions, events, and circumstances that change resources and claims to those resources." *Id.*, ¶40. STJ relied upon QP transactions and improper consignment sales as vehicles to meet revenue and earnings expectations. STJ failed to disclose the existence and nature of the QP transactions in Form 10-K for 2008 and Forms 10-Q for 1Q09 and 2Q09;

- 77 -

(c)     The principle that "[f]inancial reporting should provide information about an enterprise's financial performance during a period [because] [i]nvestors and creditors often use information about the past to help in assessing the prospects of an enterprise." *Id.*, ¶42.  STJ relied upon QP transactions and improper consignment sales as vehicles to meet revenue and earnings expectations.  STJ failed to disclose the existence and nature of the QP transactions in Form 10-K for 2008 and Forms 10-Q for 1Q09 and 2Q09.  STJ also failed to disclose that STJ was at substantial risk of not meeting its own guidance because of its dependence upon QP transactions as a critical means of meeting that guidance;

(d)     The principle that "[f]inancial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it." *Id.*, ¶50.  STJ failed to disclose the existence and nature of the QP transactions in Form 10-K for 2008 and Forms 10-Q for 1Q09 and 2Q09.  STJ also failed to disclose that STJ was at substantial risk of not meeting its own guidance because of its dependence upon QP transactions as a critical means of meeting that guidance;

(e)     The principle that financial reporting should be reliable in that it represents what it purports to represent.  "That information should be reliable as well as relevant is a notion that is central to accounting."  FASB Statement of Concepts No. 2, ¶¶58-59.  The revenues recognized in connection with the CRM QP transactions, rebates, and certain consignment sales were improper.  STJ failed to disclose the existence and nature of the QP transactions in Form 10-K for 2008 and Forms 10-Q for 1Q09 and 2Q09;

- 78 -

(f)      The principle of completeness, which means that nothing is "left out of the information that may be necessary to insure that it validly represents underlying events and conditions." *Id.*, ¶79.  The revenues recognized in connection with the CRM QP transactions, rebates and certain consignment sales were improper.  STJ failed to disclose the existence and nature of the QP transactions in Form 10-K for 2008 and Forms 10-Q for 1Q09 and 2Q09;

(g)      The principle that "[c]onservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered." *Id.*, ¶95.  The revenues recognized in connection with the CRM QP transactions, rebates and certain consignment sales were improper.  STJ failed to disclose the existence and nature of the QP transactions in Form 10-K for 2008 and Forms 10-Q for 1Q09 and 2Q09;

(h)      The principle that revenues and gains should not be recognized until they are both earned and realizable.  FASB Statement of Concepts No. 5, ¶83.  STJ did not earn the revenues in connection with the CRM QP transactions because STJ had significant obligations to track and monitor every CRM product sold in a QP transaction and to replace all "stale" products with fresh products prior to expiration, before any "stale" device could be implanted in a patient.  In QP transactions, STJ was also obligated to manage customers' inventories and to assist medical staff with selecting the appropriate device at the time of implantation.  The revenues recognized in connection with the CRM QP transactions, rebates and certain consignment sales were improper; and

(i)     The principle that revenue should not be recognized until the seller has substantially accomplished what it must do pursuant to the terms of the arrangement, which usually occurs upon delivery or performance of the services. FASB Statements of Concepts No. 5, ¶84(a)-(b), (d). In the QP transactions, delivery of the CRM products may have occurred, but the services that STJ were obligated to perform were not fully rendered. STJ had significant obligations to track and monitor every CRM product sold in a QP transaction and to replace all "stale" products with fresh products prior to expiration, before any "stale" device could be implanted in a patient. In QP transactions, STJ was also obligated to manage customers' inventories and to assist medical staff with selecting the appropriate device at the time of implantation.

**F.     STJ's Misstatements Were Material**

158.    STJ's misstatements of revenues, net income and stockholders' equity caused by STJ's improper accounting in the Company's Forms 10-Q for the periods ended April 4, 2009 (1Q09) and July 4, 2009 (2Q09) were material. The SEC clarified the principles of materiality in SAB 99, issued in August 1999. SAB 99 does not present new materiality standards but, instead, reaffirms long-accepted concepts expressed in auditing and accounting literature. It also provides interpretive guidance to ensure those concepts are properly applied.

159.    Among the most important of SAB 99's points are that:

(a)     Registrants and auditors may not rely solely on quantitative criteria to evaluate an item's materiality;

(b)     The materiality of items can be determined reliably only if they are evaluated both individually and collectively; and

(c)     An intentional misstatement may be illegal even if the item it concerns is immaterial.

160.    According to SAB 99, "quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations. Materiality concerns the significance of an item to users of a registrant's financial statements. A matter is 'material' if there is substantial likelihood that a reasonable person would consider it important."

161.    In addition, SAB 99 states that there are several ways in which a "quantitatively small" misstatement may be material. For example, the misstatement may conceal a failure to meet analysts' expectations or it may convert a loss into a profit. In fact, one of the more widespread abuses that SAB 99 addresses is the intentional recording of immaterial errors in a registrant's financial statements in order to smooth earnings artificially and give a false impression of their stability. To the extent that registrants intentionally misstate immaterial items, they potentially violate provisions of the Exchange Act, which mandates the use of accurate and reasonably detailed records as the basis for financial statements. The QP, rebate and consignment sales transactions were material because STJ knew they were improper, the magnitude of those transactions was critical to STJ's ability to meet its own guidance, and "there is substantial likelihood that a reasonable person would consider [the improper transactions to be] important."

## IX.   ADDITIONAL SCIENTER AND CONTROL PERSON ALLEGATIONS

162.   Each defendant knew or recklessly disregarded that the statements alleged above would be, and were, materially false and misleading to investors, because the material adverse facts specified herein had not been disclosed to or were being actively concealed from the market, and that defendants' positive representations during the Class Period were thus materially false and misleading.

163.   Defendants' responsibility for and control over financial reporting, including their regular participation in preparing, authorizing and filing STJ's financial statements and other periodic reports with the SEC, and authorizing or making statements about STJ's financial results in periodic press releases and on conference calls, demonstrates that each defendant knew or recklessly disregarded that the information contained therein would be, and was, materially misleading to investors.

164.   Further, defendants, because of their positions with the Company, possessed the power and authority to control the contents of STJ's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.  The Individual

- 82 -

Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective action of defendants.

165.   As alleged herein, each defendant acted with scienter in that each defendant knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading or omitted to state facts necessary to prevent them from being materially false and misleading under the circumstances.  Each defendant knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the making, issuance or dissemination of such statements or documents as a primary violation of the federal securities laws. By virtue of their receipt or reckless disregard of information reflecting the true facts regarding STJ, their control over and/or receipt and/or modification of STJ's materially misleading statements, and/or their other associations with the Company, each defendant was privy to confidential information concerning STJ and knowingly or recklessly participated in the fraudulent scheme and conduct alleged herein.

## A.   Insider Trading

166.   The Individual Defendants were highly motivated to keep STJ's stock price inflated throughout the Class Period.  According to SEC Forms 4 filed by STJ insiders, the Individual Defendants and members of the Company's Board of Directors made STJ stock sales that were suspicious in both timing and amount, as follows:

(a)   Starks: In three separate two-day periods during the Class Period, defendant Starks unloaded a total of 300,000 shares of STJ stock, reaping nearly $12 million

of proceeds, while in possession of material undisclosed information set forth herein.  On June 2 and June 4, 2009, Starks disposed of 100,000 shares total of STJ stock at near-Class-Period highs of approximately $40 per share, reaping over $4 million in proceeds.  Again on July 28 and 30, 2009, Starks disposed of 100,000 shares total, collecting profits of another $3.8 million.  Finally, on September 9-10, 2009, Starks sold another 100,000 shares of STJ for an additional $3.9 million in proceeds.

(b)     Heinmiller:  On May 7, 2009, defendant Heinmiller sold 50,000 shares of STJ stock, reaping $1.75 million in proceeds, while in possession of material undisclosed information set forth herein.

(c)     Fain:  On July 24, 2009, defendant Fain sold 52,500 shares of STJ stock, collecting nearly $2 million in proceeds, while in possession of material undisclosed information set forth herein.

**B.      Bonuses and Other Incentive Compensation**

167.    Although defendants knew, or recklessly disregarded, that the bulk sales strategy resulted in inflated earnings and was vulnerable to worsening economic conditions, they were motivated to keep the truth secret so as to avoid losing their jobs and lucrative performance-based executive compensation.

**Class Period Compensation**

168.    According to STJ's SEC filings, the Company's Executive Compensation Program included base salary, annual incentive awards and long-term incentive awards including stock options:

573787_1

(a)   **Base Salary**:  With the exception of Starks, each defendant enjoyed increases in his base salary from 2008 to 2009.  Among the considerations weighed by the Compensation Committee in determining Individual Defendants' salaries was "past performance."  Thus, Heinmiller's salary increased to $665,000, Rousseau's to $600,000 and Fain's to $549,423.  Starks saw his salary remained the same in 2009 at $975,000.

(b)   **Annual Incentive Awards**: According to STJ's Proxy Statement filed with the SEC on March 23, 2010, annual incentive awards at STJ were based on "the Company's level of achievement of Company-wide annual sales revenue and earnings per share objectives."  In December 2008, the Company set its 2009 performance objectives at double digit growth over its 2008 revenues and profitability results.  According to the Company, these goals were established to "challenge executives to maximize year-over-year growth in sales and profitability but are at the same time intended to be reasonable in that they can be achieved by the efficient execution of operating plans."  In reality, defendants were motivated not only to conceal the problems and risks associated with STJ's quarter-end bulk sales strategy, but to ensure that the Company took whatever steps necessary to meet its EPS objectives in order to maximize their compensation.

(c)   **Long-Term Incentive Awards**:  Defendants were also motivated to preserve the value of their stock options by keeping STJ's share price artificially inflated.

169.   The defendants' executive compensation for 2009, which was largely dependent upon STJ's financial results for that year, was as follows:

| Name and Principal Position | Salary | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|
| Daniel J. Starks | $975,000 | $5,865,795 | $1,061,775 | $36,350 | $7,938,920 |
| John C. Heinmiller | $665,000 | $2,789,511 | $603,487 | $39,315 | $4,097,313 |
| Michael T. Rousseau | $600,000 | $2,372,388 | $544,500 | $35,160 | $3,552,048 |
| Eric S. Fain | $549,423 | $1,824,914 | $358,224 | $29,410 | $2,761,971 |

## C.    SOX Certifications

170.    Internal control[9] is a process, carried out by an entity's board of directors, management and other personnel, designed to provide reasonable assurance that, among other things, the financial statements are reliable and accurate and that a company complies with applicable laws and regulations.

171.    Management of any public company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act.

172.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets

---

[9]    AU 319.06, *Internal Control in a Financial Statement Audit*, defines internal control as "a process – effected by an entity's board of directors, management, and other personnel – designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations.

- 86 -

of the issuer; and (B) devise and maintain a system of internal controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit the preparation of financial statements in conformity with [GAAP]." These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets. *SEC v. World-Wide Coin Invs., Ltd.*, 567 F. Supp. 724, 750 (N.D. Ga. 1983).

173.   STJ senior management, and specifically defendants Starks and Heinmiller, were responsible for evaluating the Company's internal controls over financial reporting and reporting the results of their evaluation to investors in STJ's Form 10-K. The following disclosure appeared in the Company's Forms 10-K encompassing the Class Period:

> ***Management is responsible for establishing and maintaining adequate internal control over financial reporting***, as such term is defined in Exchange Act Rules 13a-15(f). ***Under the supervision and with the participation of the Company's management, including the CEO and the CFO***, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on this evaluation, the CEO and CFO concluded*** that our internal control over financial reporting was effective as of January 3, 2009 [and as of January 2, 2010].

174.   The above statement was signed by defendants Starks and Heinmiller in Form 10-K for the year ended January 3, 2009 and in Form 10-K for the year ended January 2, 2010. Forms 10-Q for 1Q09 and 2Q09 state that there were no changes in the Company's internal control over financial reporting that have materially affected, or are reasonably likely to material affect, the Company's internal control over financial reporting,

- 87 -

except for the implementation of a new enterprise resource planning system for the NMD

division and a new human capital management system, both of which are being implemented

in phases and for which related internal controls are tested for effectiveness prior to

implementation – neither of these implementations affect the allegations herein.

175.   As part of their responsibility, defendants signed the following SOX

certifications in each of the Forms 10-Q and 10-K encompassing the Class Period,[10] in which

they: (a) certified that they had performed evaluations of STJ's financial statements,

disclosure controls and internal controls over financial reporting; and (b) certified the

accuracy of STJ's financial statements and the effectiveness of STJ's disclosure controls and

internal controls over financial reporting as a result of their evaluations.  In particular, each

of those defendants declared that they:

> are responsible for establishing and maintaining disclosure controls and
> procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and
> internal control over financial reporting (as defined in Exchange Act Rules
> 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > a)      Designed such disclosure controls and procedures, or caused
> > such disclosure controls and procedures to be designed under our
> > supervision, to ensure that material information relating to the
> > registrant, including its consolidated subsidiaries, is made known to us
> > by others within those entities, particularly during the period in which
> > this report is being prepared;
> >
> > b)      Designed such internal control over financial reporting, or
> > caused such internal control over financial reporting to be designed

---

[10]      Specifically, the SOX certifications were signed by defendants Starks and Heinmiller
in STJ's Form 10-K for the year ended January 3, 2009, in STJ's Forms 10-Q for the
quarters ended April 4, 2009, July 4, 2009 and October 3, 2009, and in STJ's Form 10-K for
the year ended January 2, 2010.

- 88 -

under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) ***Evaluated the effectiveness of the registrant's disclosure controls*** and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting . . . .

176. Defendants' "review" of STJ's financial statements, "evaluation" of STJ's disclosure controls, and "evaluation" of STJ's internal control over financial reporting that defendants certified they had personally performed in the above SOX certifications, would clearly have alerted defendants to the presence of the accounting misstatements described herein and to weaknesses in internal controls. Therefore, defendants either knew of the misstatements in the financial statements, the ineffectiveness of the disclosure controls and the weaknesses in internal controls or defendants knowingly failed to carry out the required review of the financial statements, evaluation of internal controls, and evaluation of disclosure controls (as they stated they had done in the certifications). In either case, defendants knew or recklessly disregarded that the SOX certifications they signed were false.

## X.   ADDITIONAL CONTROL PERSON ALLEGATIONS

177. Defendants Starks, Heinmiller, Fain and Rousseau acted as controlling persons of STJ within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of

- 89 -

their high-level positions, participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by STJ and disseminated to the investing public, defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements, alleged by plaintiffs to be misleading, prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

178.   Each of the defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same. Furthermore, throughout the Class Period, defendants had access to Company-wide sales information, and could track sales performance on an immediate, monthly, or quarterly basis, and compare it with forecasted sales numbers.

179.   As set forth above, defendants violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

573787_1

## XII.   CLASS ACTION AND FRAUD ON THE MARKET ALLEGATIONS

180.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired STJ securities during the Class Period and were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

181.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  STJ had over 325 million shares of stock outstanding during the Class Period, owned by tens or hundreds of thousands of persons.

182.   Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

183.   Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

184.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)   Whether the Exchange Act was violated by defendants;

(b)   Whether defendants omitted and/or misrepresented material facts;

- 91 -

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     Whether the price of STJ securities was artificially inflated; and

(f)     The extent of damages sustained by Class members and the appropriate measure of damages.

185.    The fraudulent statements, omissions and course of conduct described above operated as a fraud on the market for STJ securities.  Under the fraud on the market theory of reliance, the element of reliance is  presumed to be met by all members of the Class.

186.    At all relevant times, the market for STJ's common stock was an efficient market for the following reasons, among others:

(a)     STJ's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange ("NYSE"), a highly efficient and automated market;

(b)     As a regulated issuer, STJ filed periodic public reports with the SEC and NYSE;

(c)     STJ regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, publications on its website and other Internet sites, and through other wide-ranging public disclosures, such as through

- 92 -

conference calls, communications with the financial press and other similar reporting services;

(d)     During the Class Period, STJ was followed by securities analysts employed by major brokerage firms, including those whose reports have been quoted above. Analysts employed by each of these firms regularly wrote reports based upon the publicly available information disseminated by defendants about STJ.  These reports were distributed to the sales force and certain customers of their respective brokerage firms;

(e)     STJ had substantial institutional ownership during the Class Period. Each of these institutions regularly analyzed and reported on the publicly-available information about STJ and its operations; and

(f)     Through the foregoing mechanisms, the information publicly disseminated by defendants about STJ and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace such that, as a result of their transactions in STJ stock, the information disseminated by defendants, including the false and misleading statements described above, became incorporated into and reflected by the market price of STJ's publicly traded securities.

187.   As a result of the foregoing, the market for STJ's common stock promptly digested current information regarding STJ from all publicly available sources and reflected such information in STJ's stock price.  Under these circumstances, all purchasers of STJ's common stock during the Class Period suffered similar injury through their purchase of STJ's common stock at artificially inflated prices and its subsequent decline in value.

188.    Because the false and misleading information provided to the market during the Class Period affected the price of STJ's publicly traded securities, it is presumed that Class members who purchased STJ securities at the publicly-available prices prevailing in the regulated market for those securities relied upon the false statements and omissions alleged above.  Accordingly, the fraud on the market presumption of reliance applies.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

189.    Plaintiffs incorporate all prior allegations of this complaint by reference.

190.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

191.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of STJ securities during the Class Period.

- 94 -

192.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for STJ securities and suffered damages when that inflation was eliminated by disclosures of information that revealed the facts and conditions hidden by defendants' fraudulent statements and omissions, or the economic impact of those facts and conditions.  Plaintiffs and the Class would not have purchased STJ securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated or maintained by defendants' false and misleading statements and course of business alleged herein.

193.    As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of STJ securities during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against All Defendants

194.    Plaintiffs incorporate all prior allegations of this complaint by reference.

195.    The Individual Defendants acted as controlling persons of STJ within the meaning of §20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of STJ and their ownership of STJ stock, the Individual Defendants had the power and authority to cause STJ to engage in the wrongful conduct complained of herein.  STJ controlled each of the Individual Defendants and all of its employees.  By reason of such conduct, the Individual Defendants and STJ are liable pursuant to §20(a) of the Exchange Act.

- 95 -

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding plaintiffs and the members of the Class compensatory damages, including interest thereon;

C.     Awarding plaintiffs and the Class their reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

196.    Plaintiffs demand a trial by jury on all issues.

DATED:  August 16, 2010              ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                     DENNIS J. HERMAN
                                     PHILLIP G. FREEMON


                                     _____
                                          s/ Dennis J. Herman
                                        DENNIS J. HERMAN

                                     100 Pine Street, Suite 2600
                                     San Francisco, CA  94111
                                     Telephone:  415/288-4545
                                     415/288-4534 (fax)
                                     dherman@rgrdlaw.com
                                     gfreemon@rgrdlaw.com

ROBBINS GELLER RUDMAN
  &DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

Lead Counsel for Plaintiffs

ZIMMERMAN REED, P.L.L.P.
CAROLYN G. ANDERSON, No. 275712
BRIAN G. GUDMONDSON, No. 336695
651 Nicollet Mall, Suite 501
Minneapolis, MN  55402
Telephone:  612/341-0400
612/341-0844 (fax)
Carolyn.Anderson@zimmreed.com
Brian.Gudmundson@zimmreed.com

Liaison Counsel

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

BUILDING TRADES UNITED PENSION TRUST FUND ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5. (a) Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Osborn v. Coach, Inc.*, et al., No. 09-cv-03789 (S.D.N.Y.)
*Building Trades United Pension Trust Fund v. Kenexa Corporation, et al.*, No. 2:09-cv-02642-JS (E.D. Pa.)
*Building Trades United Pension Trust Fund v. EnergySolutions, Inc., et al.*, No. 09-cv-08648 (S.D.N.Y.)

(b) Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

(c) Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Rubin v. MF Global, Ltd.*, et al., No. 1:08-cv-02233-VM (S.D.N.Y.)
*Public Pension Fund Group, et al. v. KV Pharmaceutical Co., et al.*, No. 4:08-cv-01859-CEJ (E.D. Mo.)
*Coad v. Sequenom, Inc., et al.*, No. 3:08-cv-00921-LAB (S.D. Cal.)
*Hughes v. Huron Consulting Group Inc., et al.*, No. 1:09-cv-04734 (N.D. Ill.)
*Jean v. STEC, Inc., et al.*, No. SACV-09-01304-JVS(MLGx) (C.D. Cal.)

ST. JUDE MEDICAL

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___12___day of ___april___, 2010.

> BUILDING TRADES UNITED PENSION
> TRUST FUND
>
> By: _____
>
> Its: _____ Chairman
>
>
> By: _____
>
> Its: _____ Secretary

- 2 -

## SCHEDULE A

### SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 06/23/2009 | 14,500 | $41.10 |
| 07/24/2009 | 7,400 | $37.66 |