UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


IN RE:  ST. JUDE MEDICAL, INC.                    Civil File No. 10-851 JNE/JJK
SECURITIES LITIGATION


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION
TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**


DORSEY & WHITNEY LLP

James K. Langdon #0171931
Michelle S. Grant #0311170
Eric R. Sherman #0331430
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600

*Attorneys for Defendants St. Jude
Medical, Inc., Daniel J. Starks, John C.
Heinmiller, Eric S. Fain, and Michael T.
Rousseau*

# TABLE OF CONTENTS

**(Page)**

I.     INTRODUCTION ........................................................................................ 1

II.    STATEMENT OF FACTS ......................................................................... 2

    A.    St. Jude's Business ......................................................................... 2

    B.    The Individual Defendants ............................................................. 3

    C.    St. Jude's Results And Guidance During 2009 ............................. 3

    D.    St. Jude's Results For 3Q09 .......................................................... 4

    E.    Plaintiffs' Confidential Witnesses ................................................. 5

III.    ARGUMENT ............................................................................................. 7

    A.    The Complaint Fails To Plead False Statements With Particularity ............. 8

        1.    Plaintiffs Fail To Identify The Alleged False Statements. ................. 8

        2.    Allegations Of False Financial Results Lack Particularity. .............. 9

            a.    Plaintiffs Fail To Plead Their Consignment Accounting Allegations With Particularity ........................... 10

            b.    Plaintiffs Fail To Plead Their "Channel Stuffing" Allegations With Particularity. ............................................. 12

            c.    Plaintiffs Fail To Plead Their Exchange Accounting Allegations With Particularity. ............................................. 14

            d.    Plaintiffs Fail To Plead Their Rebate Accounting Allegations With Particularity. ............................................. 16

        3.    Plaintiffs' Allegations Of False Financial Forecasts Lack Particularity. ................................................................................. 17

        4.    St. Jude's Forward-Looking Statements Were Accompanied by Meaningful Cautionary Language ................................................. 21

    B.    The Complaint Fails To Plead Facts Giving Rise To A Strong Inference Of Scienter ................................................................................. 22

## TABLE OF CONTENTS (cont'd)

**(Page)**

1. The Accounts of Plaintiffs' "Confidential Witnesses" Do Not Give Rise To A Strong Inference Of Scienter. ................................ 23

2. Allegations Regarding SOX Certifications Do Not Give Rise to a Strong Inference of Scienter. ....................................................... 25

3. Allegations Regarding GAAP Violations Do Not Give Rise to a Strong Inference of Scienter. .......................................................... 26

4. Allegations Regarding The Sale of St. Jude Stock Do Not Give Rise to a Strong Inference of Scienter. .................................... 27

5. Allegations Regarding Compensation And Continued Employment Do Not Give Rise To A Strong Inference of Scienter. ......................................................................................... 29

6. Taken Collectively, Plaintiffs' Allegations Do Not Give Rise To A Strong Inference of Scienter. .................................................. 30

C. The Complaint Should Be Dismissed Because It Fails To Plead Loss Causation. ......................................................................................... 30

D. Plaintiffs' Section 20(a) Claim Must Also Be Dismissed. .......................... 33

E. Confidential Witnesses Testimony May Not Support The Complaint. ....... 33

IV.   CONCLUSION ..................................................................................... 34

# TABLE OF AUTHORITIES

**(Page)**

CASES

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004)......................................................................... 23

*Campbell v. Lexmark Int'l Inc.*,
  234 F. Supp. 2d 680 (E.D. Ky. 2002) ......................................................... 28

*Campo v. Sears Holdings Corp.*,
  2010 WL 1292329 (2d Cir. Apr. 6, 2010) ............................................ 17, 33

*Campo v. Sears Holdings Corp.*,
  635 F. Supp. 2d 323 (S.D.N.Y. 2009)......................................................... 33

*Cornelia I. Crowell GST Trust v. Possis Med., Inc.*,
  519 F.3d 778 (8th Cir. 2008) .............................................................. passim

*Deviries v. Prudential-Bache Sec., Inc.*,
  805 F.2d 326 (8th Cir. 1986) ...................................................................... 33

*Druskin v. Answerthink, Inc.*,
  299 F. Supp. 2d 1307 (S.D. Fla. 2004) ...................................................... 10

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005).............................................................................. 7, 31

*Elam v. Neidorff*,
  544 F.3d 921 (8th Cir. 2008) ...................................................... 17, 18, 27, 28

*Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*,
  395 F.3d 851 (8th Cir. 2005) ...................................................................... 26

*Garfield v. NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006) .................................................................. 12

*Greebel v. FTP Software, Inc.*,
  194 F.3d 185 (1st Cir. 1999)....................................................................... 13

*Higginbotham v. Baxter Int'l, Inc.*,
  2005 WL 3542521 (N.D. Ill. Dec. 22, 2005)............................................... 27

*Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*,
  580 F.3d 755 (8th Cir. 2009) ............................................................... passim

## TABLE OF AUTHORITIES (cont'd)

**(Page)**

*In re 2007 Novastar Fin., Inc. Sec. Litig.*,
    579 F.3d 878 (8th Cir. 2009) ......................................................................... 8, 9

*In re Alamosa Holdings, Inc. Sec. Litig.*,
    382 F. Supp. 2d 832 (N.D. Tex. 2005) ...................................................... 10

*In re Alpharma Inc. Sec. Litig.*,
    372 F.3d 137 (3d Cir. 2004)...................................................................... 20

*In re AMDOCS Ltd. Sec. Litig.*,
    390 F.3d 542 (8th Cir. 2004) .............................................................. 19, 21

*In re AOL Time Warner, Inc. Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007)................................................... 31, 32

*In re Ceridian Corp. Sec. Litig.*,
    504 F. Supp. 2d 603 (D. Minn. 2007) ........................................................ 26

*In re Ceridian Corp. Sec. Litig.*,
    542 F.3d 240 (8th Cir. 2008) ...................................................25, 26, 27, 29

*In re Cerner Corp. Sec. Litig.*,
    425 F.3d 1079 (8th Cir. 2005) ................................................. 13, 19, 28, 29

*In re Coca-Cola Enters. Inc. Sec. Litig.*,
    510 F. Supp. 2d 1187 (N.D. Ga. 2007) ....................................................... 13

*In re Credit Acceptance Corp. Sec. Litig.*,
    50 F. Supp. 2d 662 (E.D. Mich. 1999)........................................................ 10

*In re Dell Inc. Sec. Litig.*,
    591 F. Supp. 2d 877 (W.D. Tex. 2008)........................................................ 32

*In re Donald J. Trump Casino Sec. Litig.*,
    7 F.3d 357 (3d Cir. 1993)........................................................................... 21

*In re Hutchinson Tech., Inc. Sec. Litig.*,
    536 F.3d 952 (8th Cir. 2008) ............................................................ passim

*In re Hypercom Corp. Sec. Litig.*,
    2006 WL 1836181 (D. Ariz. July 5, 2006) ............................................ 12, 17

*In re ICN Pharm., Inc. Sec. Litig.*,
    299 F. Supp. 2d 1055 (C.D. Cal. 2004) ............................................... 13, 14

iv

## TABLE OF AUTHORITIES (cont'd)

**(Page)**

*In re Initial Public Offering Sec. Litig.*,
   399 F. Supp. 2d 298 (S.D.N.Y. 2005)...........................................................................31

*In re K-tel Int'l, Inc. Sec. Litig.*,
   300 F.3d 881 (8th Cir. 2002) .............................................................................. passim

*In re Nash Finch Co. Sec. Litig.*,
   323 F. Supp. 2d 956 (D. Minn. 2004)............................................................7, 29, 30

*In re Navarre Corp. Sec. Litig.*,
   299 F.3d 735 (8th Cir. 2002) .....................................................................8, 27, 28, 29

*In re Patterson Cos., Inc. Sec., Derivative & ERISA Litig.*,
   479 F. Supp. 2d 1014 (D. Minn. 2007)......................................................................20

*In re St. Jude Med., Inc. Sec. Litig.*,
   629 F. Supp. 2d 915 (D. Minn. 2009)........................................................................14

*In re Synovis Life Technologies, Inc. Sec. Litig.*,
   2005 WL 2063870 (D. Minn. Aug. 25, 2005) .......................................................7, 21

*Kushner v. Beverly Enters., Inc.*,
   317 F.3d 820 (8th Cir. 2003) ..............................................................................22, 29

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005).......................................................................................31

*McAdams v. McCord*,
   584 F.3d 1111 (8th Cir. 2009) ...................................................................................30

*Parnes v. Gateway 2000, Inc.*,
   122 F.3d 539 (8th Cir. 1997) .....................................................................................21

*Schaaf v. Residential Funding Corp.*,
   517 F.3d 544 (8th Cir. 2008) ...............................................................................30, 31

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................................22, 23

# TABLE OF AUTHORITIES (cont'd)

<u>**(Page)**</u>

**STATUTES**

15 U.S.C. § 78u-4(b)(1) .................................................................................................. 7

15 U.S.C. § 78u-4(b)(2) .............................................................................................. 8, 22

**OTHER AUTHORITIES**

17 C.F.R. § 240.10b5-1 ................................................................................................. 27

Fed. R. Civ. P. 11 .......................................................................................................... 33

Rule 10b-5 ............................................................................................................ 7, 14, 22

Rule 10b5-1 .................................................................................................................... 27

Rule 12(b)(6) ................................................................................................................... 2

Statement of Financial Accounting Standards No. 48 ("FAS 48") .................................. 15

## I.     INTRODUCTION

Public companies typically give guidance about what they hope to achieve in the future.  As is the case when predicting any future event, sometimes they miss the mark.  On October 6, 2009, St. Jude Medical, Inc. ("St. Jude") announced it would not meet its guidance for the third quarter of 2009 ("3Q09") because of a slowdown in hospital stocking of certain medical devices.

Using 20/20 hindsight, Plaintiffs conclude that (1) Defendants must have known when they issued guidance for 3Q09 that business would drop off precipitously and (2) St. Jude's previous financial results, which have been the subject of unqualified audit opinions and have never been restated, must have been falsely inflated.  But missing guidance does not constitute securities fraud, and just because a company suffers a downturn does not mean every statement made earlier was false and misleading.

Nor do volume sales, discount incentives, and rebates constitute securities fraud, even when saddled with the pejorative label "channel stuffing."  Each is common, appropriate, and even necessary practice to compete in the market for medical devices.  They are perfectly legal except when undertaken with the specific intent to deceive the market by manipulating a company's financial results—something Plaintiffs here do not and cannot adequately allege.

Rather than plead specific facts, the Complaint instead quotes at length from public filings and presentations and cobbles together vague statements of fifteen Confidential Witnesses, one of whom disavows those statements and others of whom

have no foundation for knowing what is attributed to them.  Among other things,

Plaintiffs fail to plead:

- precisely which statements among the extensive public utterances by St. Jude are false and why merely falling short of earnings estimates could constitute fraud;

- the specifics of the alleged channel stuffing scheme:  which customers were involved, when the supposedly fraudulent transactions occurred, and how much revenue was supposedly pulled into earlier periods;

- enough information about their Confidential Witnesses to establish that they were in a position to know any of the facts attributed to them; and

- a sufficient motive for St. Jude and the Individual Defendants to have knowingly undertaken a scheme that was so clearly against their interests.

The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires far more than

the Complaint articulates.  This Court accordingly should dismiss it.

## II.  STATEMENT OF FACTS[1]

### A.  St. Jude's Business

St. Jude is a Minnesota corporation with its principal place of business in St. Paul,

Minnesota.  St. Jude is engaged in developing, manufacturing, and distributing medical

devices for the surgical and interventional treatment of disease.  Compl. ¶ 17.  St. Jude's

business is divided into four segments:  Cardiac Rhythm Management ("CRM"),

Neuromodulation ("NMD"), Cardiovascular ("CV"), and Atrial Fibrillation ("AF").  *Id.*

¶ 17.

---

[1]     The Statement of Facts is drawn from (1) the Complaint, the allegations of which are assumed to be true for the purposes of this motion only, (2) public documents, and (3) other materials embraced by the Complaint.  Such materials can be considered upon a Rule 12(b)(6) motion.  *See In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 889 (8th Cir. 2002).

### B.       The Individual Defendants

St. Jude officers named as Defendants include Daniel J. Starks, John C. Heinmiller, Eric S. Fain, and Michael T. Rousseau (collectively "Individual Defendants").  Compl. ¶¶ 18-21.  Starks is Chairman, President, and CEO.  *Id.* ¶ 18. Heinmiller is Executive Vice President and CFO.  *Id.* ¶ 19.  Fain is President of the CRM division.  *Id.* ¶ 20.  Rousseau is Group President, responsible for all product divisions. *Id.* ¶ 21.  The Individual Defendants continue today in the positions they occupied during the class period.

### C.       St. Jude's Results And Guidance During 2009

Like most publicly-traded companies, St. Jude provides investors and the market with estimates of what it anticipates future revenues and earnings per share will be. Every such announcement during fiscal year 2009 included forward-looking statements within the safe harbor provisions of the PSLRA.  *See, e.g.* Compl. Exs. A at 4; B at 2; C at 4; D at 2.  Each also identified, or incorporated public documents that identified, key risk factors that could affect St. Jude's actual results, including competition, economic developments, and a reduction in procedures using St. Jude devices.  *See, e.g.*, Compl. Exs. A at 4; B at 2; C at 4; D at 2.

On April 22, 2009, the first day of the putative class period, St. Jude issued a press release reporting earnings for the first quarter of 2009 ("1Q09").  Compl. Ex. A at 3.  At the same time, St. Jude announced expected consolidated earnings for the second quarter ("2Q09") in the range of 62 to 64 cents per diluted share.  *Id.* Ex. A. at 3.

Three months later, St. Jude issued a press release announcing the results of 2Q09. Compl. Ex. B.  Those results matched St. Jude's earlier guidance, coming in at 63 cents per diluted share.  *Id.* Ex. B at 2.  St. Jude's results during 2008 and 2009 were the subject of unqualified audit opinions, have never been restated, and remain the results for those periods today.

In the 2Q09 press release, St. Jude also issued earnings guidance for 3Q09.  St. Jude predicted consolidated earnings for 3Q09 between 61 and 63 cents per diluted share.

**D.     St. Jude's Results For 3Q09**

On October 6, 2009, St. Jude announced that actual results for 3Q09 had failed to meet its expectations.  Compl. ¶ 109.  St. Jude stated its expectation to report consolidated earnings between 57 to 58 cents, with additional charges of 9 to 10 cents per share for severance costs.  *Id.* ¶ 109.  St. Jude commented that "one factor impacting third quarter sales was a slowdown in hospital stocking of certain medical devices."  *Id.* ¶ 109. It noted that "macro economic factors coupled with the continued pressures surrounding healthcare reform resulted in changes in purchasing behavior among some of [St. Jude's] hospital customers."  *Id.* ¶ 109.

St. Jude's stock price declined $4.84, which was 12.7% lower than the previous day's close.  Compl. ¶ 110.  Plaintiffs filed this securities fraud lawsuit on March 18, 2010.  On June 16, 2010, the Court designated Building Trades United Pension Trust Fund as Lead Plaintiff.  Plaintiffs filed an amended complaint on August 16, 2010.

### E.     Plaintiffs' Confidential Witnesses

Plaintiffs allege the Complaint is based upon "information obtained from more than 20 former employees of [St. Jude]."  Compl. ¶ 23.  Nonetheless, Plaintiffs identify only 15 of these former employees—and attribute specific allegations to only 14 of them. Only 9 of those 14 Confidential Witnesses are specifically alleged to have been present at St. Jude during any portion of the class period.  *See id.* ¶ 31 (CW8 at St. Jude "between 2006 and 2009); ¶ 32 (CW9 departed in August 2008); ¶ 36 (CW13 "laid off in mid-2009"); ¶ 37 (CW14 worked "until the end of 2008"); ¶ 38 (CW15 "worked intermittently from 2006 to 2009").

Much of what Plaintiffs attribute to the Confidential Witnesses consists of "truisms," hyperbole, opinions lacking any foundation, and irrelevant statements regarding St. Jude's business strategies.  *See, e.g.*, Compl. ¶ 48 (if hospital purchased more devices than needed, it would be unlikely to buy more); ¶ 49 ("bulk sales were akin to 'robbing Peter to pay Paul'" and sales force thought strategy was "unsustainable"). Indeed, CW11's sole contribution is to report that persons whose employment was terminated before an alleged reduction in force were told their terminations were not part of the later reduction in force.  *Id.* ¶ 93.

Other Confidential Witnesses are alleged to have provided "facts" they would not have learned in their work if the Complaint's other allegations are taken as true.  For instance, Plaintiffs allege CW1 was a "Senior Field Finance Manager in the Cardiovascular Sales Division."  Compl. ¶ 24.  Plaintiffs also allege that CV products encompasses "heart valves and other products used in open heart surgery."  *Id.* ¶ 39.

However, Plaintiffs cite CW1 as the source of allegations regarding quantity purchases ("QPs") of CRM devices (pacemakers and internal cardioverter defibrillators ("ICDs"). *Id.* ¶ 48.  Plaintiffs do not allege specific facts to show how CW1 learned information about activities relating to sales of CRM devices.

Similarly, Plaintiffs allege that several Confidential Witnesses lacking financial accounting experience opined on the application of Generally Accepted Accounting Principles ("GAAP") to St. Jude's business.  CW7, for example, was "principally responsible for the sale and support of CRM products," Compl. ¶ 30, including "assist[ing] the medical staff with selecting the appropriate device for a medical procedure."  Nevertheless, CW7 is the sole source Plaintiffs cite for the allegation that St. Jude's reported revenues from "CRM QP transactions were in violation of GAAP and SEC guidance...."  *Id.* ¶ 131.  CW9 and CW15 were tasked solely with strategic planning and forecasting functions.  *Id.* ¶¶ 32 & 38.  Yet CW9 is cited as a source of information regarding sales strategy and contract terms, *id.* ¶ 118, and CW15 is cited as discussing the booking of rebates and their treatment under GAAP.  *Id.* ¶ 143.

St. Jude believes it has identified CW15 from Plaintiffs' description in the Complaint, and, disturbingly, that person now testifies she did not make many of the statements attributed to her.  *See* Declaration of Sherry Ashford.  Ms. Ashford was contacted by a man who identified himself as an investigator hired by lawyers seeking to bring a shareholder suit against St. Jude.  *Id.* ¶ 4.  Ashford told the investigator she had no responsibility for booking rebates and that it would be a function of the accounting department.  *Id.* ¶ 11.  Ashford is not familiar with GAAP or with St. Jude's policies with

respect to accounting for rebates.  *Id.* ¶ 11.  Ashford also told the investigator that rebates would not have impacted St. Jude's sales because they were so miniscule.  *Id.* ¶¶ 5 & 13. Ashford also denied making several other statements attributed to her as CW15.  *Id.* ¶¶ 8-13.

## III.   ARGUMENT

Congress enacted the PSLRA to curb the abuse of securities fraud litigation and to eliminate frivolous securities claims.  *See In re Nash Finch Co. Sec. Litig.*, 323 F. Supp. 2d 956, 960 (D. Minn. 2004); *In re K-tel Int'l, Inc. Sec. Litig.*, 107 F. Supp. 2d 994, 998-99 (D. Minn. 2000), *aff'd*, 300 F.3d 881 (8th Cir. 2002).  To state a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, a plaintiff must plead:  (1) a misrepresentation or omission of a material fact, (2) scienter, (3) a connection with a purchase or sale of a security, (4) reliance or transaction causation, (5) economic loss, and (6) loss causation.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *In re Synovis Life Technologies, Inc. Sec. Litig.*, 2005 WL 2063870, at *3 (D. Minn. Aug. 25, 2005); *Nash Finch*, 323 F. Supp. 2d at 960.

The PSLRA requires a plaintiff to plead particular facts demonstrating the "who, what, where, when and how" of the alleged fraud.  *K-tel*, 300 F.3d at 890.  A plaintiff must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement [was] misleading" when made.  15 U.S.C. § 78u-4(b)(1); *see also Synovis*, 2005 WL 2063870, at *3.  A plaintiff must also plead facts to show that the misleading statements "caused the loss for which the plaintiff seeks to recover damages" and "state with particularity facts giving rise to a strong inference that the defendant acted

with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  Congress enacted the PSLRA

to ensure that expensive, time-consuming, and distracting discovery would occur only in

cases where plaintiffs alleged specific facts as to why the alleged false statements were

false when made.

### A.     The Complaint Fails To Plead False Statements With Particularity.

The law in the Eighth Circuit is clear:  "'[R]ote allegations that the defendants

knowingly made false statements of material fact'" fail to satisfy the heightened pleading

standard of the PSLRA.  *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d

778, 782 (8th Cir. 2008); *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 745 (8th Cir.

2002).  It is not enough that the complaint leaves a general impression a

misrepresentation occurred.  Instead, a complaint must specify each false and misleading

statement and state with particularity why it was misleading.  *See Navarre*, 299 F.3d at

742.  The Complaint does not and therefore should be dismissed.

### 1.     Plaintiffs Fail To Identify The Alleged False Statements.

As an initial matter, the Complaint fails to specify the allegedly false statements

made by Defendants.  A complaint that merely "reproduces... lengthy excerpts from press

releases, SEC filings, and transcripts of conference calls made by [defendants] during the

class period," without "any indication as to what specific statements within these

communications are alleged to be false or misleading," does not satisfy the PSLRA.  *In re*

*2007 Novastar Fin., Inc. Sec. Litig.*, 579 F.3d 878, 882 (8th Cir. 2009).  Rather than

stating what statements are allegedly false and why, Plaintiffs lump all alleged

misrepresentations in one unwieldy twenty-three-page segment.  Under one broad

heading, the Complaint contains block quotes from earnings reports, conference calls, analyst reports, and presentations, sometimes with suggestive language altered by the use of bold text and italicization. *See* Compl. ¶¶ 69-103. "This practice does not satisfy the PSLRA's requirement of pleading with sufficient particularity because it does not identify 'what' statements were allegedly false or misleading." *Id.* at 883 (citing *Possis Med.*, 519 F.3d at 782).

Although the failure to specify the alleged misstatements makes it difficult to comment on their materiality, much of the quoted material reflects the sorts of soft, puffing statements that are immaterial as a matter of law. *Compare, e.g.*, Compl. ¶ 81 ("***We are well positioned to continue to deliver at a superior level versus our peer group for the remainder of the year.***") (emphasis in original), *with In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 960 (8th Cir. 2008) (statement "we believe we are well-positioned on a number of new disk drive programs that will be transitioning into volume production in the coming months" was "too vague and too much like puffing to be material"). Indeed, that is why the PSLRA requires Plaintiffs to specify each statement they allege to have been misleading. The Court should dismiss Plaintiffs' Complaint for failure to meet that requirement.

### 2.     Allegations Of False Financial Results Lack Particularity.

Plaintiffs broadly allege St. Jude's reported financial results for fiscal year 2008 ("FY08"), the first quarter of 2009 ("1Q09"), and the second quarter of 2009 ("2Q09"), were materially false and misleading. As Plaintiffs would have it, St. Jude improperly recognized revenue for (1) goods placed on consignment, (2) CRM products that had

been "channel stuffed" by means of sales incentives, (3) goods for which the customer possessed a right of return, and (4) sales coupled with rebates.

As an initial matter, Plaintiffs' claim is discredited by the facts that St. Jude's independent outside auditor issued an unqualified audit opinion in each of fiscal years 2008 and 2009 and that St. Jude has never been required to restate its results.  When a company is not required to restate financial results, it is exceedingly difficult for plaintiffs to plead particularized facts to contradict the auditor's approval.  *See In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 854 (N.D. Tex. 2005); *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1324 n.27 (S.D. Fla. 2004) (clean opinion raises an inference that defendant was following appropriate accounting procedures); *In re Credit Acceptance Corp. Sec. Litig.*, 50 F. Supp. 2d 662, 680 (E.D. Mich. 1999) (absence of restatement one reason complaint failed under PSLRA).  Plaintiffs fail to set forth specific facts to overcome that hurdle.

### a.     Plaintiffs Fail To Plead Their Consignment Accounting Allegations With Particularity.

For their claim that St. Jude improperly recognized revenue from goods placed on consignment, Plaintiffs rely on the word of a lone "Confidential Witness" identified as "CW13."  When a plaintiff relies upon a confidential source to demonstrate the falsity of statements, the plaintiff must plead specific facts showing the basis of the source's knowledge.  *See Hutchinson Tech.*, 536 F.3d at 959-60; *see also Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 764 (8th Cir. 2009); *Possis Med.*, 519 F.3d at 783.  The Complaint fails that requirement.

Plaintiffs plead that, until "laid off in mid-2009," CW13 "worked within Customer Relationship Management," meaning that CW13 "was responsible for the deployment of a system used by the Company's sales force to track and monitor sales activity and product serial numbers." Compl. ¶ 36.  That is, CW13 was a technician who apparently had no responsibility for or direct connection with sales, accounting for sales, or customer contact. *See id.*  Nevertheless, Plaintiffs allege that CW13 came to learn that "[o]n multiple occasions" a manager instructed a sales representative to cause a Little Rock, Arkansas, "distributor" to place an order for CRM devices and to cause St. Jude to book revenue from the transaction even though the company would not be paid until a hospital implanted the devices. *See* Compl. ¶ 151.  CW13 supposedly "personally saw the paper documentation reflecting" at least one such transaction and brought the "improper practice[]... to the attention of a [St. Jude] vice president several times," who did nothing. *See id.* ¶¶ 151-52.

Plaintiffs' allegations do not meet the PSLRA particularity standard for at least two reasons.  First, Plaintiffs plead no facts to show how or why CW13, a technician charged with "deployment of a system used by the... sales force" became privy to information about particular sales arrangements with a particular distributor, who the sales representative was, who the distributor was, when the transaction occurred, how CW13 became familiar with the accounting treatment applied to the transaction, what expertise CW13 possessed to decipher and critique the accounting treatment, how CW13 came to see "paper documentation" reflecting it, what sort of documentation it was, what became of it, how many units of product were involved, what the dollar value was, or

11

even which periods' financial results were affected.  The absence of such detail dooms Plaintiffs' allegation under the PSLRA.  *See Hutchinson Tech.*, 536 F.3d at 959; *see also In re Hypercom Corp. Sec. Litig.*, 2006 WL 1836181, at *5 (D. Ariz. July 5, 2006) ("CW-1 is not an accountant, so it is unclear how he would know how to classify a lease pursuant to GAAP.").

Second, "[e]vents... with one individual customer are not enough to meet the PSLRA's heightened standard."  *Hutchinson Tech.*, 536 F.3d at 960 (citation omitted). Plaintiffs provide no context from which one can determine that these supposed "improper" transactions in Little Rock were even material to St. Jude's worldwide financial results.  Accordingly, Plaintiffs' claim that St. Jude's financial results were misleading because of improper accounting for goods on consignment fails as a matter of law.

> **b.**  **Plaintiffs Fail To Plead Their "Channel Stuffing" Allegations With Particularity.**

Plaintiffs' allegations regarding "channel stuffing" of CRM devices fare no better. "Channel stuffing is a practice whereby a company floods distribution channels by employing incentives to induce customers into purchasing their products in large quantities, creating a short-term bump in revenue and excess supply in the distribution chain."  *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1259 n.1 (11th Cir. 2006). However, "[t]here is nothing inherently improper in pressing for sales to be made earlier than in the normal course," because "there may be any number of legitimate reasons for

attempting to achieve sales earlier." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir. 1999).

Courts routinely dismiss channel stuffing claims when plaintiffs fail to plead "the amount of any overstatements, the extent of any pulling in that took place, or the amount of any revenue that was pulled in from future quarters." *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1084 (8th Cir. 2005); *see also In re ICN Pharm., Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1061 (C.D. Cal. 2004) (because "[c]hannel stuffing claims are disfavored," plaintiffs must allege "specific transactions, specific shipments, specific customers, specific times, [and] specific dollar amounts") (internal quotation omitted); *In re Coca-Cola Enters. Inc. Sec. Litig.*, 510 F. Supp. 2d 1187, 1196 (N.D. Ga. 2007) (plaintiffs must allege *at least one* specific channel stuffing transaction, including the name of the [customer], the amount of revenue improperly recognized, and when the transaction occurred....") (alterations and emphasis in original).

Plaintiffs' Complaint fails to identify any particular transaction at any particular time with any particular customer for any particular device in any particular amount that resulted from supposed channel stuffing. Nor do Plaintiffs plead any fact to show that channel stuffing had a material effect on St. Jude's financial results. The Complaint leaves the reader with no clue as to what the total dollar impact was in any particular reporting period. *See Cerner*, 425 F.3d at 1084. Instead, Plaintiffs rely on vague statements of Confidential Witnesses that quantity purchases of CRM devices were important to St. Jude and that they were "aggressively" pursued. *See* Compl. ¶¶ 46-49. Such generalized pleading does not meet the requirements of the PSLRA.

But even if Plaintiffs had pleaded such particularized facts, their channel stuffing theory still would not hold water.  "[F]or channel stuffing to be improper logically it must be a short-lived scheme in which the wrongdoer attempts to capitalize on artificially increased sales *before* the resulting drop in sales.  If channel stuffing occurs over time, the pattern of increased sales toward the end of each quarter and lower sales at the beginning of each quarter would be quite transparent to investors, and thus could not form the basis for an allegation of fraud."  *ICN Pharm.*, 299 F. Supp. 2d at 1062 (emphasis in original).

Here, Plaintiffs allege St. Jude's channel stuffing behavior began "prior to the Class Period."  Compl. ¶ 45.  Indeed, St. Jude successfully defended a Rule 10b-5 class action alleging channel stuffing of CRM devices in 2005.  *See In re St. Jude Med., Inc. Sec. Litig.*, 629 F. Supp. 2d 915 (D. Minn. 2009).  While discovery in that case "revealed no channel stuffing," it left no doubt that quarter-end quantity purchases are a perennial feature of the market for CRM devices.  *See id.* at 918 ("Typically, bulk sales occur in the third month of each financial quarter, resulting in sales volume increases at the end of each quarter.").  As a result, Plaintiffs cannot claim to have been defrauded about the existence or timing of CRM device quantity purchases.  Plaintiffs' channel stuffing claim therefore fails.

> **c.** **Plaintiffs Fail To Plead Their Exchange Accounting Allegations With Particularity.**

Plaintiffs' claim that St. Jude improperly booked revenue for CRM devices that could be "swapped out" is both pleaded inadequately and substantively invalid.

Substantively, the claim relies on Statement of Financial Accounting Standards No. 48 ("FAS 48"), entitled "Revenue Recognition When Right of Return Exists."  *See* Compl. ¶ 134.  FAS 48 "specifies how an enterprise should account for sales of its product in which the buyer has a right to return the product."  Declaration of Michelle S. Grant ("Grant Decl."), Ex. 1.  Importantly, FAS 48 distinguishes *returns* of product from *exchanges*.  *Id.*  It provides that "[e]xchanges by ultimate customers of one item for another of the same kind, quality, and price (for example, one color or size for another) are not considered returns for purposes of this Statement."  *Id.* at 10.  This is because such exchanges do not impact revenue.

Plaintiffs allege that St. Jude "would frequently *exchange* products sold as part of prior bulk sales that were nearing the end of their shelf life because their batteries were too old to permit the device [*sic*] to be implanted into patients...."  Compl. ¶ 50 (emphasis added).  Plaintiffs do not allege, however, that St. Jude replaced those "stale" devices with others of different "kind, quality, [or] price."  Accordingly, St. Jude's alleged recognition of revenue from sales of those devices does not contravene FAS 48 and could not have been false or misleading.

Procedurally, Plaintiffs' Complaint offers no "who, what, where, when or how" regarding St. Jude's alleged "exchange" practice.  Plaintiffs do not plead any facts regarding where units were exchanged, how many units were exchanged, when units were exchanged, what the associated costs were to St. Jude, or which reporting periods were affected.

For both reasons, Plaintiffs' exchange accounting claim does not meet the PSLRA's particularized pleading requirements and must therefore be dismissed.[2]

### d. Plaintiffs Fail To Plead Their Rebate Accounting Allegations With Particularity.

Plaintiffs' allegation that St. Jude improperly accounted for rebates on CRM devices also lacks sufficient particularized facts. Plaintiffs rely on alleged statements by three Confidential Witnesses identified as CW1, CW14, and CW15. Compl. ¶¶ 143-48. CW1 "was a Senior Field Finance Manager in the [CV] Division from 2007 until 2010." *Id.* ¶ 24. "Cardiovascular" devices, in St. Jude's parlance, are not CRM devices, but rather "heart valves and other products used in open heart surgery." *Id.* ¶ 39. Plaintiffs plead no facts to show how CW1 came to know anything about St. Jude's accounting treatment of rebates on sales of CRM devices.

CW14 "worked as a Project Manager for [St. Jude's] Corporate Accounts Group until the end of 2007," i.e., before the class period, and was responsible for "determining pricing for discounts on end of quarter bulk sales." *Id.* ¶ 37. Plaintiffs do not plead that CW14 ever had any responsibility for or familiarity with any aspect of St. Jude's financial accounting policies, let alone the specifics of accounting for rebates.

---

[2] Plaintiffs also contend St. Jude's revenue recognition was improper because St. Jude technical personnel advised hospitals in device selection and monitored their needs for additional devices. Compl. ¶ 136. Plaintiffs, however, point to no particularized facts to show hospitals had the right to return devices for a refund or credit if such "service after the sale" were not performed. Plaintiffs likewise fail to identify any accounting principle that bars a sales organization from offering its customers good service and they do not allege that the expense of rendering such service was inaccurately reflected in St. Jude's financial statements.

Finally, CW15 "worked at [St. Jude] intermittently from 2006 to 2009 as a Financial Analyst involved in strategic planning and forecasting for several divisions, including CRM." *Id.* ¶ 38.  Moreover, CW15 told the investigator that she had no responsibility for booking rebates and that it would be a function of the accounting department.  Ashford Decl. ¶ 11.  CW15 is not familiar with GAAP or with St. Jude's policies with respect to accounting for rebates.  *Id.* ¶ 11.  CW15 also told the investigator that rebates would not have impacted St. Jude's sales because they were so miniscule.  *Id.* ¶¶ 5 & 13.  CW15 also denied making several other statements attributed to her.  *Id.* ¶¶ 8-13.[3]  Once again, Plaintiffs plead no facts to show that this witness's responsibilities or competencies had anything whatsoever to do with accounting treatment of rebates.

In the absence of any such facts, Plaintiffs have failed to state a claim regarding St. Jude's rebate accounting.  *See Hutchinson Tech.*, 536 F.3d at 959-60; *Hypercom*, 2006 WL 1836181, at *5.

### 3.    Plaintiffs' Allegations Of False Financial Forecasts Lack Particularity.

With respect to forward-looking statements, like St. Jude's guidance regarding sales and EPS for 2Q09 and 3Q09, "the PSLRA's falsity pleading requirement requires particularity and cannot be satisfied with allegations that defendants made statements and then showing in hindsight that the statement is false." *Elam v. Neidorff*, 544 F.3d 921, 927 (8th Cir. 2008) (citations and internal quotation omitted).  A complaint that "fails to

---

[3]   The Court can consider CW15's declaration "for the limited purpose of determining whether the confidential witnesses acknowledged the statements attributed to them in the complaint" in ruling on the motion to dismiss. *Campo v. Sears Holdings Corp.*, 2010 WL 1292329, at *5 n.4 (2d Cir. Apr. 6, 2010).

point to any contemporaneous reports, witness statements, or any information that had actually been provided to defendants as of" the time alleged false statements were made cannot withstand dismissal under the PSLRA. *Id.* at 927. This Complaint fails that test.

With respect to 2Q09, St. Jude predicted EPS between 62 and 64 cents and net sales between $1.14 and $1.205 billion dollars. St. Jude's reported results for 2Q09 reflected EPS of 63 cents and net sales of $1.184 billion. As discussed above, those results have never been restated, and Plaintiffs have not pleaded with particularity that they were false. Accordingly, St. Jude's guidance for 2Q09 was always "true," even in hindsight.

With respect to 3Q09, in which sales and earnings did come up short of guidance, Plaintiffs fail to plead particularized facts to show that the projections and other forward-looking statements were false when made. Plaintiffs allege that daily sales reports were circulated to Starks and Rousseau, Compl. ¶ 52, but do not allege what the reports showed at any particular time or that such preliminary data were regarded as reliable. Indeed, Plaintiffs attack the reliability of the reports. *See id.* Moreover, Plaintiffs allege that 2008 "internal quantitative statistical forecasts" showed that sales of CRM devices "were on a downward sales trend, which was forecast to continue during 2009." *Id.* ¶ 59. Plaintiffs fail to allege, however, that St. Jude missed CRM sales targets for either of the first two quarters of 2009 and fail to allege with particularity when anyone came to know that the target for 3Q09 would not be reached.

Plaintiffs rely on CW1's statement that in early 2009 "hospitals were already telling [St. Jude] that they lacked funding to continue engaging in bulk sales of CRM

devices."  But CW1 did not work in the CRM division (or in Corporate Accounts) and thus had no responsibility for CRM device sales.  Compl. ¶ 24.  Plaintiffs fail to plead any facts to show how CW1 supposedly came to have any personal knowledge about hospitals' needs for CRM devices or about St. Jude's forecasting of CRM sales.  The hearsay statements that Plaintiffs do offer will not suffice to meet the requirements of the PSLRA.  *See H & R Block*, 580 F.3d at 764.

Even if CW1's statements were sufficiently reliable to merit consideration, Plaintiffs fail to identify any sale St. Jude lost.  *See Cerner*, 425 F.3d at 1084.  Plaintiffs name only one hospital in the entire Complaint and do not allege that hospital stopped buying CRM devices.  *See* Compl. ¶ 47.  "Without any indication that an undefined loss of sales necessarily would affect the company's overall demand or its ability to meet its future earnings projections, these allegations cannot survive the Reform Act's falsity standard."  *Cerner*, 425 F.3d at 1084 (citing *In re AMDOCS Ltd. Sec. Litig.*, 390 F.3d 542, 549-50 (8th Cir. 2004)).

Plaintiffs allege that St. Jude had access to a software program, "ForecastPro," that supposedly "had a 98% accuracy rate," and ostensibly would have produced an accurate sales forecast for 3Q09.  Compl. ¶¶ 64-65.  Plaintiffs, however, plead no facts to show what it was exactly that ForecastPro predicted, who had access to it, whether it was used, or if so, what it was used for.  Of the three Confidential Witnesses upon whom Plaintiffs rely for their "ForecastPro" allegations, two (CW8 & CW9) departed St. Jude before the class period.  *See* Compl. ¶¶ 31-32.  The other witness (CW10) had no responsibility for forecasting.  *See* Compl. ¶ 33.

Plaintiffs also fail to plead how they measured ForecastPro's supposed "accuracy rate," rendering the allegation meaningless.  For instance, assume ForecastPro predicted sales of $100 million in each of two hypothetical periods "P1" and "P2".  Assume also that actual results were $125 million in P1 and $79 million in P2.  Under those assumptions, ForecastPro arguably predicted total sales with "98% accuracy" across the two periods ($204 million being two percent greater than $200 million).  Nevertheless, actual results were 25 percent higher than predicted in P1 and 21 percent lower than predicted in P2.  Accordingly, because Plaintiffs fail to allege any detail regarding what ForecastPro predicted at any particular time or how they have measured its accuracy rate, Plaintiffs do not adequately plead that St. Jude's forecasts were false when made.

Plaintiffs' allegations that sales representatives regarded their sales targets as unattainable are likewise insufficient to show that St. Jude's guidance was false.  Such carping among sales personnel, for whom increased sales targets spell harder-to-earn bonuses, is routine and patently insufficient to show fraud.  *See In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 150 (3d Cir. 2004) (allegations that management "set 'lofty' quarterly sales goals and then pressured sales representatives to meet them" insufficient); *In re Patterson Cos., Inc. Sec., Derivative & ERISA Litig.*, 479 F. Supp. 2d 1014, 1031 (D. Minn. 2007) ("[T]here is nothing inherently improper in motivating a sales force to stay competitive and strive to reach sales goals to prevent a market backlash for missed numbers.").  In sum, Plaintiffs fail to plead any particularized facts showing that Defendants made any false statements during the class period.

### 4.    St. Jude's Forward-Looking Statements Were Accompanied by Meaningful Cautionary Language.

Of course, even if Plaintiffs had pleaded with sufficient particularity that St. Jude's projections were false, those projections still could not afford a basis for liability.  The PSLRA's safe harbor provisions provide that forward-looking statements are immaterial as a matter of law when accompanied by meaningful cautionary statements.  *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 548 (8th Cir. 1997) (quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir. 1993)); *see also Amdocs*, 390 F.3d at 548.  St. Jude's press releases and conference calls included meaningful cautionary statements.  Each of the releases states, and personnel on each of the conference calls disclosed, that "expectations... [were] subject to certain risks and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements."  Compl. Exs. A-D.  Each one incorporated by reference risks disclosed in St. Jude's public SEC filings.  *See Synovis*, 2005 WL 2063870, at *10 (safe harbor applied where statements incorporated risk disclosures in SEC filings).  Such disclosed risks include:

- "[I]ncreasing price competition as a result of managed care, consolidation among healthcare providers, increased competition and declining reimbursement rates;"

- "Cost containment pressures... resulting in restrictive reimbursement practices of third-party payors or preferences for alternate therapies[, which] could decrease the demand for products purchased by [St. Jude's] customers, the prices which they are willing to pay for those products and the number of procedures using [St. Jude] devices;" and

- "Economic factors, including inflation, contraction in capital markets, changes in interest rates, changes in tax laws and changes in foreign currency exchange rates."

Grant Decl. Ex. 2 at 14-20; Ex. 3 at 24-30.  These disclosures preclude Plaintiffs' claim

that St. Jude should be held liable for being too optimistic in the face of "a deepening

economic recession."  Compl. ¶ 59.  Their Complaint should accordingly be dismissed on

this basis as well.

### B.   The Complaint Fails To Plead Facts Giving Rise To A Strong Inference Of Scienter.

Because Plaintiffs have failed to plead with particularity that any Defendant made

any false statement, the Court need not consider whether Plaintiffs have adequately

pleaded the other elements of a Rule 10b-5 claim.  *See Hutchinson Tech.*, 536 F.3d at

961.  Nevertheless, Plaintiffs have also failed to "state with particularity facts giving rise

to a strong inference that the defendant acted with" scienter.  15 U.S.C. § 78u-4(b)(2).

Scienter is the "intent to deceive, manipulate, or defraud."  *Kushner v. Beverly

Enters., Inc.*, 317 F.3d 820, 827 (8th Cir. 2003) (quotations omitted).  Scienter may be

pleaded in three ways:  (1) by facts demonstrating a conscious intent to deceive,

manipulate, or defraud; (2) by facts that show severe recklessness; or (3) by facts

showing unusual or heightened motive and opportunity for the alleged wrongdoers.

*Possis Med.*, 519 F.3d at 782 (citing *K-tel*, 300 F.3d at 893-94).  Plaintiffs must "raise a

strong inference of scienter for each defendant and with respect to each alleged

misrepresentation."  *H & R Block*, 580 F.3d at 761.

A court's inquiry into whether pleaded facts give rise to a "strong" inference of

scienter is "inherently comparative" and "cannot be decided in a vacuum."  *Tellabs Inc.

v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 at 323 (2007).  The court "must consider

plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff," and ask:  "How likely is it that one conclusion, as compared to others, follows from the underlying facts?"  *Id.* at 323-24.  To state a valid claim of securities fraud, the inference of scienter created by the facts pleaded in the complaint "'must be more than merely reasonable or plausible—it must be cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  *H & R Block*, 580 F.3d at 761 (quoting *Tellabs*, 551 U.S. at 324).  Plaintiffs' Complaint fails to meet this exacting standard.

> **1.**    **The Accounts of Plaintiffs' "Confidential Witnesses" Do Not Give Rise To A Strong Inference Of Scienter.**

The statements attributed to Plaintiffs' Confidential Witnesses fail to create a strong inference that any Defendant acted with scienter.  Statements of an unidentified company employee will only aid in pleading scienter if they provide specific details regarding scienter and specific details to show how the employee acquired personal knowledge of the facts.  *See Possis Med.*, 519 F.3d at 783 (citing *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004)).  Quantity of witnesses will not compensate for inadequate factual detail.  *Chubb*, 394 F.3d at 155 ("Cobbling together a litany of inadequate allegations does not render those allegations particularized").

Here, Plaintiffs fail even to mention two Individual Defendants, Heinmiller and Fain, in connection with any of their fifteen Confidential Witnesses.  Plaintiffs mention the other two, Rousseau and Starks, in only five of the Complaint's 196 paragraphs.

None of these five paragraphs contains allegations regarding St. Jude's supposedly false financial results.  The Complaint is simply bereft of *any* allegation by *any* Confidential Witness that *any* Individual Defendant knew or recklessly disregarded *any* material false statement in St. Jude's reported financial results.

With respect to Plaintiffs' claim that St. Jude issued false earnings and sales guidance, the Confidential Witness allegations do not contain sufficient detail to create a strong inference of scienter.  CW10 and CW13 state that "a daily sales report circulated among Company management as well as individual defendants Starks and Rousseau," Compl. ¶ 52, but do not state what those reports showed at any particular time during 3Q09, let alone on or before July 22, which is the last date upon which Starks is alleged to have made any forward-looking statements.

CW9 recounts a speech by Starks in which he stated that "it was his 'number one objective' to improve the accuracy of [St. Jude's] forecasting methods," *id.* ¶ 63, but such a statement does nothing to suggest an intent to defraud.  While CW9 claims to have told Rousseau "[n]ear the end of 2007... that the forecasts [St. Jude] provided to the Street were unsupported by ForecastPro's analysis," Compl. ¶ 65, Plaintiffs fail to allege with particularity that St. Jude's other forecasting methodologies did not yield reasonably accurate predictions during 2007.  Moreover, by the time the class period began, CW9 was no longer employed.  *Id.* ¶ 32.

CW1 alleges that "separate CRM forecasts were provided to Starks by CRM division headquarters in Sylmar, California and by [St. Jude's] sales and marketing organization based in Austin, Texas," Compl. ¶ 66, but Plaintiffs fail to explain how

Starks' receipt of forecasting input from multiple perspectives is in any way indicative of an intent to defraud. Nor do Plaintiffs explain how a "Senior Field Finance Manager" in the CV division, *id.* ¶ 24, came to know the first thing about sales forecasting in the CRM division.

Finally, CW8 claims to have told Mike Zagger that St. Jude's forecasts overestimated sales by representatives coming off of non-compete agreements and that Zagger "reported directly to Rousseau." Compl. ¶ 68. Plaintiffs, however, fail to allege with particularity that Zagger ever passed this information along to Rousseau; they also fail to allege that sales from new representatives constituted a material portion of St. Jude's overall forecasted sales or why this was different from sales representatives coming off non-compete agreements in previous quarters. Accordingly, the statements attributed to Plaintiffs' Confidential Witnesses do not support a strong inference of scienter as to any particular statement or Defendant.

### 2. Allegations Regarding SOX Certifications Do Not Give Rise to a Strong Inference of Scienter.

Plaintiffs' allegation that SOX certifications by Starks and Heinmiller necessarily alerted them to material false statements in St. Jude's financial results, Compl. ¶¶ 170-76, is insufficient to give rise to a strong inference of scienter. "[I]f an allegation that a mandatory Sarbanes-Oxley certification was later proven to be inaccurate is sufficient to give rise to the requisite strong inference, scienter would be established in every case where there was an accounting error or auditing mistake by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." *In*

*re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008) (internal quotation omitted); *see also H & R Block*, 580 F.3d at 765-66.

Absent "particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance, that they knew the financial statements overrepresented the company's true earnings, or that they were aware of a GAAP violation and disregarded it, a showing in hindsight that the statements were false does not demonstrate fraudulent intent." *Ceridian*, 542 F.3d at 248. Plaintiffs fail to plead any specific facts to show that Starks or Heinmiller knew any aspect of St. Jude's financial results was false when announced.

### 3. Allegations Regarding GAAP Violations Do Not Give Rise to a Strong Inference of Scienter.

Plaintiffs' allegation that St. Jude's class period and pre-class period financial statements, each of which was the subject of an unqualified audit opinion and was never restated, contained GAAP violations does not give rise to a strong inference of scienter. "Allegations of GAAP violations are insufficient, standing alone, to raise an inference of scienter." *Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*, 395 F.3d 851, 855 (8th Cir. 2005) (internal quotation omitted). Plaintiffs must "allege[] specific facts *connecting* the individual defendants to... the accounting violations." *In re Ceridian Corp. Sec. Litig.*, 504 F. Supp. 2d 603, 617 (D. Minn. 2007) (emphasis in original). Plaintiffs fail to plead with particularity that any Defendant knew of or recklessly disregarded any purported accounting error in St. Jude's financial statements.

### 4. Allegations Regarding The Sale of St. Jude Stock Do Not Give Rise to a Strong Inference of Scienter.

Plaintiffs' allegations regarding stock trades during the class period are insufficient to create any inference of fraudulent intent. Only stock sales that are unusual in timing or amount can give rise to a strong inference of scienter. *See Elam v. Neidorff*, 544 F.3d 921, 928-29 (8th Cir. 2008); *Possis*, 519 F.3d at 783; *Navarre*, 299 F.3d at 747; *K-tel*, 300 F.3d at 895. As an initial matter, Plaintiffs fail to allege Rousseau even made any sales of St. Jude stock during the class period. The fact an alleged participant in a securities fraud would forego to reap the benefit of the supposed fraud undermines any inference of scienter. *See Ceridian*, 542 F.3d at 247.

Second, sales by both Starks and Fain do not contribute to an inference of scienter because they were made pursuant to Rule 10b5-1 trading plans that were entered into before the class period. Grant Decl. Exs. 4-10. "A 10b5-1 plan is an agreement which allows corporate insiders to set a schedule by which to sell shares over time[.]" *Elam*, 544 F.3d at 928 n.3 (internal quotation omitted); *see* 17 C.F.R. § 240.10b5-1. Sales pursuant to such a plan "can raise an inference that the sales were prescheduled and not suspicious," particularly when "the stock sales at issue represent only a small portion of each seller's overall holdings." *Id.* at 928 (internal quotation omitted).

As of March 13, 2009, Starks held 6,304,792 shares of St. Jude's common stock and could acquire another 1,762,000 through the exercise of options exercisable within 60 days for a total beneficial ownership of 8,066,792 shares. Grant Decl. Ex. 11 at 16. Starks' sales of 300,000 shares were coupled with the exercise of in-the-money options to

purchase an equal number of shares.  Grant Decl. Exs. 4-9.  If not exercised, the options would have expired several months later on February 15, 2010.  *Id.*  Sales like these, of shares acquired through exercise of expiring options, do not create an inference of scienter.  *See Higginbotham v. Baxter Int'l, Inc.*, 2005 WL 3542521, at *2 (N.D. Ill. Dec. 22, 2005); *Campbell v. Lexmark Int'l Inc.*, 234 F. Supp. 2d 680, 687 (E.D. Ky. 2002).

After Starks' exercise and sale, his actual common stock ownership remained unchanged—he still owned 6,304,792 shares.  When all of his exercisable options are taken into account, Starks sold during the class period only 3.7 percent of the shares he beneficially owned.  An executive's sale of such a small percentage of his holdings is not suspicious.  *See Elam*, 544 F.3d at 928 (sale of 5.3 percent of holdings not suspicious); *Cerner*, 425 F.3d at 1085 (defendant's sale of 4 percent of holdings not unusual).

Similarly, Fain's sale was of shares acquired through exercise of options scheduled to expire before year's end, leaving him with no greater or fewer number of shares than before.  Grant Decl. Ex. 10.  Before the transaction, Fain owned 59,434 shares and could have acquired approximately 361,175 more through the exercise of options.  *Id.*; Ex. 12 at 32.  His sale accounted for only 12.5 percent of his beneficially owned shares.  Such a small percentage is insufficient to give rise to an inference of scienter.  *K-tel*, 300 F.3d at 908 (citing cases in which respective sales of 17, 11, and 9.3 percent of total holdings held not suspicious); *Navarre*, 299 F.3d at 747 ("sale of ten percent or even thirty-two percent of an individual's stock interest during a class period fails to substantiate a strong inference of scienter").

Heinmiller's sale, though not pursuant to a 10b5-1 trading plan, was also of shares acquired through exercise of options scheduled to expire before year's end.  Grant Decl. Ex. 13.  Heinmiller, however, sold only half of the shares he acquired through the exercise.  *Id.*  Accordingly, Heinmiller's ownership of St. Jude common stock actually *increased* during the class period.  A defendant's choice to increase his ownership of company stock while he supposedly knows the price is inflated negates any inference of scienter, for it is unlikely that the defendant would choose to defraud himself.  *See Ceridian*, 542 F.3d at 247.  When one considers additional shares Heinmiller could have acquired through exercise of options, his 50,000 share sale accounted for a mere 5.4 percent of his holdings, far too small a percentage to give rise to any inference of scienter.

### 5.    Allegations Regarding Compensation And Continued Employment Do Not Give Rise To A Strong Inference of Scienter.

Plaintiffs' conclusory allegation that "defendants... were motivated to keep the truth secret so as to avoid losing their jobs and lucrative performance-based executive based compensation," Compl. ¶ 167, fails to give rise to a strong inference of scienter. General allegations that an executive will benefit if the company is successful or that officers were motivated to keep stock prices high in order to increase officer compensation are insufficient as a matter of law.  *See Cerner*, 425 F.3d at 1085 ($1 million bonuses were not unusual and did not give rise to an inference of scienter); *H & R Block*, 580 F.3d at 766; *Kushner*, 317 F.3d at 830 ($630,000 bonus and options were not

sufficient to give rise to any inference of scienter); *K-tel*, 300 F.3d at 894; *Navarre Corp.*, 299 F.3d at 746.

Such allegations are insufficient because they are "generally possessed by all corporate directors and officers."  *K-tel*, 300 F.3d at 894; *see also Nash Finch*, 323 F. Supp. 2d at 962-63 ("the motives plaintiffs ascribe to these defendants are typical of virtually all corporate officers, and are entirely insufficient to prove scienter").  Plaintiffs plead no facts to demonstrate Defendants' class-period compensation was out of line with St. Jude's historical compensation policies or with other companies operating in the medical device industry.

### 6.      Taken Collectively, Plaintiffs' Allegations Do Not Give Rise To A Strong Inference of Scienter.

Even if considered collectively, Plaintiffs still have not demonstrated facts giving rise to a strong inference of scienter.  Plaintiffs fail to plead any particular facts showing knowledge or recklessness, fail to show any irregularity in the Individual Defendants' compensation, and fail to allege any irregular stock sales.  A combination of trivial and irrelevant individual scienter allegations such as Plaintiffs have assembled here cannot add up to a strong inference of scienter.  *Nash Finch*, 323 F. Supp. 2d at 964.

### C.      The Complaint Should Be Dismissed Because It Fails To Plead Loss Causation.

Plaintiffs' Complaint also fails to plead loss causation.  "To adequately plead loss causation, the complaint must state facts showing a causal connection between the defendant's misstatements and the plaintiff's losses."  *McAdams v. McCord*, 584 F.3d 1111, 1114 (8th Cir. 2009) (citing *Schaaf v. Residential Funding Corp.*, 517 F.3d 544,

549 (8th Cir. 2008)).  "[T]his standard requires the plaintiff to show that the defendant's fraud—and not other events—caused the security's drop in price." *Schaaf*, 517 F.3d at 550.  "This is because the security's 'lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.'" *Id.* at 550 (quoting *Dura Pharm.*, 544 U.S. at 343).

A plaintiff must plead "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered...." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original) (internal quotation and citation omitted), *cited in Schaaf*, 517 F.3d at 550.  "Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss." *In re Initial Public Offering Sec. Litig.*, 399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005).  "By contrast, where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed—*i.e.* a corrective disclosure." *Id.* at 308 (citing *Lentell*, 396 F.3d at 173).

Plaintiffs fail to plead facts to show that any of the alleged false statements actually caused the October 6, 2009, drop in St. Jude's stock price.  First, Plaintiffs allege no facts to show that the market has ever questioned St. Jude's revenue recognition policies or the accuracy of St. Jude's audited financial results for 2008 or 2009.  Accordingly, the alleged falsity of those results cannot possibly have caused Plaintiffs'

losses.  *See In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678 (S.D.N.Y. 2007) (allegedly false audit opinion could not have caused plaintiffs' losses where financial results were never restated or publicly called into question).

Second, with respect to St. Jude's sales and earnings guidance, Plaintiffs have failed to identify any corrective disclosure of the alleged concealed truth.  The mere announcement of disappointing earnings cannot serve as a corrective disclosure.  *See In re Dell Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 909 (W.D. Tex. 2008) ("Disclosure of financial losses generally—even if those financial losses are a result of the specific concealed fact—is not sufficient to establish—or allege—loss causation.") (internal quotation omitted); *AOL Time Warner*, 591 F. Supp. 2d at 678-79.

Even if St. Jude's October 6, 2009, earnings announcement could potentially serve as a corrective disclosure, Plaintiffs plead no facts to show that the market interpreted the announcement as demonstrating the falsity of St. Jude's earlier statements.  To the contrary, Plaintiffs allege the market interpreted the announcement as simply showing that certain sales St. Jude legitimately expected to make were captured by competitors:

- "[W]e believe the company is likely *failing to take market share*."

- "We suspect [St. Jude] *share loss* is the primary contributor to the 2Q/3Q growth deceleration, with hospital budget pressure secondary."

- "The disconnect in 3Q09 may be tied to inventory behavior at certain customers, but the 6-month trend suggests incremental *competitive pressures on pricing and share* and not a dramatic change in the hospital environment."

Compl. ¶¶ 117 & 119 (emphasis added).  A company cannot be said to have committed fraud when events in the marketplace cause honest expectations of sales and earnings to

be disappointed. Accordingly, the Complaint should be dismissed because Plaintiffs fail adequately to plead loss causation.

**D. Plaintiffs' Section 20(a) Claim Must Also Be Dismissed.**

Because Plaintiffs have failed to state a claim for securities fraud against Defendants, there can be no secondary liability for the Individual Defendants as allegedly "controlling" persons. *See K-tel*, 300 F.3d at 904 n.20 (citing *Deviries v. Prudential-Bache Sec., Inc.*, 805 F.2d 326, 329 (8th Cir. 1986)). Accordingly, Plaintiffs' Section 20(a) "control person" claims should also be dismissed.

**E. Confidential Witnesses Testimony May Not Support The Complaint.**

If the Court is unsure whether the Complaint pleads adequate facts giving rise to a strong inference of scienter, Defendants request the opportunity to depose at least several Confidential Witnesses in order to determine whether their testimony supports the Complaint. *See Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 330 n. 54 (S.D.N.Y. 2009) (denying motion to dismiss without prejudice and ordering confidential witnesses to be deposed "in order to determine whether they supported the allegations in the Complaint and whether [the court] should have granted defendants' motion to dismiss."). In *Campo*, once the confidential witnesses were examined, the absence of support was exposed and the case was dismissed. *Id.* at 335-36. On appeal, the Second Circuit held that the district court's use of the deposition testimony was permissible:

> The anonymity of the sources of plaintiffs' factual allegations concerning scienter frustrates the requirement, announced in *Tellabs*, that a court weigh competing inferences to determine whether a complaint gives rise to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Because Fed. R. Civ. P. 11

requires that there be a good faith basis for the factual and legal contentions contained in a pleading, the district court's use of the confidential witnesses' testimony to test the good faith basis of plaintiffs' compliance with *Tellabs* was permissible.

2010 WL 1292329, at *3, n.4 (2d Cir. April 6, 2010) (citations omitted).

*Campo* highlights the concern a court should have in attempting to weigh inferences based on statements from confidential witnesses. This is especially true here, where one confidential witness has already denied the statements attributed to her. *See* Ashford Decl.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs' Complaint should be dismissed with prejudice or, in the alternative, that Defendants be granted limited discovery to depose the confidential witnesses.

Dated:  October 15, 2010                    DORSEY & WHITNEY LLP


By *s/ Michelle S. Grant*
      James K. Langdon (MN #171931)
      langdon.jim@dorsey.com
      Michelle S. Grant (MN #0311170)
      grant.michelle@dorsey.com
      Eric R. Sherman (MN #0331430)
      sherman.eric@dorsey.com
   50 South Sixth Street, Suite 1500
   Minneapolis, MN 55402-1498
   Telephone:  (612) 340-2600

*Attorneys for Defendants St. Jude Medical, Inc., Daniel J. Starks, John C. Heinmiller, Eric S. Fain, and Michael T. Rousseau*