# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In Re: St. Jude Medical, Inc. Securities
Litigation

Civil No. 10-0851 (SRN/TNL)

**MEMORANDUM OPINION
AND ORDER**

---

Dennis J. Herman, and Matthew S. Melamed, Robbins Geller Rudman & Dowd LLP,
Post Montgomery Center, One Montgomery St., Suite 1800, San Francisco, CA 94104;
Carolyn G. Anderson, and Brian C. Gudmundson, Zimmerman Reed, P.L.L.P., 651
Nicollet Mall, Suite 501, Minneapolis, MN 55402, for Plaintiffs.

James K. Langdon, Michelle S. Grant, and Eric R. Sherman, Dorsey & Whitney LLP, 50
South Sixth Street, Suite 1500, Minneapolis, MN 55402, for Defendants.

---

SUSAN RICHARD NELSON, United States District Judge

This matter is before the court on Defendants' motion to dismiss (Doc. No. 36).

For the reasons stated below, this Court grants the motion in part and denies it in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In this securities fraud action, Lead Plaintiff Building Trades Pension Trust Fund

and Plaintiff City of Taylor Police and Fire Retirement System claim that Defendant St.

Jude Medical, Inc. ("STJ"), and four of its officers–(1) Defendant Daniel J. Starks, STJ's

Chairman, President and Chief Executive Officer, (2) Defendant John C. Heinmiller,

STJ's Chief Financial Officer and Executive Vice President, (3) Defendant Eric S. Fain,

President of STJ's Cardiac Rhythm Management Division, and (4) Defendant Michael T.

Rousseau, STJ's Group President (collectively, the "Individual Defendants")–violated the

Securities Exchange Act of 1934 and the implementing regulations issued by the

Securities Exchange Commission ("SEC").  Seeking class certification on behalf of all

persons similarly injured by acquiring STJ securities, Plaintiffs allege a Class Period from

April 22, 2009 to October 6, 2009, when STJ announced that revenues and earnings for

the third quarter of 2009 ("3Q09") were expected to be substantially lower than what

Defendants had forecast.  That day, shares of STJ's common stock declined by $4.84, or

12.7%, on high trading volume (Doc. No. 23, ¶ 10), while the Dow Jones U.S. Medical

Devices Index Fund, which includes not only STJ, but also its two main competitors,

Medtronic Inc. and Boston Scientific Corporation, "fell by just 0.6% the same day" (Id. ¶

110).

On March 18, 2010, Plaintiffs filed their original Complaint (Doc. No. 1), and on

August 16, 2010, they filed their Consolidated and Amended Class Action Complaint

("Complaint"), asserting claims under Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(b), and the SEC's Rule 10b-5, 17 C.F.R.

§ 240.10b-5.

Defendants now move to dismiss, claiming that the allegations of the Complaint

fail to satisfy the heightened pleading requirements of the Private Securities Litigation

Reform Act of 1985 ("PSLRA"), Pub. L. 104-67, 109 Stat. 743, 758 (codified at 15

U.S.C. § 78u-4), with respect to the identification of false or misleading statements and

the requisite state of mind, as well as other legal requirements for pleading securities

fraud claims, particularly with respect to loss causation.

## II.    DISCUSSION

Plaintiffs' Complaint asserts two claims:  (1) a claim under Section 10(b) and Rule

10b-5 against all of the Defendants, alleging that Defendants made false statements of

material fact that deceived Plaintiffs (Count I); and (2) a derivative claim under Section

20(a) against all Defendants, alleging that they were liable as "control persons" under the

Exchange Act (Count II).  (Doc. No. 23, ¶¶ 189-95.)

With respect to the primary claim of liability under Count I, Section 10(b)

makes it unlawful for any person to "use or employ, in connection with the
purchase or sale of any security . . . any manipulative or deceptive device or
contrivance in contravention of such rules and regulations as the [Securities
Exchange] Commission may prescribe as necessary or appropriate in the
public interest or for the protection of investors."

Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317 (2011) (quoting 15 U.S.C. §

78j(b)).

SEC Rule 10b-5 implements this provision by making it unlawful to, among
other things, "make any untrue statement of a material fact or to omit to
state a material fact necessary in order to make the statements made, in the
light of the circumstances under which they were made, not misleading.

Id. (quoting 17 C.F.R. § 240.10b-5(b)).

At its core, the Complaint is premised largely on STJ's alleged practice of

"channel stuffing," that is, seeking or pressuring its customers to acquire large quantities

of STJ's products at the end of a financial quarter so as to artificially inflate STJ's

revenues and earnings for a particular quarter, and STJ's accounting for such sales.[1]

_____

[1]      As the Complaint notes, the American Institute of Certified Public
Accountants has defined "channel stuffing" as "inducing distributors to buy substantially
                                                              continue...

Plaintiffs contend that STJ's practice of channel stuffing in 2009, while the U.S. economy further descended into recession, eventually collapsed when its customers could not continue to absorb the excess inventory.  The Complaint alleges that Defendants–while recognizing internally that sales were slowing–repeatedly misrepresented to the public that STJ's growth and revenues remained strong until they were forced to disclose, on October 6, 2009, an earnings miss.

Defendants argue that "missing guidance does not constitute securities fraud," and that Plaintiffs may not pursue their securities fraud claims based on hindsight.  (Doc. No. 38, at 8.)  But Plaintiffs' claim does not rest simply on the fact that STJ missed its guidance:

> The extent to which [STJ relied on heavily discounted, end-of-quarter bulk sales to meet its sales and earnings estimates] was concealed from investors during and prior to the Class Period, as were the risks to its business arising from those sales.  In particular, a deepening recession affecting the health care industry in 2009 coupled with numerous hospitals having bloated inventories of STJ CRM products at the outset of the year due to previously completed bulk sales, made STJ particularly vulnerable to missing its earnings forecasts during the Class Period.  Despite this, defendants raised STJ's guidance and told investors that, due to the nature of the products it sold, the Company was well insulated from the negative effects of the economic downturn that existed during the Class Period.

(Doc. No. 23, ¶ 45.)

---

[1]...continue

more inventory than they can promptly resell," by means ranging from offering "deep discounts" to threatening the loss of supply "if the inventory is not purchased."  (Doc. No. 23, ¶ 124.)  It also notes that the SEC describes channel stuffing as the "pulling forward of revenue from future fiscal periods by inducing customers–through price discounts, extended payment terms or other concessions – to submit purchase orders in advance of when they would otherwise do so."  (Id. ¶ 125.)

Plaintiffs generally allege that Defendants used various "improper artifices and devices to inflate revenues and conceal declining demand" for STJ's products.  (Id. ¶ 2.) In particular, they allege that Defendants "(i) failed to disclose" STJ's reliance on "heavily discounted, end-of-quarter bulk sales" to meet its sales forecasts; "(ii) issued materially false and misleading financial statements that failed to account for revenues from bulk sales" and other tactics; "(iii) issued financial guidance to investors that was contradicted by STJ's internal forecasts; and (iv) concealed the extent to which an ongoing economic recession was affecting or could potentially affect sales of and demand for" STJ's products.  (Id.; see also id. ¶¶ 3-5 (elaborating on basic allegations of paragraph 2.)  Plaintiffs contend that "[h]eading into the Class Period, prior sales of STJ's products had resulted in a large buildup of excess and unnecessary inventory on its customers shelves," which, "together with recessionary economic pressures, had caused many hospitals to scale back on their . . . end-of-quarter bulk purchases of STJ's products."  (Id. ¶ 6.)  They further allege that although STJ officers and employees "recognized that 2009 was going to be an extraordinarily difficult year," "STJ–alone among its competitors–raised its financial guidance and told investors its business was well insulated from the [negative] economic conditions."  (Id.)  Although STJ's practice of "channel stuffing" created, Plaintiffs allege, a "great risk of declining [business] during an extended recession, "STJ reaffirmed its earnings per share ("EPS") guidance in the first and second quarters of 2009."  (Id. ¶¶ 6, 7.)

Plaintiffs further allege that despite their public statements, Defendants knew that

their sales practices were "ultimately unsustainable":  "[r]ecognizing internally that sales

would be insufficient to meet their misleading guidance, [D]efendants caused STJ to issue

and sell $1.2 billion in debt securities at the end of 2Q09, [but] then used most of the

proceeds to buy back Company stock in a desperate attempt to make STJ's EPS guidance

easier to meet by expediently reducing the number of shares outstanding in the market."

(Id. ¶ 8.)  Moreover, Plaintiffs allege, despite Defendants' statements to the public that

STJ's business was not only insulated from deteriorating economic conditions, but likely

to grow, "[b]efore the end of the third quarter, STJ had laid off more than 10% of its

domestic sales force due to the impact of negative economic conditions on its business."

(Id.)

Then "[o]n October 6, 2009, just weeks after [D]efendants had reaffirmed that STJ

was purportedly on track to meet its forecast guidance, the Company shocked investors

by revealing a stunning miss in its 3Q09 forecast results," that overall revenues "would be

20% below the forecast [D]efendants had just reaffirmed."  (Id. ¶ 9.)  Upon the

announcement, the price of STJ's common stock dropped 12.7%.  (Id. ¶ 10.)

In the interim, however, the Individual Defendants, Plaintiffs allege, knew from

internal forecasts that sales were declining and thus "made STJ stock sales that were

suspicious in both timing and amount."  (Id. ¶ 166.)  For example, Starks sold a total of

300,000 shares during the Class Period–100,000 shares in each of three sales in early June

2009, late July 2009, and mid September 2009.  (Id.)

Defendants now seek dismissal on several grounds, contending that the Complaint

fails to plead (1) false statements with the requisite particularity, (2) facts giving rise to a strong inference of scienter, and (3) loss causation.  (Doc. No. 38.)  Defendants further argue that the Section 20(a) claim must also be dismissed because it is derivative of the Section 10(b) claim.  (Id. at 33.)  Finally, Defendants seek to depose some of the "Confidential Witnesses" if "the Court is unsure whether the Complaint pleads adequate facts giving rise to a strong inference of scienter."  (Id.)[2]

### A.    Dismissal Standard

The Court accepts as true the factual allegations of the Complaint and draws all reasonable inferences in Plaintiffs' favor, but does not defer to any legal conclusions or formulaic recitations of the claims' elements.  Minneapolis Firefighters' Relief Ass'n v. MEMC Electronic Materials, Inc., 641 F.3d 1023, 1027 (8th Cir. 2011).  Under Rule 12(b)(6), the Complaint "'must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id.  (quoting Ashcroft v. Iqbal, 556 U.S. ___, 129 S. Ct. 1937, 1949 (2009)).  Plausibility turns on whether the facts alleged allow the Court to draw the reasonable inference that the Defendants are liable for the alleged misconduct.  Id.

In addition to these general pleading standards, the PSLRA imposes a heightened pleading standard in securities fraud actions with respect to certain elements of securities fraud claims.  "The PSLRA requires plaintiffs to state with particularity both the facts

---

[2]      The Complaint attributes the sources of certain information to "Confidential Witnesses," that is, certain (former) employees of STJ who are identified by their position, but not by name.

constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007).[3]  The intent of the PSLRA was to "'put an end to the practice of pleading fraud by hindsight.'"  Elam v. Neidorff, 544 F.3d 921, 927 (8th Cir. 2008) (quoting In re Navarre Corp. Sec. Litig., 299 F.3d 735, 742 (8th Cir. 2002)).  Thus, to survive a motion to dismiss, a securities fraud complaint must point to "contemporaneous reports, witness statements, or any [other] information that had actually been provided to defendants" at the time they were alleged to have misrepresented material facts.  Id.

But the heightened pleadings standards do not, of course, amount to any obligation on securities fraud plaintiffs of "ultimately prov[ing] their allegations," as that "is an altogether different question" from adequately pleading securities fraud.  Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1325 (2011).  And, of course, the Court presently takes no position on Plaintiffs' ability to ultimately prove their claims.

The Court now turns to Plaintiffs' main claim of primary liability for securities fraud.

---

[3]     With respect to pleading misleading statements and omissions, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  With respect to pleading the required state of mind, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Id. § 78u-4(b)(2)(A).

**B.      Count I:  The Section 10(b) and Rule 10b-5 Claim**

Count I essentially alleges that Defendants, in violation of Section 10(b) and Rule

10b-5, "disseminated or approved" false statements that "they knew . . . were materially

false and misleading," or recklessly disregarded their falsity and misleading nature.  (Doc.

No. 23, ¶¶ 190-91.)  A plaintiff asserting liability under Section 10(b) and/or Rule 10b-5

must satisfactorily allege "'(1) a material misrepresentation or omission by the defendant;

(2) scienter; (3) a connection between the misrepresentation or omission and the purchase

or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic

loss; and (6) loss causation.'"  Minneapolis Firefighter Relief Ass'n, 641 F.3d at 1028

(quoting Stoneridge Inv. Partners, LLC v. Sci.-Atl., Inc., 552 U.S. 148, 157 (2008)).

Here, Defendants' attack on the sufficiency of the Complaint's allegations is focused on

(1) the alleged materiality and falsity of the statements at issue, (2) the allegations of

scienter, and (3) loss causation.

**1.      Material False and Misleading Statements**

A viable securities fraud claim under Section 10(b) and/or Rule 10b-5 first requires

that Defendants made a material misstatement or omission–that "the defendant made a

statement that was '*misleading* as to a *material* fact.'"  Matrixx Initiatives, Inc. v.

Siracusano, 131 S. Ct. 1309, 1318 (2011) (emphasis in original) (internal citation

omitted).  To be material, the statement must create "'a substantial likelihood that the

disclosure of the omitted fact would have been viewed by the reasonable investor as

having significantly altered the total mix of information made available.'"  Parnes v.

Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997) (quoting Basic Inc. v. Levinson,

485 U.S. 224, 231-32 (1988)).

> Material information is that which "would have assumed actual significance
> in the deliberations of the reasonable shareholder."  This determination
> requires "delicate assessments of the inferences a 'reasonable shareholder'
> would draw from a given set of facts and the significance of those
> inferences to him."

In re: K-Tel Int'l, Inc. Sec. Litig. 300 F.3d 881, 897 (8th Cir. 2002) (internal citations

omitted).

> "In contrast, a fact is immaterial '[w]here a reasonable investor could not have

been swayed' by the misrepresentation."  Id.  And

> some statements are so vague and such obvious hyperbole that no
> reasonable investor would rely upon them.  "The role of the materiality
> requirement is not to attribute to investors a childlike simplicity but rather
> to determine whether a reasonable investor would have considered the
> omitted information significant at the time."  [Thus,] "soft, puffing
> statements generally lack materiality because the market price of a share is
> not inflated by vague statements predicting growth.  No reasonable investor
> would rely on these statements, and they are certainly not specific enough
> to perpetrate a fraud on the market."

Parnes, 122 F.3d at 547 (internal citations omitted), cited in Hutchinson, 536 F.3d at 960-

61.

       With respect to pleading falsity, the "PSLRA's heightened pleading requirements

compel the plaintiff to 'plead the 'who, what, when, where and how' of the misleading

statements or omissions.'"   In re 2007 Novastar Financial, Inc. Sec. Litig., 579 F.3d 878,

882 (8th Cir. 2009).  "To meet the falsity requirement, a complaint must not only indicate

that false statements were made, but must indicate why the alleged misstatements were

false when made." <u>Lustgraaf v. Behrens</u>, 619 F.3d 867, 874 (8th Cir. 2010).  <u>Accord</u> <u>In re</u> <u>Cerner Corp. Sec. Litig.</u>, 425 F.3d 1079, 1083 (8th Cir. 2005).

Plaintiffs assert that there are three categories of false and misleading material statements at issue:  (1) statements regarding the state of STJ's business, (2) statements regarding revenues and earnings, and (3) statements of inflated guidance.  (Doc. No. 45, at 12.)

Defendants generally contend that the Complaint fails to "specify each false and misleading statement and state with particularity why it was misleading."  (Doc. No. 38, at 15).  Defendants make four arguments in support of their position.

### (a)     Identification of False Statements

Defendants first contend that Plaintiffs have not even specified the allegedly false statements.  (<u>Id.</u>)  But unlike the allegations at issue in <u>In re 2007 Novastar Financial, Inc.</u> <u>Securities Litigation</u>, here the Complaint plainly enumerates the individual statements that Plaintiffs allege are false:

- STJ's April 22, 2009 press release announcing its financial results for 1Q09 and Starks' related statements.  (Doc. No. 23, ¶¶ 69, 71.)

- STJ's April 22, 2009 conference call in which Starks responded to questions regarding the impact on STJ of the general economic conditions.  (<u>Id.</u> ¶¶ 72, 73, 74.)

- STJ's May 12, 2009 Report on Form 10-Q reflecting 1Q09 results and signed by Starks and Heinmiller.  (<u>Id.</u> ¶ 77.)

- Starks's May 12, 2009 statements at the Palace Hotel Conference.  (<u>Id.</u> ¶ 81.)

- STJ's July 12, 2009 press release announcing its results for 2Q09.  (<u>Id.</u> ¶ 83.)

- STJ's July 22, 2009 conference call in which Starks and Heinmiller addressed STJ's declining sales.  (<u>Id.</u> ¶¶ 84, 85, 86.)

- STJ's August 12, 2009 Report on Form 10-Q reflecting 2Q09 results and signed by Starks and Heinmiller.  (<u>Id.</u> ¶ 87.)

- Heinmiller's September 10, 2009 statements at the Boston Four Seasons Conference.  (<u>Id.</u> ¶¶ 98, 99.)

- Heinmiller's September 15, 2009 statements at the Morgan Stanley Conference.  (<u>Id.</u> ¶¶ 101, 102.)

The fact that the Complaint addresses all of the allegedly false statements in a "twenty-three-page segment" hardly means, as Defendants claim, that "Plaintiffs lump all alleged misrepresentations" together in a fashion that fails to identify specific misstatements. (Doc. No. 38, at 15.)  Required under the PSLRA to identify the alleged misstatements and their materiality, Plaintiffs devote a separate section of their Complaint–not surprisingly–to "Materially False and Misleading Statements and Omissions and Fraudulent Scheme and Course of Business by Defendants During The Class Period," but identify the individual statements at issue separately.  In other words, Defendants may not obtain dismissal by arguing that the fact that Plaintiffs congregate their allegations of

misstatements renders those allegations undifferentiated and unspecific.

In addition, Defendants suggest that the Complaint fails to identify specific statements because it quotes statements of various STJ officers at some length.  (Doc. No. 38, at 15-16.)  But such an argument ignores the fact that an individual "statement" is not necessarily confined to a single sentence.  A securities fraud defendant may not insulate himself from liability by the simple expedient of verbosity or loquaciousness.  And as Plaintiffs respond, "[t]he specific language that misled investors is highlighted, and each quotation is preceded or followed by specific allegations describing why the quoted and highlighted language was misleading."  (Doc. No. 45, at 15.)

Identifying a particular statement and differentiating it from others is a question of content as well as context.  For example, the statement attributed to Starks that was included in the 1Q09 press release of April 22, 2009, while initially explaining that STJ's growth was "resilien[t]," "remarkably stable," and "on track," concludes with the clear, succinct statement that "'[w]e reaffirm our guidance for full year 2009 earnings.'"  (Doc. No. 23, ¶ 71.)

With respect to materiality, Defendants further contend that Plaintiffs rely on "soft puffing statements."  (Doc. No. 38, at 16.)  Although Defendants locate at least one example of a statement similar to one found to be merely vague puffing in In re Hutchinson Technologies, Inc. Securities Litigation, they do so only by pulling one sentence out of one of many statements identified in the Complaint as constituting a false statement.  And even if some portions of individual statements might be too vague and

general to be actionable, particular statements by Defendants must be evaluated not only in their entirety, but also in context.

Many of the statements at issue were provided in direct response to questions from financial analysts at conferences held expressly to discuss STJ's earnings and guidance. As the Seventh Circuit has ruled in a case involving similar allegations of channel stuffing, the line between mere "puffery" and an actionable misrepresentation often depends on the context of a statement, particularly the fact that it was made in response to either "investors' frequently asked questions" or an analyst's specific inquiry.  Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.2d 588, 597-98 (7th Cir. 2006) (explaining that in context of being responses to questions from analysts, statement "went well beyond puffery:  it was a direct response to an analyst's inquiry about a possible decline" in sales), vacated in part on other grounds, 551 U.S. 308 (2007) (scienter standard).

Here, the Complaint alleges that Starks' statement of April 22, 2009, Heinmiller's statement to the St. Paul Pioneer Press, Starks' statements to investors on May 12, 2009, Starks' and Heinmiller's statements during the July 22, 2009 conference call, and Heinmiller's statements during the two September 2009 investor conferences were all responses to questions or comments posed by investors, journalists or analysts.  (Doc. No. 23, ¶¶ 74, 76, 81, 85, 86, 90, 91, 98-99, & 102.)  Investors would reasonably find such statements material.

### (b)    Allegations of Financial Results

Defendants also argue that the allegations of falsity lack the requisite particularity.

(Doc. No. 38, at 16.)  They further note that STJ's "independent outside auditor issued an unqualified audit opinion" in each of the relevant years and that it "has never been required to restate its results."  (Doc. No. 38, at 17.)  But the lack of any such formal restatement does not preclude a claim for securities fraud.  "[T]he fact that the financial statements for the year in question were not restate does not end [Plaintiffs'] case when [they have] otherwise met the pleading requirements of the PSLRA."  Aldridge v. A.T. Cross Corp., 284 F.3d 72, 83 (1st Cir. 2002).

> To hold otherwise would shift to accountants the responsibility that belongs to the courts.  It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements.

Id.  And here, the Court does not understand the Complaint to allege non-existent sales, but rather to allege that STJ front-loaded sales to fraudulently inflate its present sales without disclosing that such practices could not be maintained.

Defendants then contend that the allegations of four particular forms of falsity lack the requisite particularity.

### (i)    Consignment Accounting

With respect to consignment accounting, Defendants argue that Plaintiffs' allegations fail because they are based on "a lone 'Confidential Witness,'" the identification of which Defendants then claim does not "show how or why CW13"

> became privy to information about particular sales arrangements with a particular distributor, who the sales representative was, who the distributor was, when the transaction occurred, how CW13 became familiar with the accounting treatment applied to the transaction, what expertise CW13 possessed to decipher and critique the accounting treatment, how CW13

came to see "paper documentation" reflecting it, what sort of documentation
it was, what became of it, how many units of product were involved, what
the dollar value was, or even which periods' financial results were affected.

(Doc. No. 38, at 18-19.)  Defendants contend that <u>Hutchinson</u> "dooms" such allegations.

(<u>Id.</u> at 19.)

But in <u>Hutchinson</u>, the "backbone" of the allegations came from statements made

by five CWs, the allegations that earnings were overstated were "either bare allegations or

allegations supported by anecdotal information about specific customers with no

historical context," and the Complaint lacked "any allegations showing the basis of" the

knowledge of the sole CW who "provided the only basis for an allegation of an actual

increase in the customer return rate," the alleged misrepresentation of which was the basis

for plaintiffs' claim.  536 F.3d 952, 959 (8th Cir. 2008).  The court explained that "without

any allegations showing the basis of CW1's knowledge," the claim "that the return

allowances were inadequate because of rising customer returns does not meet the standard

of the PSLRA":

> Nothing in the complaint puts the returns spoken of by CW1 in perspective
> or suggests that they were something other than normal business
> fluctuations.  And these anecdotes offered by the CWs about specific plants
> and specific customers are the only information that support the claim that
> return allowances were inadequate. . . .  Events at one specific plant or with
> one individual customer are not enough to meet the PSLRA's heightened
> standard. . . .  Allegations that production and errors were up at certain
> plants is not enough to support a claim that Hutchinson knew their
> company-wide EPS statements were false.

<u>Id.</u>

Here, in contrast, Plaintiffs allege that "revenue was not permitted to be recognized

at the time goods were consigned," whereas in <u>Hutchinson</u> the plaintiffs claimed that the defendant failed "to properly estimate returns of defective products for which revenues had originally been properly recognized."  (Doc. No. 45, at 33-34.)  In addition, Plaintiffs effectively counter Defendants' argument that the Complaint lacks sufficient allegations of the basis of the witnesses knowledge.  Plaintiffs assert that the witness "was no mere 'technician' as Defendants surmise," but rather that the witness learned of the "repeated consignment deals" because the witness "implemented the Siebel system that STJ used to track and report sales of medical devices."  (<u>Id.</u> at 34.)[4]

### (ii)      "Channel Stuffing" Allegations

With respect to the allegations of channel stuffing, Defendants argue that there "'is nothing inherently improper in'" channel stuffing because "'there may be any number of legitimate reasons for'" such practices.  (Doc. No. 38, at 19-20 (internal citations omitted).)  They further contend that such claims are "routinely dismiss[ed]" where "plaintiffs fail to plead 'the amount of any overstatements, the extent of any pulling in that took place, or the amount of any revenue that was pulled in from future quarters.'"  (<u>Id.</u> at 20 (quoting <u>In re Cerner Corp. Sec. Litig.</u>, 425 F.3d 1079, 1084 (8th Cir. 2005)).)

---

[4]      Defendants note that with respect to consignments (and with respect to other issues), Plaintiffs allege activity that occurred "*before* the putative class period." (Doc. No. 52, at 13.)  But such allegations do not undermine Plaintiffs' claims, because the Complaint does not premise liability on STJ's sales or consignments *per se*, but rather on the alleged misstatements that occurred during the class period.  The thrust of the Complaint, as this Court understands it, is that the financial impact of STJ's various sales practices–channel stuffing, accounting for consignments as sales, etc.–whether they occurred before or during the class period, were misrepresented by STJ during the class period.

Defendants also assert that the Complaint

> fails to identify any particular transaction at any particular time with any
> particular customer for any particular device in any particular amount that
> resulted from supposed channel stuffing.  Nor do Plaintiffs plead any facts
> to show that channel stuffing had a material effect on St. Jude's financial
> results.  The Complaint leaves the reader with no clue as to what the total
> dollar impact was in any particular reporting period.

(Id. (citing Cerner, 425 F.3d at 1084).)  But the Cerner court also stated that a plaintiff "is

*not* required to describe in detail the circumstances of [a defendant's channel-stuffing]

activities."  Cerner, 425 F.3d at 1084 (emphasis added).  And in any event, Defendants

cannot shoehorn the particular facts as alleged here into the framework of those at issue in

Cerner.

Defendants further argue that "even if Plaintiffs had pleaded" the facts as required

under the PSLRA, "their channel stuffing theory still would not hold water" because

channel stuffing, to be actionable,

> "must be a short-lived scheme in which the wrongdoer attempts to
> capitalize on artificially increased sale *before* the resulting drop in sales.  If
> channel stuffing occurs over time, the pattern of increased sales toward the
> end of each quarter and lower sales at the beginning of each quarter would
> be quite transparent to investors, and thus could not form the basis for an
> allegation of fraud."

(Id. at 21 (quoting In re ICN Pharmaceuticals, Inc., Sec. Litig., 299 F. Supp. 2d 1055,

1062 (C.D. Cal. 2004) (emphasis in original)).)  Defendants note that "Plaintiffs allege St.

Jude's channel stuffing behavior began 'prior to the Class Period,'" and contend that a

fraud claim is untenable because "quarter-end quantity purchases ["QPs"] are a perennial

feature of the market for CRM devices."  (Id.)

This Court recognizes that channel stuffing per se is not necessarily fraudulent. The Supreme Court has observed that "channel stuffing" exists in two forms, the "legitimate kind (*e.g.*, offering customers discounts as an incentive to buy)" and the "illegitimate kind (*e.g.*, writing orders for products customers had not requested)." Tellabs, 551 U.S. at 325.  And "[w]hile there may be legitimate reasons for attempting to achieve sales earlier via channel stuffing, providing excess supply to distributors in order to create a misleading impression in the market of the company's financial health is not one of them."  Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.2d 588, 598 (7th Cir. 2006), vacated in part on other grounds, 551 U.S. 308 (2007).  "Channel stuffing becomes a form of fraud only when it is used . . . to book revenues on the basis of goods shipped but not really sold because the buyer can return them."  Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 709 (7th Cir. 2008).

Here, the Court does not understand Plaintiffs' Complaint to be based merely on the claim that STJ engaged in quarter-end bulk sales.  Rather, Plaintiffs allege that STJ mislead investors by stating that its earnings and growth rate would be maintained even though STJ was engaging in an unsustainable pattern of channel stuffing and not properly accounting for its sales.  And the fact that the alleged channel stuffing began before the Class Period is thus largely irrelevant because Plaintiffs' claim is that the ongoing practice became fraudulent when Defendants informed investors that their sales and growth rates were stable.

Defendants correctly observe that STJ "successfully defended" against a previous

claim of channel stuffing.  (Doc. No. 38, at 21.)  But it did so only on summary judgment after "discovery . . . 'revealed no channel stuffing.'"  (Id.)  "Plaintiffs survived defendants' motion to dismiss on the channel stuffing theory."  In re: St. Jude Medical, Inc. Sec. Litig., 629 F. Supp. 2d 915, 917 (D. Minn. 2009).  Moreover, "[a]fter completing discovery," plaintiffs "jettisoned their claims of channel stuffing" and "plaintiffs entire theory changed."  Id.  Perhaps here too discovery and the resolution on the merits will reveal no actionable fraud, but the PSLRA has not converted a motion to dismiss into a motion for summary judgment, much less a trial on the merits.

### (iii)   Exchange Accounting Allegations

Defendants next argue that the allegations regarding STJ's accounting for product exchanges lack the requisite particularity.  (Doc. No. 38, at 21.)  They argue that the accounting standard on which Plaintiffs rely "distinguishes *returns* of product from *exchanges*" and that the Complaint here alleges only improper accounting with respect to exchanges.  (Id. at 22 (emphases in original).)  Defendants essentially argue that exchanges "do not impact revenue."  (Id.)

Plaintiffs claim Defendants' argument "is a red herring because such detail is not required to establish the GAAP violation alleged here," that is, that "[i]t was the *agreement* to replace the devices, rather than the actual replacement, which gives rise to the GAAP violation," not that "STJ improperly recognized revenues *only* on the products which ultimately were replaced by STJ."  (Doc. No. 45, at 28 (emphases in original).)  As Plaintiffs explain, "[b]ecause *all* of the devices sold by QPs were subject to being

replaced if they were not used before their expiration date, GAAP prohibited STJ from recognizing ***any*** revenues on those sales until the devices were actually used."  (Id. (further noting that it was not possible to reliably estimate the return rate due to the large excess inventory already on hospitals shelves).)

Defendants' reply–that there is no "specific ruling from the Public Company Accounting Oversight Board" or any restatement of financial results, as there was in a different case (Doc. No. 52, at 11)–is unpersuasive.  The Court is unaware of any legal requirement that such events are prerequisites to filing a complaint for securities fraud.

### (iv)    Rebate Accounting Allegations

In addition, Defendants contend that the allegations regarding STJ's accounting for rebates lack the requisite particularity.  (Doc. No. 38, at 23.)  They challenge the factual bases for statements regarding rebates attributed to several of the Confidential Witnesses cited in the Complaint, including the CW that Defendants claim to have identified and whom, Defendants assert, now disavows the statements the Complaint attributes to her. (Id. at 23-24.)

> Plaintiffs assert:
>
> Defendants misread the Complaint to suggest that the witnesses themselves opined as to the existence of a GAAP violation.  They did not.  The witnesses provided factual information which was analyzed by Lead Counsel, in consultation with forensic accountants experience in the field, to determine whether or not STJ's accounting complied with GAAP.

(Doc. No. 45, at 30.)  Furthermore, "[e]ach of the witnesses here was plainly in a position to learn the information attributed to them in the Complaint."  (Id. at 31.)

On a Rule 12(b)(6) motion to dismiss, the Court presently is in no position to resolve the purported factual discrepancies between the Complaint and the Declaration of Sherry Ashford.  And even ignoring the allegations solely attributed to that witness, the Court concludes that the remaining rebate allegations, attributed to other confidential witnesses, are sufficient.  (Doc. No. 23, ¶ 53.)

### (c)      Financial Forecasts

Defendants' next major argument is that the allegations of false financial forecasts are insufficiently particularized.  (Doc. No. 38, at 24.)  With respect to such forward-looking statements, a plaintiff may not premise a claim of fraud on allegations of false statements that are shown to be false only later.  In short, there is no viable claim for fraud in hindsight.  E.g., Elam v. Neidorff, 544 F.3d 921, 927 (8th Cir. 2008).  Defendants note that STJ did not restate its earnings for 2Q09, and argue that, with respect to 3Q09, Plaintiffs have failed to plead that STJ's earnings projections "were false when made." (Doc. No. 38, at 25.)  Defendants assert that the Complaint fails to "'point to any contemporaneous reports, witness statements, or any information that had actually been provided to defendants as of' the time alleged false statements were made."  (Id. (quoting Elam, 544 F.3d at 927).)

But Plaintiffs repeatedly allege that STJ's contemporaneous "internal" and presumably undisclosed forecasting data and sales reports contradicted the public statements Starks and Heinmiller provided the market, investors, and analysts.  (Doc. No. 23, ¶¶ 78, 80, 82, 88, 92, 100, & 103.)  Moreover, Defendants' argument that Plaintiffs

have not "identif[ied] any sale [that] STJ lost" (Doc. No. 38, at 26), is irrelevant.  The theory of the Complaint is not that STJ lost particular sales.

Defendants further take issue with the allegations regarding STJ's use of the software program "ForecastPro."  (Id. at 26-27.)  The Court views such issues as matters for discovery and resolution on the merits.

### (d)    Safe Harbor Language

Defendants also contend that their forward-looking statements were accompanied by meaningful cautionary language such that they are entitled to the safe harbor protections under the PSLRA.  (Doc. No. 38, at 28.)  In particular, they argue that each of STJ's "press releases and conference calls" disclosed "that 'expectations . . . [were] subject to certain risks and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements.'"  (Id. (quoting press releases and conference calls cited in and attached to Complaint).)  This Court agrees with Plaintiffs that because this generic, "boiler-plate" statement lacks any specificity as to particular risks or uncertainties, it may not serve as a "meaningful cautionary statement." Slayton v. American Express Co., 604 F.3d 758, 772 (2d Cir. 2010) (explaining that "'boilerplate warnings will not suffice,'" and that cautionary statements "'must be extensive and specific,'" "'substantive and tailored to the specific future projections'").

Defendants also assert that STJ disclosed, in its SEC filings, risks such as (1) "increasing price competition," (2) "cost containment pressures," and (3) general "economic factors."  (Id.)  In response, Plaintiffs argue that "[n]ot one of those warnings,"

which are excerpted from "STJ's 2008 Report on Form 10-K and 2Q09 Report on Form

10-Q," "addresses the risks that Plaintiffs allege caused STJs guidance to be misleading."

(Doc. No. 45, at 39.)  Rather, Plaintiffs contend, "the warnings address risks STJ faced

from increasing competition or refusals by health insurers to pay for STJ's devices, or

economic factors which play no role in STJ's missed earnings."  (Id.)  Defendants

contend that Plaintiffs' argument fails "to explain how 'increasing price competition' and

'[c]ost containment pressures' did not feed into customers' 3Q09 demands for

unacceptably steep price discounts and unwillingness 'to commit capital to inventory.'"

(Doc. No. 52, at 14.)

        The Court agrees with Plaintiffs that the purported "cautionary statements" on

which Defendants rely do not address the theory of Plaintiffs' case, that is,

> that STJ was overly reliant on end of quarter QPs to meet its guidance, that
> as a result of prior QPs many of its customers had far more inventory than
> needed to meet current demands, and that these conditions gave rise to
> heightened risks of missing guidance when the economy turned sour.

(Doc. No. 45, at 39.)  Plaintiffs' theory of the alleged fraud, as this Court understands it,

is not simply that Defendants misrepresented the negative effect that the general

economic deterioration in 2009 had on STJ, but that within that negative context,

Defendants misrepresented that STJ's revenues and earnings remained strong, and would

remain strong throughout the year, because those results were based on STJ's

unsustainable practice of channel stuffing and forcing QPs on its customers.  The

cautionary statements on which Defendants rely all concern exogenous variables–factors

such as "declining [insurer] reimbursement rates," "inflation," and changing "foreign

currency exchange rates"–not STJ's undisclosed practice of channel stuffing and the alleged improprieties of how STJ accounted for such sales.  While such exogenous variables might have had a negative impact on STJ's results, the Court understands Plaintiffs' claim to be that STJ's undisclosed sales and accounting practices materially exacerbated the negative impact of the underlying deteriorating economic conditions.

In sum, with respect to pleading material misrepresentations, the Court concludes that the allegations of the Complaint are sufficiently particularized to proceed.  "On a motion to dismiss, the question is not whether Plaintiff[s] can be successful on [their] securities fraud claims, but rather, whether Plaintiff[s] [have] pled [their] allegations and supporting facts with particularity such that the Complaint should remain for discovery." In re Nash Finch Co. Sec. Litig., 502 F. Supp. 2d 861, 877 (D. Minn. 2007).  Cf. Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1323 (2011) ("We believe that these allegations suffice to 'raise a reasonable expectation that discovery will reveal evidence' satisfying the materiality requirement.").

## 2. A "Strong Inference" of Scienter

As noted above, the PSLRA imposes heightened pleading requirements with respect to not only the allegations of false or misleading statements, but also the allegations of scienter.  Tellabs, 551 U.S. at 321.  The Supreme Court has clarified that the scienter required for a Section 10(b) / Rule 10b-5 claim "refers to a mental state embracing intent to deceive, manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425

U.S. 185, 193, n.12 (1976).  Thus, negligence alone is not enough.  Id. at 201.[5]  If the

alleged misstatement or omission is a "forward-looking statement," the "required level of

scienter is 'actual knowledge.'"  Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309,

1324 n.14 (2011) (quoting 15 U.S.C. § 78u-5(c)(1)(B)).

        With respect to scienter, a plaintiff "must 'state with particularity facts giving rise

to a strong inference that the defendant acted with the required state of mind.'"  Tellabs,

Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313, 314 (2007) (quoting 15 U.S.C. §

78u-4(b)(2)).  This standard requires more than a showing "that a reasonable fact-finder

plausibly could infer from the complaint's allegations the requisite state of mind."  Id.

Rather, on a motion to dismiss, the court "must engage in a comparative evaluation; it

must consider, not only inferences urged by the plaintiff, . . . but also competing

inferences rationally drawn from the facts alleged."  Id.  In short, "an inference of scienter

must be more than merely plausible or reasonable–it must be cogent and at least as

compelling as any opposing inference of nonfraudulent intent."  Id.  The heightened

_____

        [5]       The Supreme Court deferred addressing "the question whether, in some
circumstances, reckless behavior is sufficient for civil liability under" Section 10(b) and
Rule 10b-5.  Id.  But the Eighth Circuit, as well as most other federal circuits, recognizes
that, even under the PSLRA, a plaintiff may satisfy the scienter requirement "with proof
of severe recklessness, that is, 'highly unreasonable omissions or misrepresentations that
. . . present a danger of misleading buyers or sellers which is either known to the
defendants, or is so obvious that the defendants must have been aware of it.'" In re
Ceridian Corp. Sec. Litig., 542 F.3d 240, 244 (8th Cir. 2008) (quoting Fla. State Bd. Of
Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 654 (8th Cir. 2001)).  And since
Hochfelder, the Supreme Court has not yet ruled on the issue.  S.E.C. v. Shanahan, 646
F.3d 536, 543-44 (8th Cir. 2011) (noting Supreme Court's decision in Matrixx Initiatives,
Inc. v. Siracusano, 131 S. Ct. 1309, 1323-24 (2011), that it need not address issue of
sufficiency of recklessness).

pleading standards imposed by the PSLRA are confined, however, to these two

components–falsity and scienter–and do not apply to the issues of materiality and loss

causation.  Gebhardt v. Conagra Foods, Inc., 335 F.3d 824, 830 n.3 (8th Cir. 2003).[6]

In evaluating the sufficiency of the allegations, "courts must consider the

complaint in its entirety," inquiring "whether *all* of the facts alleged, taken collectively,

give rise to a strong inference of scienter, not whether any individual allegation,

scrutinized in isolation, meets that standard."  Tellabs, Inc. v. Makor Issues & Rights,

Ltd., 551 U.S. 308, 322-23 (2007) (emphasis in original).  And in determining whether

allegations "give rise to a 'strong' inference of scienter, the court must take into account

plausible opposing inferences."  Id. at 323.  In other words, the elevated statutory

standard does not merely require that a plaintiff allege "facts from which an inference of

scienter rationally *could* be drawn.  Instead, Congress requires plaintiffs to plead with

particularity facts that give rise to a 'strong'–*i.e.*, a powerful or cogent–inference."  Id.

(emphasis in original).

This "inquiry is inherently comparative," requiring the court to "consider

plausible, nonculpable explanations for the defendant's conduct, as well as inferences

---

[6]        Defendants also premise their motion to dismiss on Rule 9(b), but the
PSLRA "supercedes and embodies the standards of Rule 9(b)."  In re Nash Finch Co. Sec.
Litig., 502 F. Supp. 2d 861, 871 n.5 (D. Minn. 2007).  Accord Lustgraaf v. Behrens, 619
F.3d 867, 874 n.2 (8th Cir. 2010) ("The PSLRA requirements are more rigorous than those
under Rule 9(b) of the Federal Rules of Civil Procedure.").  Cf. In re Navarre Corp. Sec.
Litig., 299 F.3d 735, 742 (8th Cir. 2002) ("[T]he investors technically do not need to meet
the requirements of *both* Federal Rule of Civil Procedure 9(b) and the PSLRA, as the
PSLRA supersedes reliance on 9(b) in securities fraud cases and embodies the standards
of 9(b).").

favoring the plaintiff.  The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  Id. at 323-24.  But "the inference of scienter must be more than merely 'reasonable' or 'permissible'–it must be cogent and compelling."  Id. at 324. Accordingly, a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Id.

"Scienter can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud, (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." Cornelia I. Crowell GST Trust v. Possis Med., Inc., 519 F.3d 778, 782 (8th Cir. 2008). Accord In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 893-94 (8th Cir. 2002).  See generally In re Navarre Corp. Sec. Litig., 299 F.3d 735, 745 (8th Cir. 2002) (discussing motive and opportunity and other means of establishing scienter).

With respect to "motive and opportunity," the Eighth Circuit has explained that this phrasing "is a term of art, 'meaning something far narrower than what it appears to mean,' and is not per se required under the heightened PSLRA pleading requirements." In re Navarre Corp. Sec. Litig., 299 F.3d 735, 745 (8th Cir. 2002).

> First, motive and opportunity are generally relevant to a fraud case, and a showing of unusual or heightened motive will often form an important part of a complaint that meets the Reform Act standard.  Second, in some cases the same circumstantial allegations that establish motive and opportunity also give additional reason to believe the defendant's misrepresentation was knowing or reckless. . . .  Third, when the complaint does not show motive

> and opportunity of any sort–either the unusual, heightened motive highlighted in the Second Circuit cases, or even an everyday motive such as keeping one's job–then other allegations tending to show scienter would have to be particularly strong in order to meet the Reform Act standard.

Florida State Bd. Of Admin. v. Green Tree Financial Corp., 270 F.3d 645, 660 (8th Cir. 2001). "One 'classic' fact pattern giving rise to a strong inference of scienter is that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate." Id.

> "Evidence we have found relevant to the scienter issue includes: insider trading in conjunction with false or misleading statements; a divergence between internal reports and public statements; disclosures of inconsistent information shortly after the making of a fraudulent statement or omission; bribery by top company officials; evidence of an ancillary lawsuit, charging fraud, which was quickly settled; disregard of current factual information acquired prior to the statement at issue; accounting shenanigans; and evidence of actions taken solely out of self-interest."

In re Navarre Corp. Sec. Litig., 299 F.3d 735, 747 (8th Cir. 2002) (adopting First Circuit's reasoning).

Finally, Plaintiffs must make the requisite showing with respect to each alleged misrepresentation and each Defendant separately. Horizon Asset Mgmt. Inc. v. H & R Block, Inc., 580 F.3d 755, 761 (8th Cir. 2009). But insofar as Plaintiffs' allegations are similar with respect to the Individual Defendants as well as the corporate entity itself, the Court addresses the allegations of their scienter together. Id.

With respect to pleading corporate scienter, the Eighth Circuit recently stated that it appears to be an open question whether one may impute the scienter of a corporate officer to the corporation, at least where the officer has *not* been named as a Defendant.

Id. at 767.  But here, the Court faces no such issue as it appears that the Complaint alleges that STJ's scienter is that of the Individual Defendants, which include STJ's CEO, Defendant Starks, as well as its CFO, Defendant Heinmiller.  The knowledge and scienter of a corporate officer such as its CEO or CFO may of course be imputed to the corporate entity.  Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 603 (7th Cir. 2006), vacated in part on other grounds, Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322-23 (2007); Cummings v. Paramount Partners, LP, 715 F. Supp. 2d 880, 906 (D. Minn 2010).  Thus, the Court will address scienter with respect to the Individual Defendants.  And if it concludes that any of them possessed the requisite state of mind, such scienter is then imputed to STJ itself.

Defendants' argument regarding scienter is as follows:  (1) that the allegations regarding the Confidential Witnesses (CWs) fail to provide the requisite details of how the particular employees acquired personal knowledge of facts; (2) Starks' and Heinmiller's certifications as required by the Sarbanes-Oxley Act of 2002 ("SOX") fail to plead a strong inference of scienter; (3) STJ's alleged GAAP violations, standing alone, do not support the necessary inference of scienter; (4) the Individual Defendants' sale of STJ stock during the class period does not support scienter; and (5) the Individual Defendants' compensation and other benefits does not support scienter.  (Doc. No. 38, at 30-37 (addressing above components first individually and then collectively).)

Granted, a plaintiff's reliance on CWs adds a "knotty complication" to the PSLRA's pleading requirements, Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.2d

588, 596 (7th Cir. 2006), vacated in part on other grounds, Tellabs, Inc. v. Makor Issues &

Rights, Ltd., 551 U.S. 308 (2007) (scienter standard).  And SOX certifications are not

necessarily sufficient to support a strong inference of scienter.  Horizon Asset Mgmt. Inc.

v. H & R Block, Inc., 580 F.3d 755, 766 (8th Cir. 2009).  The Court also recognizes that

accounting malpractice, as evidenced by GAAP violations, does not by itself amount to a

claim for securities fraud.  In re Ceridian Corp. Sec. Litig., 542 F.3d 240, 246 (8th Cir.

2008); In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 889-93 (8th Cir. 2002) (clarifying

that GAAP violations must be "coupled with evidence of corresponding fraudulent

intent").  In addition, insider stock sales during the class period "'are not inherently

suspicious'" unless they were "unusual in timing or amount" from the pattern of the

Individual Defendants' other sales–that is, "dramatically out of line with prior trading

practices at times calculated to maximize the personal benefit from the undisclosed

information.'"  In re Ceridian Corp. Sec. Litig., 542 F.3d at 246-47.[7]  Finally, there is no

dispute that a corporate officer's motivation to keep the price of the corporation's stock

high so as to increase the officer's total compensation, including performance-based

bonuses, is generic and benign absent allegations that the benefit to the individual

defendant is unusual.  Horizon Asset Mgmt. Inc., 580 F.3d at 766; In re Cerner Corp. Sec.

Litig., 425 F.3d 1079, 1085 (8th Cir. 2005) ("The desire to make a company seem more

---

[7]        Here, as in Cornelia Crowell GST Trust v. Possis Medical, Inc., Plaintiffs
have "failed to place the allegedly suspicious stock sales within any meaningful context."
519 F.3d 778, 783 (8th Cir. 2008).  Accord In re Cerner Corp. Sec. Litig., 425 F.3d 1079,
1085 (8th Cir. 2005) ("[T]he complaint lacks any additional allegations–such as prior
trading history–that would tend to show that [an individual defendant's] trading activity
was otherwise unusual.").

profitable is a desire 'universally held among corporations and their executives, ' and thus is insufficient to prove scienter as a matter of law."); In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 894-96 (8th Cir. 2002) ("[U]nsupported allegations with regard to motives generally possessed by all corporate directors and officers are insufficient as a matter of law.").

But it is also true that reliance on CWs is permissible–if not necessary in light of the fact that fraud, particularly those perpetrated by a group of corporate officials, are rarely conducted in the open–if sufficient facts are plead to support the statements attributed to the CWs. In re Nash Finch Co. Sec. Litig., 502 F. Supp. 2d 861, 874-75 (D. Minn. 2007). And "false SOX certifications" may be probative of scienter "if they are accompanied by 'allegations of particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance, that they knew the financial statements over-represented the company's true earnings, or that they were aware of a GAAP violation and disregarded it.'" In re Moneygram Int'l, Inc. Sec. Litig., 626 F. Supp. 2d 947, 973 (D. Minn. 2009) (quoting Ceridian, 542 F.3d at 248). Similarly, "[c]lear violations of GAAP support falsity," and that GAAP violations may support an inference of scienter where "coupled with evidence of corresponding fraudulent intent." In re Moneygram Int'l, Inc. Sec. Litig., 626 F. Supp. 2d at 973. And although insider stock sales are one way of showing motive and opportunity, "'the absence of a motive allegation is not fatal' to a plaintiff's claim. Id. at 981 (quoting Tellabs, 551 U.S. at 325). As discussed above, motive and opportunity is only one of several general means of

establishing scienter.  <u>Possis Med., Inc.</u>, 519 F.3d at 782.

In addition, Defendants focus largely, if not entirely on the Complaint's allegations regarding scienter in the section devoted to "Additional Scienter and Control Person Allegations."  Plaintiffs' allegations pertaining to scienter, however, pervade much of the Complaint, including the section devoted to the allegedly false statements.  For example, with respect to STJ's 1Q09 press release, conference call and Form 10-Q Report–which "reaffirm[ed]" STJ's guidance for full year 2009 earnings and denied that the negative economic conditions of early 2009 had any impact on its earnings–Plaintiffs allege that "[a]t the time [these] statements were made, internal forecasting data and daily sales reports that were circulated among the Company's executives and management reflected a downwards sales trend across the CRM and AF product lines contradicting the positive outlook the statements were intended to create."  (Doc. No. 23, ¶ 78, at 38.)

Similarly, with respect to STJ's 1Q09 guidance–which generally "reiterat[ed] the increased guidance STJ had issued at the close of FY08"–Plaintiffs allege that "[t]he published guidance exceeded STJ's own internal forecasts of sales," that "[a]s early as 2008, STJ's internal forecasts indicated that the sales of STJ's CRM devices through 2009 were trending downward, and hospitals were telling STJ that they were going to be unable to continue engaging in bulk sales," and "STJ's financial guidance lacked a reasonable basis because it failed to account for the practice of QPs sales that were highly sensitive to changing market conditions, and because it failed to account for STJ's improper accounting violations."  (<u>Id.</u> ¶ 80.)

With respect to the May 12, 2009 investor conference–at which Starks "reiterated defendants' bullish outlook," "denied, in no uncertain terms, that STJ's growth was slowing, and strongly reaffirmed the Company's guidance"–Plaintiffs allege that "[a]t the time of Starks' statement, weakening market conditions were already impacting STJ's sales operations, and internal forecasting numbers showed that the effects would only worsen," thereby "contradict[ing] the positive outlook the statements were intended to create."  (Id. ¶¶ 81, 82.)

With respect to STJ's 2Q09 guidance–with respect to which Heinmiller told financial analysts that the slightly lowered top-end of the guidance was only a cautious reaction to the "market, not market share"–Plaintiffs allege that "[c]ontrary to their representations about current market conditions, by the time of the 2Q09 call, defendants were aware of, or recklessly disregarded, the deepening impact the economic recession was having on STJ's business . . . .  In fact, by this time, defendants were already making plans for and commencing a significant reduction in force that would not be revealed until months later," that "published guidance exceeded STJ's own internal sales forecasts," that "[a]s early as 2008, STJ's internal forecasts indicated that the sales of STJ's CRM devices through 2009 were trending downward," and that "[b]y June 2009, there were increasing efforts to reduce corporate expenses, including a complete prohibition on corporate travel."  (Id. ¶¶ 90, 92.)

With respect to the first of two September 2009 investor conferences–at which Heinmiller stated STJ was "sticking by the guidance that we've given in July," and

characterized substantial layoffs in its sales force as "really more of just a tweak in the way we are managing our business"–Plaintiffs allege that "[b]y the time these statements were made, the Company had begun laying off workers in response to the severe impact economic conditions were having on" STJ, "[t]he published guidance exceeded internal forecasts" as the guidance "failed to account for the practice of quarter-end QP sales" and "for STJ's improper accounting practices."  (Id. ¶ 100.)  Likewise, with respect to the second conference–at which Heinmiller, just a few weeks before STJ announced its expected earnings shortfall, expressed "confidence that we can continue to grow our business on the top-line at a double-digit rate"–Plaintiffs allege that "Defendants knew, at the time these statements were made, that end-of-quarter QPs would not permit the Company to meet its forecast guidance," that "[a]s early as 2008, STJ's internal forecasts indicated that the sales of STJ's CRM devices through 2009 were trending downward," and that "[a]t the time of Heinmiller's statements, weakening market conditions were impacting STJ's sales operations, and internal forecasting numbers showed that the effects would only worsen."  (Id. ¶ 103.)

Such allegations–essentially that STJ's undisclosed internal numbers contradicted what Defendants were telling the public–plainly support the "strong inference of scienter" necessary to survive a motion to dismiss.  Although Plaintiffs do not elaborate on the "internal forecasts" that they allege contemporaneously contradicted what Defendants were telling the markets and investors, the Complaint elsewhere makes frequent reference to the new software program STJ had begun using–allegedly in response to a prior

earnings miss–to track its sales more accurately.  (E.g., Doc. No. 23, ¶¶ 51, 52, 63, & 64.)
It also alleges that various STJ personnel, including sales representatives, recognized that
STJ's channel stuffing and bulk sales practices were not sustainable and informed their
superiors–including Rousseau–that "the forecasts provided to the Street were unsupported
by ForecastPro's analysis."  (Id. ¶ 49, 59, 60, 65, 66, & 68.)

Furthermore, the Complaint includes various additional allegations that support an
inference of scienter.  For example, it alleges that STJ changed its practice with respect to
replacing expiring products from documenting such "swaps" to confining
communications regarding such transactions only to oral statements.  (Id. ¶ 128.)  It also
alleges that with respect to QP transactions, serial numbers for devices sold in such bulk
sales were not recorded in order to "conceal the exchange of 'stale' products for newer
ones."  (Id. ¶ 130.)

Of the various arguments Defendants raise with respect to scienter, only their
argument regarding the Confidential Witnesses cited in the Complaint merits further
discussion.  Defendants argue that the individual statements attributed to such witnesses
lack the requisite details of scienter, concluding that the Complaint "is simply bereft of
*any* allegation by *any* Confidential Witness that *any* Individual Defendant knew or
recklessly disregarded *any* material false statement in St. Jude's reported financial
results."  (Doc. No. 38, at 30-31.)  But no such requirement exists.  Rather, the requisite
*inference* of scienter is drawn from *all* of the plausible allegations and weighed against
any competing inference of non-culpable conduct.

Defendants assert various deficiencies in the CW's statements, but the CW

statements they address occur in either the "Sources" or "Background" sections of the

Complaint.  (Doc. No. 38, at 31-32.)  Defendants do not address the numerous

attributions to the CWs throughout the rest of the Complaint, including in the section

devoted to "Materially False and Misleading Statements and Omissions and Fraudulent

Scheme and Course of Business by Defendants During The Class Period," as well as the

section asserting that "STJ's Financial Statements Were Materially Misstated In Violation

of GAAP And SEC Rules."  (E.g., Doc. No. 23, ¶¶ 92, 93, 94, 96, 118, 128-31, 136, 141,

143, 147-48, & 150-52.)[8]

---

[8]      Defendants do not flatly contend that Plaintiffs may not rely on confidential
witnesses in their Complaint.  In a recent decision issued after the Complaint was filed,
the Eighth Circuit stated that it "disregard[s]" any "reliance on the allegations of
confidential sources."  Minneapolis Firefighters' Relief Ass'n v. MEMC Electronic
Materials, Inc., 641 F.3d 1023, 1030 (8th Cir. 2011).  The court relied on the Seventh
Circuit's decision in Higginbotham v. Baxter Int'l Inc., which ruled that "[o]ne upshot" of
Tellabs "is that we must discount allegations that the complaint attributes to five
'confidential witnesses.'"  495 F.3d 753, 757 (7th Cir. 2007).  But as the Seventh Circuit
clarified, "allegations from 'confidential witnesses' must be 'discounted' rather than
ignored.  Usually that discount will be steep.  It is unnecessary to say more today."  Id. at
757.  And the Seventh Circuit later distinguished Higginbotham as "a very different case
from this one."  Makor Issues and Rights, 513 F.3d 702, 711 (7th Cir. 2008).  In
Higginbotham, "[t]he misconduct alleged consisted of frauds committed by [the
defendant's] Brazilian subsidiary, but because the suit was against the parent, the
plaintiffs had to show that the parent knew about the Brazilian fraud."  Id.  "The
subsidiary had tried to conceal it from its parent as well as from the Brazilian
government."  Id.  "There was no basis other than the confidential sources, described
merely as three ex-employees of Baxter and two consultants, for a strong inference that
the subsidiary had failed to conceal the fraud from its parent and thus that the
management of the parent had been aware of the fraud during the period covered by the
complaint."  Id. at 712.  Here, however, as in Makor, the confidential sources "are
numerous and consisted of persons who from the description of their jobs were in a
position to know at first hand the facts to which they are prepared to testify."  Id.

continue...

Moreover, the "Background" allegations regarding the Confidential Witnesses are sufficient under the PSLRA.  First, the allegations attributed to Confidential Witnesses are not plead as being "on information and belief."  Therefore, the Complaint need not satisfy the requirement imposed by 15 U.S.C. § 78u-4(b)(1) that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  Florida State Bd. Of Admin. v. Green Tree Financial Corp., 270 F.3d 645, 667 (8th Cir. 2001).  Second, if such allegations pertain to scienter, "each fact supporting the inference of scienter [must] be stated with particularity."  Id.  Third,

> [i]f the shareholders' attorneys do not have a factual basis for [these]
> allegation[s], they will be subject to Rule 11 sanctions.  Therefore, there is
> already a mechanism in place to deter and punish fabrication.
> Consequently, there is no need for the name of the [Confidential Witness]
> to be pleaded in the complaint, although it appears it will soon have to be

---

[8]...continue
Although "[i]t would be better were the informants named in the complaint," as many circuits have ruled, "the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions."  Id.  Moreover, until Minneapolis Firefighters' Relief Ass'n, the Eighth Circuit addressed allegations by confidential witnesses without flatly discounting or ignoring them, e.g., In re Hutchinson Technology, Ins. Sec. Litig., 536 F.3d 952, 957-58 (8th Cir. 2008), and the panel in Minneapolis Firefighters' Relief Ass'n did not mention, much less distinguish, any of those decisions, such as Florida State Board of Administration v. Green Tree Financial Corporation, 270 F.3d 645, 667-68 (8th Cir. 2001).  As the Seventh Circuit explained, it agrees with the other circuits–including the Eighth Circuit–that "it would be too much to require plaintiffs to provide 'name, rank, and serial number' for each of" any confidential sources on which a complaint relies.  Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.2d 588, 596 (7th Cir. 2006), vacated in part on other grounds, 551 U.S. 308 (2007) (scienter standard).  Although plaintiffs must "describe their  sources with sufficient particularity 'to support the probability that a person in the position occupied by the source would possess the information alleged,'" any "bright line rule obliging the plaintiffs to reveal their sources has the potential to deter informants from exposing malfeasance."  Id.

disclosed under [Rule 26] if the shareholders intend to make use of it.

Id. at 668.

Here, the Complaint includes allegations based on information derived from fifteen

"Confidential Witnesses," which the Complaint describes as former employees of STJ

whose information is

> reliable and credible because: (a) each of the witnesses worked at STJ
> during or immediately prior to the Class Period; (b) each witness stated that
> she/he had personal knowledge of the information provided; (c) the
> witnesses' job titles and responsibilities show that they had personal
> knowledge of the information provided; (d) the witness accounts
> corroborate one another; and (e) the witness accounts are corroborated by
> other information alleged herein.

(Doc. No. 23, ¶ 23.)  And, in fact, the Complaint includes, for each CW, their job title,

and the time frame of their employment with STJ.  In addition, it usually identifies their

particular employment responsibilities.  (Id. ¶¶ 24, 26, 28, 30, 31, 32, 33, 34, 36, 37, 38.)[9]

As discussed above, the PSLRA requires that the Complaint support a "strong

inference" of scienter, a standard that the Supreme Court has construed to require a

showing–based on a comparative consideration of all of the relevant allegations

together–that a "reasonable person would deem the inference of scienter cogent and at

least as compelling as any opposing inference one could draw from the facts alleged."

Tellabs, 551 U.S. at 324.  But again, the requisite inference "need not be irrefutable, *i.e.*,

---

[9]     Defendants purport to have identified one of the Confidential Witnesses and
submit the Affidavit of Sherry Ashford, contending that the Complaint has
misrepresented her recollections.  (Doc. No. 38, at 13-14.)  This Court doubts the
propriety of addressing the factual accuracy of an affidavit on a Rule 12(b)(6) motion.  At
this juncture, the Court will simply ignore the few allegations attributed solely to that
witness.

of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" Id.

Defendants argue that "the more compelling inference–the only reasonable one to be drawn–is of innocent and appropriate business practices." (Doc. No. 52, at 14.) But taking the allegations of scienter as a whole, this Court concludes that the inference of fraudulent conduct that may be drawn from the Complaint satisfies the Tellabs requirement that it be as least as compelling as any opposing inference of non-culpable conduct with respect to Starks and Heinmiller, but not with respect to Fain and Rousseau.

Defendants first contend that "Plaintiffs attempt to pass off vague statements from hindsight analyses of 3Q09 events as evidence of specific, contemporaneous knowledge that forecast earnings could not be attained." (Doc. No. 52, at 14.) Defendants highlight the January 2010 research report made by William Blair & Co., L.L.C.–and quoted in paragraph 116 for the proposition that STJ's management knew in early 2009 that its customers were engaged in ongoing "inventory destocking"–to argue that it does not support any inference "that Defendants knew months earlier that 3Q09 earnings would disappoint," and that it "is nothing more than a restatement of adverse conditions that Defendants themselves disclosed during the putative Class Period." (Id. at 14-15.)

But paragraph 116 is in the "Damages, Loss Causation and Reliance" section of the Complaint. Plaintiffs apparently are not relying on the allegations of paragraph 116 to establish an inference of scienter. Rather, Plaintiffs rely on the William Blair report as evidence that the disappointing 3Q09 results and lowered FY 09 expectations were not, as Defendants claimed at the time, "caused by a sudden or unexpected change in hospital

purchasing behavior," but rather by conditions impacting STJ all year that "had been concealed from investors by defendants' publication of unsupported guidance and misleading sales reports."  (Doc. No. 23, ¶ 116).

Defendants also focus on the Complaint's citation of a Summer Street Research Partners report in paragraph 103 to support their "hindsight" defense.  (Doc. No. 52, ¶ 15.)  With respect to the research report, the Complaint alleges that

> Defendants knew, at the time these statements [of September 2009] were made, that end-of-quarter QPs would not permit the Company to meet its forecast guidance, as reflected in a Summer Street Research Partners analyst report which stated that "STJ management acknowledged that the weakness in ordering patterns became pronounced in the last 2-3 weeks of the quarter, but they are still working on a root-cause analysis.  We remain cautious of blaming the economy or the overhang for this surprising miss."

(Doc. No. 23, ¶ 103.)  Defendants assert that "Plaintiffs claim this statement shows that Mr. Heinmiller was aware that earnings guidance could not be achieved when he spoke at investor conferences on September 10 and 15."  (Doc. No. 52, at 15.)  Defendants argue, however, that because three weeks before the third quarter ended on October 3, 2009 was September 12, 2009, the weakness in the ordering pattern began no earlier than September 12, that is "*after* Heinmiller's September 10 statements."  (Id. at 16.)  Thus, Defendants contend, Plaintiffs' Complaint alleges only "fraud by hindsight" that the PSLRA was intended to preclude, because Plaintiffs' theory only supports the claim that the "pattern was discernible after the fact."  (Id.)

Defendants appear to misconstrue Plaintiffs' Complaint, if not also the "fraud by hindsight" problem.  The scienter requirements of the PSLRA require that a plaintiff

allege facts that a defendant knew (or recklessly disregarded facts showing) that his or her statement was false when made, not just that a defendant's statement was later shown to be false. Elam v. Neidorff, 544 F.3d 921, 927 (8th Cir. 2008).   Contrary to Defendants' characterization, Plaintiffs' Complaint alleges that on September 10, 2009, Heinmiller announced to investors that STJ was "sticking by the guidance that we've given in July," that the recent layoffs of about 200 salespeople were just a "tweak in the way [STJ is] managing [its] business," and that, on September 15, 2009, Heinmiller reaffirmed STJ's ability to continue its growth rate.  (Doc. No. 23, ¶¶ 98-102.)  Moreover, the Complaint does not allege that the undisclosed weakness in STJ's sales *first* occurred only in the last two or three weeks of the third quarter–that is, after Heinmiller's September 2009 statements, but rather that "*[a]s early as 2008*, STJ's internal forecasts indicate that the sales of STJ's CRM devices through 2009 were trending downward, and hospitals were telling STJ that they were going to be unable to continue engaging in bulk sales," and that "[a]t the time of Heinmiller's statements, weakening market conditions were impacting STJ's sales operations, and internal forecasting numbers showed that the effects would only worsen."  (Id. ¶ 103 (emphasis added).)  Moreover, the analyst report quoted in the Complaint does not allege that the weakness *began* two to three weeks before the end of the quarter, but rather states that STJ acknowledged that the weakness in orders "*became pronounced* in the last 2-3 weeks of the quarter."  (Id. (emphasis added).)  In sum, Plaintiffs' theory is not that Defendants erroneously failed to predict the future.

Next, Defendants dispute the validity of, as well as the satisfaction here of, the

"core business theory."  (Doc. No. 52, at 16-17.)  Plaintiffs argue that the "importance of QPs to STJ's ability to meet forecast estimates, and the fact that QPs were managed by a specialized group of senior representatives working out of STJ's corporate headquarters, also supports an inference that each of the Individual Defendants were aware of those transactions and the sales practices that the Company was using to induce customers to agree to make them."  (Doc. No. 45, at 44.)

The Eighth Circuit has deferred on deciding "whether the core operations approach can be utilized to plead scienter," but ruled that if that approach is warranted, it requires factual allegations that the relevant information "was known within the company at that time."  Elam v. Neidorff, 544 F.3d 921, 929 (8th Cir. 2008).  A plaintiff relying on that theory must show, with all requisite particularity, that the critical facts were actually known within the company, not just speculate that "this information must have existed and must have been known."  Id. at 930.

The Court first observes that Plaintiffs' scienter argument does *not* rely solely on the "core business theory" approach.  Plaintiffs also rely on the allegations that the Individual Defendants and other STJ supervisory and managerial personnel had actual knowledge–based on sales and forecasting software and reports from the sales force–that the guidance STJ was offering the public could not be supported by the actual data of genuine sales.  (Doc. No. 23, ¶¶ 78, 80, 82, 88, 92, 100, & 103.)

In any event, after a thorough review of the Complaint and the parties' respective arguments, this Court is satisfied that Plaintiffs have alleged, with sufficient particularity,

that the critical facts regarding QPs, channel-stuffing, and STJ's accounting for sales were known within STJ, such that this core business information could be imputed to the Individual Defendants.  (E.g., Doc. No. 23, ¶¶ 46, 52, 59, 63, 65 & 66.)  Defendants attempt to minimize the relevance of their alleged sales and accounting practices with respect to the CRM products at issue by noting that "Plaintiffs readily admit that the CRM division" is "one of only four divisions" at STJ.  (Doc. No. 52, at 19.)  But as the Complaint alleges, "CRM devices" account "for approximately 60% of the Company's sales."  (Doc. No. 23, ¶ 40.)  Moreover, the CRM division appears to have been the main focus of STJ at the time, as STJ sought continuing growth in that market relative to the other two companies that dominated that field.  (Id. ¶¶ 42-44.)

Defendants next attack Plaintiffs' allegations regarding the software program that the Complaint alleges STJ adopted in the wake of an earlier forecasting error, the ForecastPro system.  (Doc. No. 52, at 19-20.)  Defendants characterize the Complaint as alleging that ForecastPro "possessed the magical power to predict sales with consistent 98 percent accuracy" but ignoring that the program "is an off-the-shelf software program that has been around since 1997" and has never been implicated in any prior securities fraud or other legal action.  (Id.)

But Plaintiffs are not alleging that the program was somehow defective, such that it should have been the subject of earlier litigation.  Nor is the fact that the software is "an off-the-shelf" program, much less a dated one, of any relevance here.  The Complaint alleges that "defendants issued guidance that was deliberately inflated from STJ's internal

financial forecasts," because STJ continued to rely on its "historic and unreliable" "top-down" method of basing forecasts on management's sales goals, rather than the "highly accurate statistical forecast model" generated by the software at issue.  (Doc. No. 23, ¶ 5.) In the wake of "significant earnings miss in 2007," Starks told STJ employees "that it was his 'number one objective' to improve the accuracy of STJ's forecasting methods."  (Id. ¶ 63.)  Accordingly, STJ developed "a new computer-based forecasting methodology based on Forecast Pro software."  (Id.)  The new system "quickly proved to be much more reliable than the Company's historical qualitative approach to forecasting based on mandated predictions of sales results" and was "particularly accurate in predicting sales results within the U.S."  (Id. ¶ 64.)

The Complaint further alleges that STJ's management rejected the new system's forecasts in favor of the higher results that "they wanted to present to the Street."  (Id.) Based on that "consistent" difference in results, one of the Confidential Witnesses asked his or her supervisor "whether the forecasts were being provided to management." (Id. ¶ 65.)  That employee also "told Rousseau that the forecasts provided to the Street were unsupported by ForecastPro's analysis," but "senior management" "continued to rely on STJ's historical forecasting method to support guidance given to the Street."  (Id.)  "To make up the difference, . . . STJ continued pushing its largest customers to take additional CRM devices they didn't need through end-of-quarter bulk sales negotiated at substantial discounts under its QPs program."  (Id.)

Defendants further contend that Plaintiffs admit that "they have no clue how" this

employee (along with another Confidential Witness) "arrived at the software's supposed

98 percent accuracy rate," and that they "cap [this] failure . . . with the additional failure

to plead *what* the 'true' forecast was that the software was supposed to have generated for

3Q09." (Doc. No. 52, at 20.) But Plaintiffs simply argue that

> Defendants' quibble that the Complaint does not plead how these
> percentages were calculated misses the point. The numbers reflect what the
> witnesses learned during their employment. Regardless of how STJ
> determined the rates, the basic point remains the same – the computer
> model was significantly more accurate than the historic method, yet
> Defendants consistently ignored the former and relied on the latter in
> providing financial guidance to investors.

(Doc. No. 45, at 36.) The Confidential Witnesses at issue were, respectively, "a Senior

Financial Analyst from 2006 to August 2008" who "was involved in developing revenue

forecasting methodologies," and "a Senior Marketing Manager and then . . . a Regional

Sales Manager" "tasked with improving STJ's CRM sales forecasting methodologies for

its internal forecasts reflecting the sales goals the Company hoped to achieve within a

given period." (Doc. No. 23, ¶¶ 31, 32.) Although the PSLRA imposes certain

heightened pleading standards, it does not require a securities fraud plaintiff to prove its

case in the Complaint. Discovery–generally "stayed during the pendency of any motion

to dismiss" under the PSLRA, 15 U.S.C. § 78u-4(b)(3)(B)–remains to begin.

Finally, Defendants argue that Plaintiffs have not established the requisite "strong

inference" of scienter based on the Complaint's "allegations regarding layoffs, a stock

buyback program, and GAAP violations." (Doc. No. 52, at 24.)[10] That "Plaintiffs cite no

---

[10]     The Court largely agrees with Defendants' other remaining scienter
                                                                              continue...

case in which a reduction in force or a repurchase of company stock has been held to show fraudulent intent" is not only irrelevant here, but also wide of the mark.  Plaintiffs do not allege that the 2009 layoffs themselves support an inference of scienter, but rather that the unannounced substantial layoffs of salespeople–while STJ was publicly reiterating its revenue and earnings forecasts and its growth rate–contributes to an inference of scienter that Defendants fraudulently represented STJ's earnings.  (Doc. No. 23, ¶¶ 99, 100.)

Similarly, Defendants also miss the mark when they argue that "spending $49 million [to layoff numerous employees] and decimating the sales force" is no way to "artificially *inflate* 3Q09 financial results."  (Doc. No. 52, at 24.)  Incurring such costs–presumably in order to save more in the long-run, as the necessary consequence of declining sales that the company is not revealing while it maintains its public growth and revenue guidance–thus does not support innocent motivations.

Finally, with respect to the alleged GAAP violations, Defendants' arguments again fail to accurately represent the Plaintiffs' allegations.  Defendants first attempt to shoehorn the allegations of Plaintiffs' Complaint into the facts at issue in Ceridian in order to argue that the individual alleged violations are not linked to any of the Individual Defendants.  (Doc. No. 52, at 24-25.)  But the accounting problems alleged here are of a

_____

[10]...continue
argument–that regarding the Individual Defendants' stock sales during the Class Period. Without any context into which the Court may place those sales in order to determine whether they were "unusual," the Court may not base any inference of scienter on such sales.

nature different than those <u>Ceridian</u> concerned:

> "a sprawling jumble of a securities-fraud action . . . based on dozens, if not hundreds, of accounting errors–errors of many different types committed by many different employees over many different years."

542 F.3d 240, 245 (8th Cir. 2008) (quoting district court's decision).  Here, the allegations of GAAP violations are much more focused–centering on the proper methods for accounting for end-of-quarter bulk sales, rebates, the replacement of "stale" products, and purported "sales" that were in fact only consignments (Doc. No. 23, ¶ 120) –and the particular violations at issue dove-tail with the general thrust of the Complaint–that is, that STJ manipulated its earnings by inappropriately front-loading sales.

 With respect to STJ's sales-tracking software, Defendants argue that "the mere fact that certain data are not entered into an available data management system does not automatically give rise to a 'manipulation,'" and that "Plaintiffs fail even to plead that there was a failure to enter the data," but only that it was not entered immediately and without specifying the length of the delay.  (Doc. No. 52, at 25.)  But again, Defendants' attempt to isolate specific allegations fails to consider the nature and context of the fraud Plaintiffs allege.  Plaintiffs' theory is that STJ misled investors by issuing earnings and growth forecasts that were not supported by STJ's sales and accounting practices, primarily an unjustifiable and unsustainable "front-loading" of purported sales.  (Doc. No. 23, ¶¶ 2, 45.)

 Defendants further contend that "Plaintiffs contradict themselves" because while the Complaint alleges that "the timely entry of data [into the Siebel system] was

important 'so that the sales personnel were aware of when [CRM devices] . . . needed to be swapped out," it also alleges "that *not* entering the data was key to keeping the swaps secret." (Doc. No. 52, at 25.) This argument misunderstands the gravamen of Plaintiffs' Complaint. Plaintiffs' claim that Defendants misused the Siebel system to hide the reality of their QP sales. The Complaint alleges that the Siebel system was deployed to facilitate "the timely and accurate reporting of sales information by sales personnel," but that corporate account managers failed to enter QP sales in a timely fashion in order to manipulate the sales data. (Doc. No. 23, ¶¶ 51, 52.) This is no contradiction.

As the Court already has concluded, at least several of the statements at issue were false and misleading. The question then becomes which of two competing inferences is more likely: "One is that the company knew (or was reckless in failing to realize . . .) that the statements were false, and material to investors. The other is that although the statements were false and material, their falsity was the result of innocent, or at worst careless, mistakes at the executive level." Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 707 (7th Cir. 2008).

Of the four Individual Defendants, the Court finds that Plaintiffs have alleged sufficient facts to establish a strong inference of scienter with respect to Starks and Heinmiller, but not with respect to Fain or Rousseau. With respect to Starks (STJ's Chairman, President and CEO), and Heinmiller (STJ's CFO and Executive Vice President), the Complaint alleges that both "prepared or authorized and signed STJ's SEC filings" and SOX certifications, "prepared or authorized the press releases" at issue, and

"participated in or directed STJ's conference calls" in which the allegedly false statements were made.  (Doc. No. 23, ¶¶ 18, 19.)  Most importantly, all of the statements that the Complaint identifies as allegedly false are attributed either to Starks or to Heinmiller or both.  (Id. ¶¶ 70, 73, 74, 76, 81, 85, 86, 90, 91, 98, 99, 101, 102.)

With respect to the latter two Individual Defendants, the Complaint simply alleges that each "helped prepare for and participated in each of the quarterly conference calls . . . in which false statements were made."  (Doc. No. 23, ¶¶ 20, 21.)  There are no allegations that either participated in any of the press releases at issue, or that they contributed to or signed off on any of the SEC filings or SOX certifications.[11]  Although the Complaint alleges that "each" of the Individual Defendants "participated" in certain conference calls (Doc. No. 23, ¶¶ 72, 84), such generalized allegations do not satisfy the PSLRA.  More importantly, *none* of the particular statements addressed in the section delineating the "Materially False And Misleading Statements and Omissions" is attributed either to Fain or to Rousseau.  (Id. ¶¶ 69-103.)  On these facts (taken as true where sufficiently plead),

---

[11]     The "group pleading doctrine" might suffice to keep Fain and Rousseau on the hook.  See In re Nash Finch, 502 F. Supp. 2d at 877-78.  The doctrine is "a judicial presumption that statements in group-published documents including annual reports and press releases are attributable to officers and directors who have day-to-day control or involvement in regular company operations."  Makor Issues & Rights, Ltd., 513 F.3d at 710.  The Eighth Circuit apparently has not yet ruled on its validity.  Hutchinson, 536 F.3d at 961 n.6 (noting it "need not consider the issue of whether this doctrine survived the PSLRA or whether the doctrine applies" in that case).  But as the Seventh Circuit concluded, the doctrine cannot survive the PSLRA's references to "the defendant" with respect to scienter–that the complaint must "state with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind"–such that while allegations may be aggregated "to determine whether [the complaint] creates a strong inference of scienter, plaintiffs must create this inference with respect to each individual defendant in multiple defendant cases."  Makor Issues & Rights, Ltd., 437 F.3d at 602-03.

the Court cannot conclude that the Complaint's allegations support liability under Section 10(b) and / or Rule 10b-5 for Fain or Rousseau.[12]

Weighing the competing inferences with respect to Starks and Heinmiller, in contrast, the Court notes that Defendants merely offer the generic explanation that their conduct and statements reflect business tactics that are "common, appropriate, and even necessary practice[s] to compete in the market for medical devices."  (Doc. No. 38, at 8; accord Doc. No. 52, at 25 (asserting that the "undisputed facts" support "the innocent inferences" more than Plaintiffs' claims).)  The Court recognizes that practices such as channel stuffing are not necessarily fraudulent.  But it is also obvious that a company cannot engage in channel stuffing, quarter after quarter, in a deteriorating economic environment while also claiming that it will maintain its growth and revenue rates–sooner or later, a company's customers can no longer absorb a quantity of products beyond what the market demands.

Thus, it is not difficult to draw the inference that a company's management could intentionally engage in such practices in order to front-load sales from the future to the present quarter and thereby artificially inflate quarterly earnings, at least in the near term.  Or perhaps management simply hoped that such a company expected the overall market, or that company's share of the market, to grow fast enough to absorb the excess inventory.  But see Makor Issues & Rights, Ltd., 513 F.3d at 710 ("The fact that a gamble–concealing bad news in the hope that it will be overtaken by good news–fails is

---

[12]     The Complaint also alleges, however, that they are liable as "control persons" under Section 20 of the Exchange Act.  See infra Section II.C.

not inconsistent with its having been a considered, though because of the risk a reckless, gamble.").  On the other hand, such a hope, perhaps myopic even in the best of economic times, might simply be untenable in the deteriorating economic conditions from late 2008 through 2009.  In sum, taking the well-pled allegations at face value, the Court cannot conclude at this juncture that an innocent inference outweighs an inference of culpable conduct by Starks and Heinmiller.  Such questions remain for discovery and beyond.

This conclusion also controls the issue of scienter with respect to the corporate Defendant itself, St. Jude.  "To establish corporate liability for a violation of Rule 10b-5 requires 'look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'"  Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 708 (7th Cir. 2008).  This is simply an application of the general rule that "[a] corporation is liable for statements by employees who have apparent authority to make them."  Id.  "[T]he doctrines of respondeat superior and apparent authority remain applicable to suits for securities fraud."  Id.  Because this Court has found that the Complaint alleges sufficient facts to support a strong inference of scienter with respect to at least some of the Individual Defendants, the requisite showing may be imputed to STJ itself.  E.g., In re St. Paul Travelers Sec. Litig., 2006 WL 2735221, *4 n.3 (D. Minn. Sep. 25, 2006) ("The scienter of senior executives can be imputed to the corporate

defendants.").

### 3.    Loss Causation

Finally, Defendants challenge the sufficiency of the Complaint's allegations of

loss causation.  (Doc. No. 38, at 37.)  "To adequately plead loss causation, the complaint

must state facts showing a causal connection between the defendant's misstatements and

the plaintiff's losses."  McAdams v. McCord, 584 F.3d 1111, 1114 (8th Cir. 2009).

Unlike the elements of material misrepresentations and scienter, which are subject to

heightened pleadings standards imposed by the PSLRA, the pleading of loss causation is

subject only to "the simple test" of Rule 8(a)(2)'s requirement of a short and plain

statement of the claim.  Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 346 (2005)

(assuming "that neither the Rules nor the securities statutes impose any special further

requirement in respect to the pleading of proximate causation or economic loss").[13]  "[I]t

should not prove burdensome for a plaintiff who has suffered an economic loss to provide

a defendant with some indication of the loss and the causal connection that the plaintiff

has in mind."  Id. at 347.  Alleging loss causation "'is not a probability requirement . . . it

simply calls for enough facts to raise a reasonable expectation that discovery will reveal

evidence of loss causation.'"  In re Retek Inc., 621 F. Supp. 2d 690, 701 (D. Minn. 2009)

(quoting In re Gilead Sci. Sec. Litig., 536 F.3d 1049, 1057 (9th Cir. 2008)).

"Loss causation in a securities fraud case is analogous to the common law's

_____

[13]     The PSLRA addresses loss causation, but simply provides that "the plaintiff
shall have the burden of proving that the act or omission of the defendant alleged to
violate this chapter caused the loss for which the plaintiff seeks to recover damages."  15
U.S.C. § 78u-4(b)(4).

requirement of proximate causation." <u>McAdams</u>, 584 F.3d at 1114.  A plaintiff "must

show 'that the loss was foreseeable *and* that the loss was caused by the materialization of

the concealed risk.'"  <u>Id.</u>  As the Supreme Court has explained, a reduced stock price

"may reflect, not the earlier misrepresentation, but changed economic circumstances,

changed investor expectations, new industry-specific or firm-specific facts, conditions or

other events, which taken separately or together account for some or all of that lower

price." <u>Dura Pharmaceuticals, Inc.</u>, 544 U.S. at 342-43.[14]  Plaintiffs thus must "show that

the defendant's fraud–and not other events–caused the security's drop in price." <u>Schaaf</u>

<u>v. Residential Funding Corp.</u>, 517 F.3d 544, 550 (8th Cir. 2008).

Here, Defendants argue that Plaintiffs have failed to plead facts showing "that any

of the alleged false statements actually caused the October 6, 2009, drop in St. Jude's

stock price."  (Doc. No. 38, at 38.)  As Defendants elaborate, Plaintiffs have not plead any

facts showing that "the market has ever questioned St. Jude' revenue recognition policies

or the accuracy of St. Jude's audited financial results for 2008 or 2009."  (<u>Id.</u>)

Defendants also argue that "with respect to St. Jude's sales and earnings guidance,

Plaintiffs have failed to identify any corrective disclosure of the alleged concealed truth.

The mere announcement of disappointing earnings cannot serve as a corrective

disclosure."  (<u>Id.</u> at 39.)  Finally, Defendants assert that even if the October 6, 2009

---

[14]      The Court rejected the argument that a plaintiff may satisfy its loss-
causation requirement simply by pleading that the stock price "'*on the date of purchase*
was inflated because of the misrepresentation.'"  <u>Id.</u> at 338.  In a fraud-on-the-market
case, "[a]n inflated purchase price will not itself constitute or proximately cause the
relevant economic loss."  <u>Id.</u> at 342.  Rather, a plaintiff must then show that revelation of
the fraud "deflated" that price.

announcement of STJ's earnings miss could serve as a corrective disclosure, "Plaintiffs plead no facts to show that the market interpreted the announcement as demonstrating the falsity of St. Jude's earlier statements."  (Id.)

In response to Defendants' motion, Plaintiffs argue that "investors were misled by Defendants' concealment of declining demand for STJ's devices caused by its prior shipment of excess inventory to customers and the impact of an ongoing economic recession," which concealment inflated the price of STJ's stock until STJ missed its 3Q09 guidance.  (Doc. No. 45, at 56.)  "The resulting stock drop on October 6, 2009, therefore is alleged to have been caused by the manifestation of risks that were concealed during the Class Period."  (Id. (citing paragraphs 108 through 110 of the Complaint).) "Subsequent disclosures revealed the extent to which those concealed risks and conditions had caused the 3Q09 earnings miss and resultant economic injury to Plaintiffs."  (Id. (citing paragraphs 111 through 119 of the Complaint).)  The Complaint alleges that

> [c]ontrary to defendants' claims in the October 2009 press releases and on the 3Q09 conference call, the disappointing 3Q09 results and lowered FY09 expectations were not caused by a sudden or unexpected change in hospital purchasing behavior.  Instead, those disclosures were caused by and reflected conditions that had been impacting the Company all year, but had been concealed from investors by defendants' publication of unsupported guidance and misleading sales reports that relied on undisclosed end-of-quarter QPs, rebates and product swaps that created the appearance of greater demand for STJ's products than actually existed.

(Doc. No. 23, ¶ 116.)

Defendants contend that the sole "corrective" disclosure on which Plaintiffs rely,

the 3Q09 earnings announcement, pertains "only to the results of that period," not any

"supposed '*prior* shipment of *excess* inventory,'" much less "improper accounting, secret

return agreements, or any other element of Plaintiffs' fraud theory."  (Doc. No. 52, at 26.)

Finally, Defendants contend that Plaintiffs may not now assert that the 3Q09 earnings

announcement "revealed an unrelated fraud," because the Complaint "affirmatively

allege[s] that the market understood St. Jude's earnings announcement as revealing a loss

of market share."  (Id. at 27 (citing Complaint, ¶¶ 117, 119).)

This Court does not read the Complaint to allege that the market understood that

announcement as revealing a loss of market share.  Rather, it alleges that analysts

questioned STJ's claim that the miss was "due to a sudden or unexpected change in

hospital stocking procedures" because STJ's two main rivals had not noted any

comparable customer behavior.  (Doc. No. 23, ¶ 117.)  The fact that one analyst thus

speculated that STJ was "likely failing to take market share" does not define (or confine)

Plaintiffs' theory of fraud.  Moreover, Defendants' emphasis on the fact that the October

6, 2009 preliminary announcement of STJ's 3Q09 results and the expected 3Q09 earnings

miss did not expressly "correct" the details of STJ's practices such as channel stuffing is

not persuasive.  Granted, the October 6, 2009 announcement identifies "one factor" as "a

slowdown in hospital stocking of certain medical devices"–which Starks attributed to

"macro economic factors coupled with the continued pressures surrounding healthcare

reform."  (Doc. No. 23, 109.)  But the fact that Starks thereby did not "correctively

disclose" the particular practices that Plaintiffs allege, largely channel stuffing

accompanied by misleading accounting for such sales, does not warrant dismissal on a

Rule 12(b)(6) motion for failure to adequately plead loss causation.

"Since <u>Dura</u>, courts . . . have found loss causation satisfied, at least at the pleading

stage, by allegations that the plaintiff bought securities at a price artificially inflated by a

defendant's misrepresentations, and that the price dropped once the truth was revealed."

<u>In re Motorola Sec. Litig.</u>, 505 F. Supp. 2d 501, 538 (N.D. Ill. 2007), <u>abrogated in part on</u>

<u>other grounds</u>, <u>Merck & Co., Inc. v. Reynolds</u>, 130 S. Ct. 1784 (2010) (notice for

purposes of statute of limitations).  What Defendants contend is required here to survive

their motion to dismiss is the type of specificity that the *Motorola* court found that *Dura*

does *not* require.

> Rather than speaking in terms of a single event in which all is revealed, the
> *Dura* court referred to a hypothetical loss that might occur "after the truth
> makes its way into the market," and the lack of any such loss if the investor
> sells "before the relevant truth begins to leak out.  This language suggests
> that a disclosure sufficient to satisfy loss causation can occur in ways other
> than an announcement that points directly to a previous representation and
> proclaims its falsity.

<u>Id.</u> at 540.  As the *Motorola* court elaborated, to establish loss causation, a plaintiff is not

confined to only "showing a corrective disclosure that both identifies a specific prior false

representation and 'calls [it] into question.'"  <u>Id.</u> at 542.  Thus, the court did "not read

*Dura* to imply that a plaintiff cannot satisfy loss causation without identifying a

corresponding, mirror-image prior representation for every disclosure that precedes a

share price decline."  <u>Id.</u> at 544.

Although, as Defendants note, an earnings warning itself does not disclose fraud

(Doc. No. 52, at 26), the *Motorola* court–cognizant of this principle–concluded that

> a securities fraud plaintiff is not necessarily precluded from establishing
> loss causation where a corrective disclosure does not, on its face,
> specifically identify or explicitly correct a previous representation, or
> expressly disclose the particular fraudulent scheme the plaintiff alleges.

505 F. Supp. 2d at 546.  Here, as in In re Retek Inc. Securities, the ultimate chain of

causation might be "long and somewhat tortured," 2005 WL 3059566 (D. Minn. Oct. 21,

2005) (denying motion to dismiss), but at the pleading stage Plaintiffs have alleged

enough to provide Defendants with "'notice of what the relevant loss might be or of what

the causal connection might be between that loss and the misrepresentation,'" 621 F.

Supp.2d 690, 701 (D. Minn. 2009) (contrasting motion-to-dismiss standard with

summary-judgment standard) (quoting Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S.

336, 347 (2005)).

### C.     Count II:  The Section 20(a) Claim

In Count II of the Complaint, Plaintiffs allege the Individual Defendants were

controlling persons of STJ, and that STJ itself "controlled each of the Individual

Defendants and all of its employees," such that they are liable under Section 20(a) of the

Exchange Act of 1934.  (Doc. No. 23, ¶ 195.)  Under Section 20(a) of the Exchange Act,

"[e]very person who, directly or indirectly, controls any person liable" under Section

10(b) and Rule 10b-5 "shall also be liable jointly and severally with and to the same

extent as such controlled person is liable."  15 U.S.C. § 78t.  In short, the statute generally

subjects to liability "those who, subject to certain defenses, 'directly or indirectly' control

a primary violator of the federal securities laws."  Lustgraaf v. Behrens, 619 F.3d 867,

873 (8th Cir. 2010).

To meet the statutory standard, "a plaintiff must prove: (1) that a 'primary violator' violated the federal securities laws; (2) that 'the alleged control person actually exercised control over the general operations of the primary violator'; and (3) that 'the alleged control person possessed–but did not necessarily exercise–the power to determine the specific acts or omissions upon which the underlying violation is predicated.'" Id.  At the pleading stage, to state a claim under Section 20(a), a plaintiff must plead "'(1) an alleged control person actually exercised control over the general operations of the primary violator; and (2) the alleged control person possessed but did not necessarily exercise the power to determine the specific acts or omissions upon which the underlying violation is predicated.'"  Cummings v. Paramount Partners, LP, 715 F. Supp. 2d 880, 907 (D. Minn. 2010) (quoting In re Retek, 621 F. Supp. 2d 690, 709 (D. Minn. 2009)).  A Section 20(a) claim, however, "'is not subject to the heightened pleading standards of either the Reform Act or Fed. R. Civ. P. 9(b).'"  Id. (citation omitted).

A claim under Section 20(a) for control person liability is thus derivative of a primary claim, that is, "[c]ontrol-person claims are predicated on plaintiffs first establishing that a controlled person was a primary violator."  Id.; accord In re Hutchinson Technology, Ins. Sec. Litig., 536 F.3d 952, 957-58 (8th Cir. 2008) ("[A] Section 20 claim is derivative and requires an underlying violation of the 1934 Act.").  The failure to satisfactorily plead a Section 10(b) / Rule 10b-5 claim thus also precludes a Section 20(a) claim.  E.g., Lustgraaf v. Behrens, 619 F.3d 867, 873 (8th Cir. 2010)

("[A]bsent a primary violation, a claim for control-person liability must fail."); In re

Hutchinson Technology, Ins. Sec. Litig., 536 F.3d at 961.

"Whether an individual is a controlling person is 'an intensely factual question,

involving scrutiny of the defendant's participation in the day-to-day affairs of the

corporation and the defendant's power to control corporate actions.'" Cummings, 715 F.

Supp. 2d at 907. Here, however, Defendants' opposition to the Section 20(a) claim is

confined to the purported failure of the Section 10(b) claim.

Because this Court has concluded that Count I survives Defendants' motion to

dismiss, Plaintiffs' Section 20(a) claim also survives. The Court notes that although it has

found that the Complaint does not support the requisite inference of scienter with respect

to Fain and Rousseau, the Complaint alleges that they are liable not only for primary

violations of Section 10(b) and Rule 10b-5, but also as "control persons."[15] Defendants

do not challenge the allegations that Fain and Rousseau were "control persons."

The Court also notes that the Complaint includes STJ itself, in addition to the

Individual Defendants, as a "control person" subject to liability under Section 20. The

governing definitional section provides that "[t]he term 'person'" includes a "company"

in addition to "a natural person" (among others). 15 U.S.C. § 78c(a)(9). Defendants do

not presently challenge the sufficiency of the allegations that STJ itself was a "control

---

[15]    Finally, Defendants request that if this Court does not dismiss the
Complaint with prejudice, that they be permitted to depose the confidential witnesses.
(Doc. No. 38, at 41.) Defendants provide no authority for such early depositions, and the
PSLRA provides for a stay of discovery pending the resolution of any motion to dismiss.
Defendants shall be able to depose those witnesses soon enough.

person" during the purported Class Period.

## III.    ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendants' motion to dismiss [Doc. No. 36] is **GRANTED IN PART** (insofar as it seeks dismissal of Count I with respect to Defendants Fain and Rousseau) and **DENIED IN PART** (insofar as it seeks dismissal of Count I with respect to Defendants Starks and Heinmiller and insofar as it seeks dismissal of Count II).


Dated:   December 23, 2011                         s/ Susan Richard Nelson
                                                SUSAN RICHARD NELSON
                                                United States District Judge